ACCEPTED
04-15-00606-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
10/30/2015 4:24:52 PM
KEITH HOTTLE
CLERK

**NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
10/30/2015 4:24:52 PM
KEITH E. HOTTLE
Clerk

No. 04-15-00606-CV

# IN THE COURT OF APPEALS
# FOR THE FOURTH DISTRICT OF TEXAS
# AT SAN ANTONIO

**IN RE JAMES DAVID HENRY,**

*Relator.*

Original Proceeding from 2011-CI-11645
Pending in the 150th Judicial District Court, Bexar County, Texas
The Honorable Karen Pozza, Presiding

## RELATOR'S BRIEF IN REPLY TO REAL PARTY IN INTEREST'S RESPONSE

David T. Emory
State Bar No. 06612100
*davidemory@hhzlaw.com*
HIGDON, HARDY, & ZUFLACHT, L.L.P.
12000 Huebner Road, Suite 200
San Antonio, Texas 78230
Telephone: (210) 349-9933
Fax: (210) 349-9988

*Counsel for Relator James David Henry*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.....................................................................................i

INDEX OF AUTHORITIES...............................................................................ii

ARGUMENT & AUTHORITIES ....................................................................1-8

PRAYER...........................................................................................................9

CERTIFICATION.............................................................................................9

CERTIFICATE OF SERVICE.........................................................................10

CERTIFICATE OF COMPLIANCE................................................................11

APPENDIX

    Trial Court Pleadings (MR: 1)......................................................Tab A

    1.   Original Petition in Suit Affecting the Parent-Child Relationship (MR:1-6)

    2.   Citation Directed to Stephanie Suzanne Markell (MR:7-8)

    3.   Respondent's Original Answer (MR:9-10)

    4.   First Amended Petition in Suit Affecting the Parent-Child Relationship (MR:11-16)

    5.   Judge's Notes entered on February 9, 2012 (MR:17-20)

    6.   Order on Motion to Examine Stephanie Suzanne Markell (MR:21-26)

    7.   Order on Motion to Examine Stephanie Suzanne Markell (MR:27-29)

    8.   Request for Writ of Attachment (MR:30-31)

    9.   Return of Service on Stephanie Markell (MR:32)

    10.   Petition for Writ of Habeas Corpus and Motion for Issuance of Writ of Attachment (MR:36-39)

11.    Order for Issuance of Writ of Attachment (MR:40-42)

12.    Judge's Notes entered on April 10, 2012 (MR:43-44)

13.    Notice of Setting on Dismissal Set for
       November 21, 2012 (MR:45-47)

14.    Order Dismissing Causes for the Want of Prosecution (MR:48-61)

15.    Official Notice of Notice of Dismissal
       for Want of Prosecution on December 3, 2014 (MR:62-64)

Reporter's Record of September 16, 2015 (Motion to Transfer With Notice
of Setting, Petition for Further Relief, And
Modify Parent-Child Relationship) (MR:65-150)...........................................Tab B

Case Law & Texas Statutes........................................................................Tab C

# INDEX OF AUTHORITIES

Page(s)

## CASES

*In re Cooper.*, 320 S.W.3d 905 (2010)...............................................4, 5

*In re Nabors*,
   276 S.W.3d 190 (Tex.App—Houston [14th Dist.] 2009, orig. proceeding).......5

*Pinnacle Gas Treating, Inc. v. Read*, 13 S.W.3d 126 (2000)..........................8

*Trader v. Dear*, 565 S.W.2d 233 (Tex.1978)........................................6

*Walker v. Packer*, 827 S.W.2d 833 (Tex.1992)......................................8

## STATUTES

TEX. FAM. CODE ANN. § 155.201...............................................1, 5, 6

No. **04-15-00606-CV**

In Re James David Henry,

Relator

---

**RELATOR'S BRIEF IN REPLY TO REAL PARTY IN INTEREST'S RESPONSE**

---

## ARGUMENT AND AUTHORITIES

Real Party in Interest, Stephanie Markell, is attempting to obscure the issue presented to this Honorable Court against Relator, James David Henry inserting random arguments in avoidance of the real issue: whether Respondent should be ordered to carry out her ministerial, nondiscretionary duty imposed by law under Tex. Fam. Code Ann. § 155.201(b).

### I.

Stephanie Markell claims in her Response that James David Henry had "illegal possession or non-legal custody" of B.A.H., child subject to this suit; however Stephanie Markell position is misplaced. (See Real Party in Interest Response (RPIR) p. 7 para. 2). In Stephanie Markell's Response she claims, "Relator had 'illegal possession' or 'non-legal custody' only because of his wrongful acts in hiding and preventing the mother, Stephanie Markell, from access to her child, B.A.H." (RPIR p. 7 para.2).

1

However, it should be noted, contrary to Stephanie Markell's position, that James David Henry did in fact have the legal right to custody of the minor from an order of the Bexar County Court dated April 5, 2012. On April 5, 2012, the Bexar County District Court granted James David Henry's Order on Motion to Examine Stephanie Suzanne Markell. MR:21. In this Order, the Bexar County District ordered that B.A.H. be removed from Stephanie Markell's home and placed into the custody and control of James David Henry, Stephanie Markell be enjoined from disturbing B.A.H. or James David Henry, and be enjoined from interfering with James David Henry's possession of B.A.H. by taking or attempting to take possession of B.A.H. *Id.*

In fact, on April 9, 2012, James David Henry had to seek further relief from the Bexar County Court in enforcing this order by filing a Petition for Writ of Habeas Corpus seeking a Writ of Attachment commanding Stephanie Markell to return the child to James David Henry. MR:36. At the hearing in which Stephanie Markell was served and appeared the Bexar County Court ordered Stephanie Markell to immediately return the child to James David Henry. MR:40. The Bexar County District Court Ordered the Issuance of the Writ of Attachment on the basis of the evidence and argument of counsel and found it necessary and proper to issue a writ of attachment immediately. *Id.*

2

Additionally, the Judge's Notes entered on April 10, 2012 indicate that Stephanie Markell, appearing in person, was given a copy of the Order for Issuance of Writ of Attachment. MR:43. Since April 5, 2012, James David Henry had the legal right to custody of the minor child until November 21, 2014 when unknown to James David Henry or Stephanie Markell the underlying case had been Dismissed for Want of Prosecution. MR:48. It was not until just recently Stephanie Markell and James David Henry became aware to the dismissal at which time Stephanie Markell sought to travel to Dallas, Texas in an attempt to regain possession of the minor child in the stealth of the night. MR:89. Stephanie Markell and James David Henry both in good faith believed the order of April 5, 2012 granting custody to James David Henry and the ruling from the Bexar County Court granting James David Henry's Writ of Attachment on April 10, 2012 was in full force and effect and both were acting as if the order and the subsequent ruling were valid and the case was still pending. MR:27, 40.

James David Henry, in good faith, acted under the indicia of authority and was not aware of the dismissal until Stephanie Markell took the minor child on August 23, 2015. MR:89. In the alternative and without waiving the above, James David Henry shall show the court that he has had continuance actual, care, custody and control of the minor child since April 10, 2012 and the child has thrived in

3

private school and sports since his move to Midland Texas on April 10, 2012. MR:79, 80, 81, 82, 83, 84.

If there are any facts to show deceitful or wrongful acts by a party, it is when Stephanie Markell snatched B.A.H. in Dallas, Texas without James David Henry's knowledge, and brought B.A.H. to San Antonio, Texas just prior to his private school starting in August. MR:89. Once James David Henry was appointed sole managing conservator of B.A.H., B.A.H.'s life drastically improved psychologically and that school records indicate that B.A.H.'s educational situation had improved. MR:107.

This case and the of *In Re Cooper*, distinguishes the *Huey case* as cited by Stephanie Markell, because, as in *Cooper*, James David Henry did not violate any court order nor acted in bad faith or wrongfully, but rather acted under a legal court orders at the time and subsequently, acted in good faith believing the April 5, 2012 order and the ruling of April 10, 2012 were in full force and effect until August 23, 2015 when the child was snatched by Stephanie Markell in Dallas, Texas. *In re Cooper*, 320 S.W.3d 905, 910 (Tex. App.—Texarkana 2010, no pet.). In *Cooper*, the uncontested evidence established the fact that Cooper did not intend to violate the divorce decree. *Id.* at 908. In fact, Cooper was reasonable in expecting the decree to have been modified to approve her move to Travis County. *Id.* Cooper's conduct in moving can be questioned only in her failure to confirm that the written

4

agreement was actually filed and a modified decree actually obtained. *Id.* at 909. Because there was no evidence Cooper *intentionally* violated the decree's geographical restriction, the trial court could reasonably have reached only one decision. *Id.* (emphasis added) *See Walker,* 827 S.W.2d at 839–40 ("[R]elator must establish that the trial court could reasonably have reached only one decision."). Because Cooper's violation of the divorce decree was not intentional, we are unable to conclude she forfeited the benefit of mandatory transfer. *Id.*

Further, James David Henry testified at the hearing on the motion to transfer on September 16, 2015 that the child's permanent residence was Midland Texas for the prior three and one-half years. MR:77. As in *In re Cooper*, there was no intent by James David Henry to violate the prior decree, or to wrongfully withhold the minor child from Stephanie Markell since both parties were acting under the color of authority from the April 5, 2012 Order and the April 10, 2012 ruling from the Bexar County Court in the granting of the Writ of Attachment. MR:27, 40. The appellate court in *In re Cooper*, saw no reason to deny the mandatory transfer provisions of section 155.201 of the Texas Family Code. *In re Cooper*, 320 S.W.3d 909 citing Tex. Fam. Code Ann. § 155.201.

Further in *In re Cooper* the court stated; "In determining the county of principal residence we focus on elements of permanency for the children which are critical to establishing residency for venue purposes." *Id.* citing *In re Nabors*, 276

5

S.W.3d 190, 193 (Tex.App.-Houston [14th Dist.] 2009, orig. proceeding). The purpose of having a court of continuing jurisdiction is to avoid forum shopping, races to the courthouse, child snatching, and the harassment of a parent by the other parent's filing suits in random courts." *Trader v. Dear,* 565 S.W.2d 233, 235 (Tex.1978) (orig. proceeding). The Texas Legislature has made the choice that, in general, the county of the child's residence is in the best position to determine the "best interests" of the child. This policy is reflected in Section 155.201 of the Texas Family Code. *See* Tex. Fam.Code Ann. § 155.201.

Stephanie Markell is also wrong to infer in her Response that James David Henry "established a pattern of continually secreting B.A.H" from Stephanie Markell by "blocking phone calls and hiding B.A.H." (RPIR p.18 para.3). At the September 16, 2015 hearing, James David Henry testified he blocked Stephanie Markell's phone calls because she continuously called him at work while B.A.H. was at school or home. MR:92. As referenced above, Bexar County District Court ordered that James David Henry have sole managing conservatorship of B.A.H. and limited Stephanie Markell's access, thereby indicating that it was incorrect for Stephanie Markell to assume that James David Henry "hid" B.A.H. MR:27, 28.

6

## II.

Stephanie Markell's argument that the Motion to Transfer Venue required the Movant to set this matter for an evidentiary hearing is exactly what the hearing was on September 16, 2015. (RPIP p.15). The Motion for Transfer and Petition for Further Relief was filed and set for hearing for September 16, 2015. MR:65. James David Henry and Stephanie Markell announced *ready* and were assigned to Judge Karen Pozza sitting for the 150th Judicial District Court of Bexar County, Texas. MR: 70. Stephanie Markell did not seek a continuance or announce to the trial court that she was not ready on the hearing set for the Motion to Transfer Venue. *Id.* Any right to contest or object to the hearing on the Motion to Transfer Venue was waived by both parties. The trial court called the case and without objection proceeded to hear the Motion to Transfer and subsequently the Motion for Further Relief. *Id.* Evidence and argument of counsel was offered on the pending Motion to Transfer Venue and Request for Further Relief. Stephanie Markell's claim that she was denied an evidentiary hearing on the Motion to Transfer Venue is misplaced. (RPIR p.15, 16).

## III.

Stephanie Markell's argument that "findings of fact and conclusions of law are necessary" is misplaced by virtue of the fact that this is an original proceeding mandamus review. (RPIR p.22 para.2). A petition for a writ of mandamus

7

commences an original proceeding that is governed by a set of different rules than the rules governing direct appeals. *Pinnacle Gas Treating, Inc. v. Read*, 13 S.W.3d 126, 127 (Tex. App.—Waco 2000, no pet.) citing Tex. R. App. P. 52. The Texas Supreme Court has held that a writ of mandamus is issued to "compel the performance of a ministerial act or duty" or to "correct a clear abuse of discretion committed by the trial court," and is intended to be an "extraordinary remedy available only in limited circumstances." *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). Given that the inherent nature of a writ of mandamus is to request immediate relief, the guiding principles differ. None of the cases or authority cited by Stephanie Markell relates to an original proceeding in mandamus but are all appellate review cases. The cases and authority Stephanie Markell cites contesting the standard of review are rules that govern appellate proceedings, and are inapplicable to mandamus.

## PRAYER

For these reasons, Relator respectfully request the Court grant a writ of mandamus directing Respondent to vacate the Order Denying the Change of Venue. Relator further prays for all other relief to which it may be entitled at law and in equity.

Respectfully submitted,

**HIGDON HARDY & ZUFLACHT LLP**
12000 Huebner Road, Suite 200
San Antonio, Texas 78230-1210
Tel: (210) 349-9933
Fax: (210) 349-9988

By: _____
**DAVID T. EMORY**
State Bar No. 06612100
Attorney for Relator

## CERTIFICATION

I certify that I have reviewed the reply to response and have concluded that every factual statement made in the petition and reply is supported by competent evidence included in the appendix to Relator's Petition for Writ of Mandamus and Reply to Real Party in Interest Response.

By: _____
**DAVID T. EMORY**

9

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October 2015, a true and correct copy of the foregoing Petition and Reply, including Appendix and hyperlinked materials, is served on Real Parties in Interest through counsel of record and on Respondent as described below:

Via e-mail and e-service:

*Pamela R. Julian*
Law Office of Pamela R. Julian
2420 McCullough Ave., No. 122
San Antonio, Texas 78212


*Attorney for Real Party in Interest*
*Stephanie Markell*

Via U.S. Mail, Certified, RRR:

Hon. Karen Pozza
407th Judicial District Court
Bexar County Courthouse
100 Dolorosa, 4th Floor
San Antonio, Texas 78205


*Respondent*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to TEX. R. APP. P.9.4(i)(3) that this document complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1.      Exclusive of the contents identified by Rule 9.4(i)(1) and inclusive of all textboxes, footnotes, and endnotes, this document contains 2,119 words as counted by the Word Count function of Microsoft Word 2010.

2.      This document has been prepared in proportionally spaced typeface using:

> Software Name and Version: Microsoft Word 2010
> Typeface Name: Times New Roman
> Font Size: 14 point

3.      This filing is labeled with or accompanied by the following information:

a.      Case Style: In re James David Henry Relator

b.      Case Number: 04-15-00606-CV

c.      The Type of Brief: Brief in Reply to Real Party in Interest's Response

By: _____
**DAVID T. EMORY**

No. 04-15-00606-CV

IN RE JAMES DAVID HENRY,

RELATOR

---

**RELATOR'S BRIEF IN REPLY TO REAL PARTY IN INTEREST'S RESPONSE**

---

No. 04-15-00606-CV

---

# IN THE COURT OF APPEALS
# FOR THE FOURTH DISTRICT OF TEXAS
# AT SAN ANTONIO

---

## IN RE JAMES DAVID HENRY,
### *Relator.*

---

Original Proceeding from 2011-CI-11645
Pending in the 150th Judicial District Court, Bexar County, Texas
The Honorable Karen Pozza, Presiding

---

**APPENDIX TO REPLY TO REAL PARTY IN INTEREST'S RESPONSE**

---

Tab

Trial Court Pleadings (MR: 1)................................................................Tab A

1. Original Petition in Suit Affecting the Parent-Child
Relationship (MR:1-6)

2.    Citation Directed to Stephanie Suzanne Markell (MR:7-8)

3.    Respondent's Original Answer (MR:9-10)

4.    First Amended Petition in Suit Affecting the Parent-Child Relationship (MR:11-16)

5.    Judge's Notes entered on February 9, 2012 (MR:17-20)

6.    Order on Motion to Examine Stephanie Suzanne Markell (MR:21-26)

7.    Order on Motion to Examine Stephanie Suzanne Markell (MR:27-29)

8.    Request for Writ of Attachment (MR:30-31)

9.    Return of Service on Stephanie Markell (MR:32)

10.   Petition for Writ of Habeas Corpus and Motion for Issuance of Writ of Attachment (MR:36-39)

11.   Order for Issuance of Writ of Attachment (MR:40-42)

12.   Judge's Notes entered on April 10, 2012 (MR:43-44)

13.   Notice of Setting on Dismissal Set for November 21, 2012 (MR:45-47)

14.   Order Dismissing Causes for the Want of Prosecution (MR:48-61)

15.   Official Notice of Notice of Dismissal for Want of Prosecution on December 3, 2014 (MR:62-64)

Reporter's Record of September 16, 2015 (Motion to Transfer With Notice of Setting, Petition for Further Relief, And Modify Parent-Child Relationship) (MR:65-150)..............................................Tab B

Case Law & Texas Statutes........................................................................Tab C

# Tab A

2011CI16579 -P00001

Filed
11 October 12 P1:39
Donna Kay McKinney
District Clerk
Bexar District
Accepted by
Cecilia Barbosa

NO. 2011 CI 16579

IN THE INTEREST OF

BRYCE ALLEN HENRY

A CHILD

CRT§ IN THE DISTRICT COURT
PROCESS DEPT
§ 407 JUDICIAL DISTRICT
§
§
§ BEXAR COUNTY, TEXAS

## ORIGINAL PETITION IN SUIT AFFECTING THE PARENT-CHILD RELATIONSHIP

1. **Discovery Level**

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

2. **Objection to Assignment of Case to Associate Judge**

Petitioner objects to the assignment of this matter to an associate judge for a trial on the merits or presiding at a jury trial.

3. **Parties**

This suit is brought by James David Henry, Petitioner. The last three numbers of James David Henry's driver's license number are 327. The last three numbers of James David Henry's Social Security number are 410.

Respondent is Stephanie Suzanne Markell.

Petitioner is the father of the child the subject of this suit and has standing to bring this suit based on the parent-child relationship.

4. **Jurisdiction**

This Court has acquired and retains continuing, exclusive jurisdiction of the suit and of the child the subject of this suit as a result of prior proceedings.

1



### 5.  *Child*

The following child is the subject of this suit:

Name: Bryce Allen Henry
Sex: Male
Birth date: January 21, 2002
County of Residence: Bexar

### 6.  *Person Entitled to Citation*

The mother of the child the subject of this suit is Stephanie Suzanne Markell.

Process should be served at 8313 Loneshadow Trail, Converse, Texas 78109.

There are no court-ordered conservatorships, court-ordered guardianships, or other court-ordered relationships affecting the child the subject of this suit.

### 7.  *Property*

No property of consequence is owned or possessed by the child the subject of this suit.

### 8.  *Conservatorship*

The parents of the child were never married. The appointment of the parents as joint managing conservators would not be in the best interest of the child. It is in the best interest of the child that Petitioner be appointed sole managing conservator of the child.

### 9.  *Support*

Stephanie Suzanne Markell, Respondent, is obligated to support the child and should be ordered by the Court to make payments for the support of the child and to provide medical child support in the manner specified by the Court.

### 10.  *Request for Temporary Orders*

Petitioner requests the Court, after notice and hearing, to make temporary orders for the

2

MR 000002

safety and welfare of the child, including but not limited to the following:

Appointing Petitioner temporary sole managing conservator.

Ordering the preparation of a social study into the circumstances and condition of the child and the home of any person requesting conservatorship of, possession of, or access to the child.

Ordering the psychological evaluation of Stephanie Suzanne Markell and the child.

Ordering Respondent to pay child support, health insurance premiums for coverage on the child, and 50 percent of the child's uninsured medical expenses while this case is pending.

Restricting the residence of the child to the State of Texas.

Enjoining Respondent from removing the child beyond a geographic area identified by the Court, acting directly or in concert with others.

Ordering Respondent to pay reasonable interim attorney's fees and expenses.

### 11. Request for Temporary Orders and Injunction

Petitioner requests the Court to dispense with the necessity of a bond, and Petitioner requests that, after notice and hearing, Respondent be further restrained and enjoined, pending the further order of the Court, from:

Disturbing the child or Petitioner or interfering in any way with Petitioner's possession of the child by taking or attempting to take possession of the child, directly or through any other person, from the residence, school, or any other place.

Withdrawing the child from enrollment in the school or day-care facility where the child is presently enrolled.

Hiding or secreting the child from Petitioner.

3

MR 000003

Making disparaging remarks regarding Petitioner or Petitioner's family in the presence or within the hearing of the child.

Consuming illegal drugs or prescription drugs not taken in accordance with a prescription given to Respondent within the 24 hours before or during the period of possession of or access to the child.

Canceling, altering, failing to pay premiums, or in any manner affecting the present level of coverage of any health insurance policy insuring the child.

### 12. *Request for Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Petitioner to secure the services of Richard R. Fletcher, a licensed attorney, to preserve and protect the child's rights. Respondent should be ordered to pay reasonable attorney's fees, expenses, and costs through trial and appeal, and a judgment should be rendered in favor of this attorney and against Respondent and be ordered paid directly to Petitioner's attorney, who may enforce the judgment in the attorney's own name. Petitioner requests postjudgment interest, as allowed by law.

### PRAYER

Petitioner prays that citation and notice issue as required by law and that the Court enter its orders in accordance with the allegations contained in this petition.

Petitioner prays that the Court, after notice and hearing, grant a temporary injunction enjoining Respondent, in conformity with the allegations of this petition, from the acts set forth

4

above while this case is pending.

Petitioner prays for attorney's fees, expenses, costs, and interest as requested above.

Petitioner prays for general relief.



Respectfully submitted,

Fletcher Law Offices, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

CRT
PROCESS DEPT

By: _____
Richard R. Fletcher
State Bar No. 07142500
Kelly A. Stapler
State Bar No. 24072363
Attorneys for Petitioner

5



CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY M<sup>c</sup>KINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 20, 2015*

DONNA KAY M<sup>c</sup>KINNEY
BEXAR COUNTY, TEXAS

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

SHERIFF

"The State of Texas"    NO.   2011-CI-16579

2011CI16579 -S00001

INT OF BRYCE A HENRY
Plaintiff
vs.

Defendant
( Note: Attached Document May Contain Additional Litigants. )    **NOTICE**

**Citation** Directed to: STEPHANIE SUZANNE MARKELL

IN THE DISTRICT COURT
407th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

8313 LONESHADOW TRAIL
CONVERSE TX 78109-2429

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the _12th_ day of _October_ , _2011_ .
ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS _14th_ DAY OF _October_ A.D., _2011_ .

PETITION IN SUIT AFFECTING PCR

KELLY A STAPLER
Attorney/PETITIONER
address 6 DESTA DR 5900 .
MIDLAND, TX 79705-5520

DONNA KAY MCKINNEY
District Clerk of Bexar County, Texas

By: _Stephanie R Holman_ , Deputy
STEPHANIE HOLMAN

---

### OFFICER'S RETURN

Came to hand _____ day of _____, A.D. _____, at _____ o'clock _____.M.
and executed (not executed) the _____ day of _____, A.D. _____, in _____
at _____ o'clock _____.M. by delivering to _____
in person a true copy of this citation together with the accompanying copy of plaintiff's petition. Served at _____
Cause of failure to execute this citation _____
I traveled _____ miles in the execution of this citation. Fees: _____ Serving citation
$ _____ Mileage _____ Total $ _____
Badge/PPS # _____

_____ County, Texas

By _____

The State of Texas

NON - PEACE OFFICER VERIFICATION
VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER)
SWORN TO this _____ day of _____, _____

NOTARY PUBLIC STATE OF TEXAS

MR 000007

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS**

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



NO. 2011-CI-16579

| IN THE INTEREST OF | § | IN THE DISTRICT COURT FOREIGN ST |
| | § | |
| | § | |
| BRYCE ALLEN HENRY | § | 407TH JUDICIAL DISTRICT COURT OF |
| | § | |
| | § | |
| A CHILD | § | BEXAR COUNTY TEXAS |

## RESPONDENT'S ORIGINAL ANSWER

I.

NOW COMES STEPHANIE MARKELL, Respondent, and files this answer in response to Petitioner's petition on file herein. Respondent denies each and every, all and singular, the allegations contained in said Petitioner's petition and demands strict proof thereof.

II.

WHEREFORE, PREMISES CONSIDERED, Respondent prays that Petitioner take nothing by his suit against her and that Respondent recover whatever relief, at law and in equity, to which she may show herself justly entitled.

Respectfully Submitted,

Stephanie Markell, *pro se*
8313 Longshadow Trail
Converse, Texas 78109
(210) 246-3216

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was served on Respondent by and through his attorney of record, Kathy A. Stapler, Fletcher Law Offices, 6 Desta Drive, Suite 5900, Midland, Texas 79705.

Stephanie Markell, *pro se*

MR 000009

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 20, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

MR 000010



Filed
11 December 12 P3:02
Donna Kay McKinney
District Clerk
Bexar District
Accepted by:
Cecilia Barbosa



NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| BRYCE ALLEN HENRY | § § | 407th JUDICIAL DISTRICT |
| A CHILD | § § | BEXAR COUNTY, TEXAS |

## FIRST AMENDED PETITION IN SUIT AFFECTING THE PARENT-CHILD RELATIONSHIP

1.  *Discovery Level*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

2.  *Objection to Assignment of Case to Associate Judge*

Petitioner objects to the assignment of this matter to an associate judge for a trial on the merits or presiding at a jury trial.

3.  *Parties*

This suit is brought by James David Henry, Petitioner. The last three numbers of James David Henry's driver's license number are 327. The last three numbers of James David Henry's Social Security number are 410.

Respondent is Stephanie Suzanne Markell.

Petitioner is the father of the child the subject of this suit and has standing to bring this suit based on the parent-child relationship.

4.  *Jurisdiction*

This Court has acquired and retains continuing, exclusive jurisdiction of the suit and of the

1

child the subject of this suit as a result of prior proceedings.

5.  **Child**

The following child is the subject of this suit:

Name: Bryce Allen Henry
Sex: Male
Birth date: January 21, 2002
County of Residence: Bexar



6.  **Person Entitled to Citation**

The mother of the child the subject of this suit is Stephanie Suzanne Markell.

Process should be served at 8313 Loneshadow Trail, Converse, Texas 78109.

There are no court-ordered conservatorships, court-ordered guardianships, or other court-ordered relationships affecting the child the subject of this suit.

7.  **Property**

No property of consequence is owned or possessed by the child the subject of this suit..

8.  **Protective Orders**

There are no protective orders in effect and no application for a protective order involving the parties is pending.

9.  **Conservatorship**

The parents of the child were never married. The appointment of the parents as joint managing conservators would not be in the best interest of the child. Respondent claims to have serious physical medical conditions which impair her ability to care for the child in a manner that is in the best interest of the child. On information and belief, Respondent also suffers from untreated mental and psychological illness. Additionally, Respondent has represented that she ingests a large

2

MR 000012

quantity of pain medication on a daily basis which further impairs her ability to provide adequate care for the child. Respondent has represented that the consumption of these painkillers prevents her from operating a motor vehicle. However, Respondent's driving record clearly indicates that the reason she does not have a valid driver's license is that she caused a car accident in which the injured party filed suit. This party filed a lawsuit against Respondent to which Respondent never answered. According to the Texas Department of Public Safety, the reason that Respondent cannot hold a valid driver's license is that she must pay off this nearly $8,000.00 judgment against her before she can secure a new license. Respondent has also displayed a habitual propensity for lying. The child's continuous exposure to Respondent and her mental illnesses has caused and will continue to cause harm to the child, in addition to endangering the child's health, welfare and safety. It is in the best interest of the child that Petitioner be appointed sole managing conservator of the child.

10.    *Support*

Stephanie Suzanne Markell, Respondent, is obligated to support the child and should be ordered by the Court to make payments for the support of the child and to provide medical child support in the manner specified by the Court.

11.    *Request for Psychological and Medical Examination of Stephanie Suzanne Markell*

By separate motion and order, Petitioner requests that the Court issue an order compelling Stephanie Suzanne Markell to submit to a physical examination by a qualified physician and a mental examination by a qualified psychologist pursuant to Texas Rule of Civil Procedure 204.

12.    *Request for Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Petitioner to secure the services of Richard R. Fletcher, a licensed

3

attorney, to preserve and protect the child's rights. Respondent should be ordered to pay reasonable attorney's fees, expenses, and costs through trial and appeal, and a judgment should be rendered in favor of this attorney and against Respondent and be ordered paid directly to Petitioner's attorney, who may enforce the judgment in the attorney's own name. Petitioner requests postjudgment interest as allowed by law.

## PRAYER

Petitioner prays that citation and notice issue as required by law and that the Court enter its orders in accordance with the allegations contained in this petition.

Petitioner prays that the Court, after notice and hearing, appoints Petitioner as sole managing conservator of the child or, in the alternative, appoints Petitioner and Respondent as joint managing conservators, with Petitioner as joint managing conservator with primary physical possession of the child and the right to determine the child's residence.

Petitioner prays that the Court grant possession of and access to the child pursuant to the Standard Possession Order, in accordance with the elections made as presented in the Proposed Parenting Plan submitted by Petitioner.

Petitioner prays that the court enter the Proposed Parenting Plan submitted by Petitioner.

Petitioner prays for attorney's fees, expenses, costs, and interest as requested above.

Petitioner prays for general relief.

4

Respectfully submitted,



Fletcher Law Offices, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Kelly A. Stapler
State Bar No. 24072363
Attorneys for Petitioner

## Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on the 12th day of December, 2011.

_____
Kelly A. Stapler
Attorney for Petitioner

5

MR 000015

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



30 min

# JUDGE'S NOTES



2011CI16579 ~P00022

CAUSE NO.: 2011CI16579 COURT: 407 DATE / TIME: 02/09/2012 09:00AM SETTING COURT: 218
STYLE: INT OF BRYCE A HENRY

DISCOVERY LEVEL: 2
ATTORNEY(S) FOR CASE:
KELLY STAPLER                                    STEPHANIE MARKELL

TYPE OF MOTION OR APPLICATION:
NON-JURY SETTING ON MOTION TO EXAMINE STEPHANIE SUZANNE MARKELL (PER JUDGE'S NOT

CONFERRING_____ ESTIMATE HEARING TIME_____
AGREED ORDER_____ ASSIGNED COURT_____
DROP_____ RECORD TAKEN_____
INTERPRETER_____ RESET DATE_____TIME_____

DATE OF NOTES 2/9/12                            JUDGE INITIALS_____

M/ Examine — un opposed psychological evaluation;
medical records Granted; medical exam by T. Kingman, PhD.

Case Number: 2011CI16579        Document Type: JUDGE'S NOTES        Page 1 of 2
PROPERTY OF BEXAR COUNTY DISTRICT CLERK'S OFFICE

MR 000017

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

30 min

# JUDGE'S NOTES



2011CI16579 _P00022

CAUSE NO.: 2011CI16579 COURT: 407 DATE / TIME: 02/09/2012 09:00AM SETTING COURT: 218
STYLE: INT OF BRYCE A HENRY

DISCOVERY LEVEL: 2
ATTORNEY(S) FOR CASE:
KELLY STAPLER                                    STEPHANIE MARKELL

TYPE OF MOTION OR APPLICATION:
NON-JURY SETTING ON MOTION TO EXAMINE STEPHANIE SUZANNE MARKELL (PER JUDGE'S NOT

CONFERRING_____ ESTIMATE HEARING TIME_____
AGREED ORDER_____ ASSIGNED COURT_____
DROP_____ RECORD TAKEN_____
INTERPRETER_____ RESET DATE_____ TIME_____

DATE OF NOTES  2/9/12                                    JUDGE INITIALS_____

M/ Examine - un opposed psychological evaluation;
medical records Granted; medical exam by T.Kingman, M.D.

PROPERTY OF BEXAR COUNTY DISTRICT CLERK'S OFFICE

Case Number: 2011CI16579            Document Type: JUDGE'S NOTES            Page 1 of 2

MR 000019

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 20, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*


2011CI16579 -0407

## NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | 407th |
| BRYCE ALLEN HENRY | § | 125 JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ON MOTION TO EXAMINE STEPHANIE SUZANNE MARKELL

On January 26, 2012, the Court considered Petitioner James David Henry's motion to order Stephanie Suzanne Markell, a party, to submit to a physical and mental examination. The Court finds that movant shows good cause and that Stephanie Suzanne Markell's physical and mental condition is in controversy. The Court further finds that there is good cause for the Court to order these examinations because they are relevant to the case and likely to lead to the discovery of relevant evidence and that there is a reasonable nexus between the conditions in controversy and the examinations sought. Specifically, a physical and psychological evaluation of Stephanie Suzanne Markell is necessary to establish whether or not she should be a joint managing conservator, whether or not supervised visitation with the child is appropriate and whether the child's continuing relationship with Stephanie Suzanne Markell is in the best interest of the child. The Court also finds that it is not possible for Petitioner to obtain the information that would result from an examination through less-intrusive means.

IT IS ORDERED that Stephanie Suzanne Markell submit to a physical examination to be conducted by _____Dr. Thomas Kingman_____, a licensed and qualified physician, and at a time and date that is suitable to all parties.

IT IS ORDERED that Stephanie Suzanne Markell submit to a mental examination to be conducted by Dr. Kenneth Reid, Ph.D., a licensed and qualified psychologist, and at a time and date that is suitable to all parties but not later than 20 days from the signing of this Order.

MR 000021

IT IS ORDERED that Stephanie Suzanne Markell execute an Authorization for Release of Protected Health Information and a HIPAA Release, in the form of the authorizations attached as Exhibit "A" to this Order on Motion to Examine Stephanie Suzanne Markell authorizing all physicians, ~~dentists,~~ psychiatrists, ~~chiropractors,~~ clinics, laboratories, physical therapists, or any other medical-care providers or any other health-care providers that have provided services or care to Stephanie Suzanne Markell to disclose any and all protected health information of Stephanie Suzanne Markell *from January 1, 2001 to present. qtd*.

IT IS ORDERED that the information is to be used only in connection with this litigation and that the parties to this matter, their counsel, the employees of their counsel, and their respective agents are prohibited from using or disclosing health information protected by HIPAA for any purpose other than in connection with this litigation.

All health records in the possession of any health-care provider containing protected health information of Stephanie Suzanne Markell are subject to this order.

SIGNED on _____ *February 9 2012* _____.

_____
JUDGE PRESIDING

MR 000022

**EXHIBIT "A"**



MR 000023

## NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 123 JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## MEDICAL AUTHORIZATION FORM

TO THE CUSTODIAN OF MEDICAL RECORDS:

    RE:    Stephanie Suzanne Markell
            8313 Loneshadow Trail
            Converse, TX 78109
            DOB: 12/10/1978
            SSN: XXX-XX-X938

    I, Stephanie Suzanne Markell, authorize Fletcher Law Offices, P.C. to obtain a full and complete copy of the medical records relating to my care and treatment held or maintained by any physician, dentist, psychiatrist, chiropractor, hospital, clinic, laboratory, physical therapist, or any other medical-care provider, including confidential information regarding HIV testing and test results.

    2. This authorization does not authorize Fletcher Law Offices, P.C. or any health-care professional to communicate, orally or in writing, with any person about Stephanie Suzanne Markell's medical records, treatment, or condition outside the presence of Stephanie Suzanne Markell or her attorney. This limitation does not prohibit administrative communications for the purposes of copying or mailing records covered by this authorization. However, any communication about the medical records, treatment, or condition of Stephanie Suzanne Markell is a violation of Stephanie Suzanne Markell's physician-patient privilege.

    3. This authorization is valid until the 180th day after the date it is signed.


_____
Stephanie Suzanne Markell

MR 000024

## HIPAA RELEASE

I, Stephanie Suzanne Markell, intend for any agent named in this release to be treated as I would be treated with respect to my rights regarding the use and disclosure of my individually identifiable health information and other medical records. This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. 1320d and 45 C.F.R. 160-164.

I authorize the disclosure of any information governed by HIPAA to be provided to the following persons:

> Fletcher Law Offices, P.C.
> 6 Desta Drive, Suite 5900
> Midland, Texas 79705.

Accordingly, I hereby authorize any physician, health-care professional, dentist, health plan, hospital, clinic, laboratory, pharmacy or other covered health-care provider, any insurance company and the Medical Information Bureau Inc. or other health-care clearinghouse that has provided treatment or services to me, or that has paid for or is seeking payment from me for such services, to give, disclose and release to Fletcher Law Offices, P.C., without restriction, all of my individually identifiable health information and medical records regarding any past, present or future medical or mental health condition, including all information relating to the diagnosis and treatment of HIV/AIDS, sexually transmitted diseases, mental illness, and drug or alcohol abuse.

This authority given to Fletcher Law Offices, P.C. shall supersede any prior agreement that I may have made with my health-care providers to restrict access to or disclosure of my individually identifiable health information. The individually identifiable health information and other medical records given, disclosed, or released to any named agent may be subject to redisclosure by a named agent and may no longer be protected by HIPAA. The authority given to any named agent herein has no expiration date and shall expire only in the event that I revoke this HIPAA Release in writing and deliver it to my health-care provider. There are no exceptions to my right to revoke this HIPAA Release.

_____
Stephanie Suzanne Markell

**SUBSCRIBED AND SWORN TO BEFORE ME** by the said Stephanie Suzanne Markell, Principal this _____ day of _____, 2012.

_____
Notary Public, State of Texas

MR 000025

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: MARIA PALACIOS, Deputy/District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*





2011CI16579 -0407

NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 407th JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ON MOTION TO EXAMINE STEPHANIE SUZANNE MARKELL

On the APR 5 2012 day of April, 2012, the Court considered Petitioner James David Henry's Motion to Compel and Motion for Sanctions and Temporary Restraining Order in the above-entitled and numbered cause.

The Court finds that on February 9, 2012, Respondent, Stephanie Suzanne Markell, was ordered to submit to a mental and physical examination within 20 days of the signing of said Order. The Court further finds that Respondent is in violation of the Court's Order by failing to submit to these examinations within the time period ordered.

IT IS ORDERED that Respondent submit to a mental examination by Dr. Kenneth Reid, Ph.D., a licensed and qualified psychologist, to submit to a physical examination to be conducted by Dr. Thomas Klingman, a licensed and qualified physician, by Friday, April 14, 2012.

The Court finds that the following temporary orders are necessary and equitable and in the best interest of the child, Bryce Allen Henry:

IT IS ORDERED that Petitioner is appointed temporary sole managing conservator of the child.

IT IS ORDERED that the child be removed from the home of Stephanie Suzanne Markell, to be placed in the custody and control of Petitioner.

Page 1 of 3

MR 000027

IT IS ORDERED that Respondent pay Petitioner's reasonable attorney fees incurred in preparing and prosecuting Petitioner's Motion to Compel, Motion for Sanctions and Temporary Restraining Order; travel expenses and costs of court.

The Court further finds that Petitioner is entitled to the temporary injunction prayed for and that it should be granted.

IT IS ORDERED that Respondent be enjoined from the following:

Disturbing the child or Petitioner or interfering in any way with Petitioner's possession of the child by taking or attempting to take possession of the child, directly or through any other person, from the Petitioner's residence, the child's school or any other place.

Hiding or secreting the child from Petitioner.

Making disparaging remarks regarding Petitioner or Petitioner's family in the presence or within the hearing of the child.

All other relief requested and not expressly granted is hereby denied.

SIGNED on _____ APR 5 2012 _____.

_____
JUDGE PRESIDING

Page 2 of 3

Rick Fletcher
Attorney For Petitioner
David I. Henry

MR 000028



CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*


2011CI16579 -P00026

Writs attach

FILED
DISTRICT CLERK
BEXAR CO. TEXAS

12 APR -9 PH 2: 12

DEPUTY

B_____



# Donna Kay McKinney
## Bexar County District Clerk

### Request for Process

Clerk#



Cause Number 2011- CI - 16579

Style: In the Interest of

Vs. Bryce Allen Henry
a child

District Court 407th

Request the following process: (Please check all that Apply)

Citation ☐ Notice ☐ Temporary Restraining Order ☐ Notice of Temporary Protective Order ☐
Temporary Protective Order ☐ Precept with hearing ☐ Precept without a hearing ☐ Writ of Attachment ☑
Writ of Habeas Corpus ☐ Writ of Garnishment ☐ Writ of Sequestration ☐ Caplas ☐ Other: _____

**1.**
Name: Any Sheriff a Constable
Registered Agent/By Serving: Stephanie Markell
Address 8213 Loneshadow Trail Converse, Bexar County, TX
Service Type: (Circle One) Private Process *Sheriff* Publication (Circle One) Commercial Recorder Hart Beat Courthouse Door
Certified Mail Registered Mail Out of County Out of State Secretary of State Commissioner of Insurance

**2.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Circle One) Private Process Sheriff Publication (Circle One) Commercial Recorder Hart Beat Courthouse Door
Certified Mail Registered Mail Out of County Out of State Secretary of State Commissioner of Insurance

**3.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Circle One) Private Process Sheriff Publication (Circle One) Commercial Recorder Hart Beat Courthouse Door
Certified Mail Registered Mail Out of County Out of State Secretary of State Commissioner of Insurance

**4.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Circle One) Private Process Sheriff Publication (Circle One) Commercial Recorder Hart Beat Courthouse Door
Certified Mail Registered Mail Out of County Out of State Secretary of State Commissioner of Insurance

Name of Attorney/Pro se: Rick Fletcher Bar Number: 07142500
Address: 6 Desta Drive, Ste. 5900 Phone Number: 432-687-1910
Midland, Texas 79705

Attorney for Plaintiff _____ Defendant _____ Other Petitioner David Henry

****IF SERVICE IS NOT PICKED UP WITHIN 14 BUSINESS DAYS, SERVICE WILL BE DESTROYED****

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



2011CI16579 -P00027

Bexar County 407th Judicial District

In the Interest of
Bryce Allen Henry



Case No.: 2011-CI-16579

## RETURN OF SERVICE

I Carl Weeks, being duly sworn, depose and say, I have been duly authorized by the Supreme Court of Texas to serve Citations and other Notices as well as make service of the document(s) listed herein in the above styled case.

**For:**

Date Received: 4/5/2012    11:00 AM

Document(s):   a True and Correct Copy of Order on Motion to Examine Stephanie Suzanne Markell

Serve To:   Stephanie Suzanne Markell

Address:   8313 Lone Shadow Trail, Converse, Tx

Date Served:  4/5/2012          4:20 PM

Method of Service:   Personally

Person Served:   Stephanie Suzanne Markell

Address:   8313 Lone Shadow Trail, Converse, Tx

My name is Carl Weeks my date of birth is___08141252___, and my address is 316 West 12th Street, Ste. 316Austin, TX 78701 U.S.A. I declare under penalty of perjury that the foregoing is true and correct.

Executed in _Bexar_ County, State of _Texas_ on the _5th_ day of _April_, 2012

_Carl Weeks_

Carl Weeks, SCH1297 Certification Expires: 7/31/14

Weeks & Associates, LLC
316 West 12th Street, Ste. 316
Austin, TX 78701
(512) 472-9989
(512) 494-1133

ID: 18238
Client Reference:

FILED
DISTRICT CLERK
BEXAR CO. TEXAS
2012 APR -9  A 11: 32
DEPUTY

MR 000032

## NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 407th JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER ON MOTION TO EXAMINE STEPHANIE SUZANNE MARKELL

On the ~~APR - 5 2012~~ day of April, 2012, the Court considered Petitioner James David Henry's

Motion to Compel and Motion for Sanctions and Temporary Restraining Order in the above-entitled

and numbered cause.

The Court finds that on February 9, 2012, Respondent, Stephanie Suzanne Markell, was

ordered to submit to a mental and physical examination within 20 days of the signing of said Order.

The Court further finds that Respondent is in violation of the Court's Order by failing to submit to

these examinations within the time period ordered.

IT IS ORDERED that Respondent submit to a mental examination by Dr. Kenneth Reid,

Ph.D., a licensed and qualified psychologist, to submit to a physical examination to be conducted by

Dr. Thomas Klingman, a licensed and qualified physician, by Friday, April 14, 2012.

The Court finds that the following temporary orders are necessary and equitable and in the

best interest of the child, Bryce Allen Henry:

IT IS ORDERED that Petitioner is appointed temporary sole managing conservator of the

child.

IT IS ORDERED that the child be removed from the home of Stephanie Suzanne Markell, to

be placed in the custody and control of Petitioner.

Page 1 of 3

MR 000033

IT IS ORDERED that Respondent pay Petitioner's reasonable attorney fees incurred in preparing and prosecuting Petitioner's Motion to Compel, Motion for Sanctions and Temporary Restraining Order; travel expenses and costs of court.

The Court further finds that Petitioner is entitled to the temporary injunction prayed for and that it should be granted.

IT IS ORDERED that Respondent be enjoined from the following:

Disturbing the child or Petitioner or interfering in any way with Petitioner's possession of the child by taking or attempting to take possession of the child, directly or through any other person, from the Petitioner's residence, the child's school or any other place.

Hiding or secreting the child from Petitioner.

Making disparaging remarks regarding Petitioner or Petitioner's family in the presence or within the hearing of the child.

All other relief requested and not expressly granted is hereby denied.

SIGNED on _____ APR - 5 2018

Judge Victor H. Negrón, Jr.
Presiding Judge
438th District Court
Bexar County, Texas

_____
JUDGE PRESIDING

MR 000034

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By: _____

MARIA PALACIOS, Deputy/District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



NO. 2011-CI-16579

EX PARTE

BRYCE ALLEN HENRY

A CHILD

§
§
§
§
§
§
§

IN THE DISTRICT COURT

407TH JUDICIAL DISTRICT

BEXAR COUNTY, TEXAS

## PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR ISSUANCE OF WRIT OF ATTACHMENT

1.  Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

2.  This Petition for Writ of Habeas Corpus and Motion for Issuance of Writ of Attachment is brought by James David Henry, Petitioner, who resides at Midland, Midland County, Texas. The last three numbers of James David Henry's driver's license are 327 _____. The last three numbers of James David Henry's Social Security number are 410 _____. In support of this Petition for Habeas Corpus and Motion for Issuance of Writ of Attachment Petitioner would show the following:

3.  Petitioner is presently entitled to the possession of the child Bryce Allen Henry by virtue of an Order entered by the Presiding Court of Bexar County, Texas, in Cause No. 2011-CI-16579. This Order is in full force and effect. A certified copy of the Order is attached to this petition.

4.  The child is illegally restrained by Stephanie Suzanne Markell, Respondent, at 8313 Loneshadow Trail, Converse, Bexar County, Texas. Process should be served on Respondent at that address.

5.  Petitioner applies for a writ of attachment of the person of Bryce Allen Henry

MR 000036

because on April 5, 2012, the Court issued an Order granting physical custody of the child to Petitioner and Petitioner believes that the child is imminently likely to suffer serious physical and/or psychological harm.

6. Upon information and belief, Respondent is mentally and physically incompetent to care for the child, Bryce Allen Henry, and it is in the best interest of the child that he be removed from Respondent's home.

7. Based on these facts, Petitioner believes that Respondent's continued possession of the child will create and is creating a serious, immediate threat to the child's physical and emotional well-being.

8. It was necessary to secure the services of Richard R. Fletcher, a licensed attorney, to preserve and protect the rights of the child. Respondent should be ordered to pay reasonable attorney's fees, expenses, and costs, and a judgment should be rendered in favor of this attorney and against Respondent and be ordered paid directly to Petitioner's attorney, who may enforce the judgment in the attorney's own name. Petitioner requests postjudgment interest as allowed by law.

9. Petitioner prays that the Court immediately issue its writ of habeas corpus commanding that the child be immediately returned to Petitioner.

Petitioner further requests that Respondent be ordered to pay all costs of court.

Petitioner prays for recovery of all relief requested and for all general relief to which this Court may deem Petitioner entitled.

Respectfully submitted,

FLETCHER LAW OFFICES, P.C.
6 Desta Drive, Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Kelly A. Stapler
State Bar No. 24072363

ATTORNEYS FOR PETITIONER

The undersigned states under oath: "I am the Petitioner in the foregoing Petition for Writ of Habeas Corpus. I have personal knowledge of the allegations and facts stated in it, and they are true and correct."

_____
James David Henry

SIGNED under oath before me on _April 9th, 2012_ 2012.

_____
Notary Public, State of Texas

CARL M. WEEKS
Notary Public, State of Texas
My Commission Expires
June 18, 2015

Document scanned as filed.
Description:
Date: 4-11-12 Clerk Initials: MW

Case Number: 2011CI16579          Document Type: PETITION FOR WRIT OF HABEAS CORPUS Page 3 of 4
PETITION FOR WRIT OF HABEAS CORPUS

MR 000038

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk

*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*





NO. 2011-CI-16579

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
| | § | |
| BRYCE ALLEN HENRY | § | 407TH JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | BEXAR COUNTY, TEXAS |

## ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

On April____, 2012 there was presented to this Court a verified motion requesting a writ of attachment with respect to Bryce Allen Henry, a child.

On the basis of the sworn statement in the petition and of the evidence and argument of counsel, the Court finds it necessary and proper to issue a writ of attachment immediately.

IT IS THEREFORE ORDERED that the clerk of this Court immediately issue a writ of attachment commanding any sheriff or constable within the state of Texas to take the body of Bryce Allen Henry, a child, and to deliver the child safely into the possession of ~~James David Henry at~~ the Presiding Civil Dist. Judge, Rm 218, Bexar County Court-house, 100 Dolorosa, San Antonio, TX 78205.

SIGNED on _____APR 9 2012_____.

_____
JUDGE PRESIDING

Case Number: 2011CI16579                Document Type: ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

MR 000040

APPROVED AS TO FORM ONLY:

FLETCHER LAW OFFICES, P.C.
6 Desta Drive
Suite 5900
Midland, Texas 79705
Tel: (432) 687-1910
Fax: (432) 687-1961

By: _____
Richard R. Fletcher
State Bar No. 07142500
Kelly A. Stapler
State Bar No. 24072363

ATTORNEYS FOR PETITIONER



CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: 

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



Case Number: 2011CI16579     Document Type: ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT

15 min

INT OF BRYCE A. HENRY



2011CI16579 -P00029

## JUDGE'S NOTES          Page_____

CASE NO. 2011 CI 16579 COURT 407

All future Judge's notations must be done on this form

| DATE OF NOTE/S | NOTE | JUDGE INTIALS |
|---|---|---|
| 4/10/12 | Record By: Yvonne T. Gonzales, 131st S.O.G... | JS Cernel |
| | allocheur — child given to father (mother given copy of order) | |
| | Richard Fletcher — atty for David Henry | |
| | Stephanie Markell — mother | |

MR 000043

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By:

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



2011CI16579 -P00046



**Donna Kay McKinney**

BEXAR COUNTY DISTRICT CLERK

*Linysa Moreno*

DEPUTY

BY:

14 OCT 24 P 4: 25

FILED
DONNA KAY McKINNEY
DISTRICT CLERK
BEXAR COUNTY

DOCUMENT SCANNED AS FILED

MR 000045

FIRST-CLASS MAIL

neopost
10/17/2014
US POSTAGE $00.34⁰

10/17/2014
NOTICE OF SETTING ZIP 78205
ON DISMISSAL DOCKET 2202050
OFFICIAL NOTICE

Kelly A Stapler
Attorney At Law
6 Desta Dr 5900
Midland, Tx 79705-5520

Donna Kay McKinney
Bexar County District Clerk
101 W. Nueva Suite 217
San Antonio, TX 78205

Return Service Requested

2011-CI-16579          10/17/2014

...OF BRYCE A HENRY

ORDER OF THE PRESIDING JUDGE, THE ABOVE STYLED AND NUMBERED Case Is Set For Hearing On The, 21St Day Of November 2014 8:30 O'Clock A.M., In The ...h Court, Second Floor Bexar County Courthouse

NIXIE          799          DE 1009          0010/22/14

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 78205300000          *0310-07933-22-38

DOCUMENT SCANNED AS FILED

MR000046

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 20, 2015*

DONNA KAY McKINNEY
BEXAR COUNTY, TEXAS

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



# 66792

**ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION
IN THE 407th JUDICIAL DISTRICT COURT OF BEXAR COUNTY, TEXAS**

ON THE 21st DAY OF November, 2014 CAME ON TO BE CALLED AT 8:30 AM, THE FOLLOWING ENTITLED AND NUMBERED CAUSES SPECIALLY SET ON THE DISMISSAL DOCKET IN THE MANNER PROVIDED BY LAW; AND

IT APPEARING TO THE COURT THAT THERE IS GOOD AND SUFFICIENT REASON FOR DISMISSAL OF THESE CASES FOR WANT OF PROSECUTION;

IT IS THEREFORE, ORDERED THAT THE CAUSES OF ACTION LISTED BELOW, BE, AND THE SAME ARE HEREBY, DISMISSED FOR WANT OF PROSECUTION WITH COSTS ASSESSED AGAINST THE PLAINTIFFS FOR WHICH EXECUTION SHALL ISSUE.

| | |
|---|---|
| 2002-CI-06618 | RICHARD A MEYER VS. KARLA Y MEYER |
| 2008-CI-20218 | INT OF DREW M TARTALONE |
| 2009-CI-19229 | INT OF ANTHONY L MOREIRA |
| 2009-CI-19757 | INT OF JAREN R HADDEN |
| 2010-CI-01242 | RUBY A HERNANDEZ VS. BRIAN A CHAVEZ |
| 2010-CI-01612 | MARIA MARTINEZ VS. RUBEN MARTINEZ III |
| 2010-CI-05134 | JOSEPH B HALL VS. ANGELA A P HALL |
| 2010-CI-06205 | INT OF ALEXIS B DYER |
| 2010-CI-09490 | INT OF BRIANNA A GARCIA |
| 2010-CI-17587 | CYNTHIA A CORONADO VS. JOSE A CORONADO JR |
| 2011-CI-00361 | INT OF DANIEL ESCALERA |
| 2011-CI-00420 | INT OF CARLOS J FLORES III |
| 2011-CI-00540 | INT OF ISABELLA ORTA |
| 2011-CI-01166 | JEREMIAH REYES VS. AMANDA R REYES |
| 2011-CI-01939 | INT OF JOHN NOLAN CASEY |
| 2011-CI-09486 | ASHLEY M KELLEY VS. RICHARD A FISSETTE |
| 2011-CI-09777 | CRYSTAL GUTIERREZ VS. JESUS GUTIERREZ |
| 2011-CI-10869 | ERASMO GUTIERREZ III VS. AYAKO GUTIERREZ |

# 66792

2011-CI-12044   INT OF DESTINY L MCWRIGHT

2011-CI-14637   CAROLINA F SEGUNDO VS. DANIEL A SEGUNDO

2011-CI-14974   IDALIA DIAZ VS. MANUEL DIAZ

2011-CI-15161,  WILLIAM S GOEN VS. ALICIA M GOEN

2011-CI-15291   ROBERT H AVERY VS. TERRY L HOLDEN

2011-CI-15726   MELINDA K CHASE VS. SCOTT W CHASE

2011-CI-15896   BRENDA P ARREOLA VS. ADRIAN ARREOLA

2011-CI-16579   INT OF BRYCE A HENRY

2011-CI-17805   MARTIN V MCATEE VS. NATALIE A MCATEE

2011-CI-18406   INT OF ADRIAN D M RAMOS

2011-CI-20111   APRIL F RODRIGUEZ VS. ANDREW J HERRERA

2011-CI-20199   JOSEPH GEORGE VS. AMANDA GEORGE

2012-CI-00183   MONICA C SHELTON VS. LAWRENCE DIXON

2012-CI-00480   INT OF TORIBIO S GOMEZ IV ET AL

2012-CI-00540   INT OF Z N S

2012-CI-03755   PAUL J RUDDER VS. APRIL R RUDDER

2012-CI-06379   JENNIFER MORALES VS. DAVID A MORALES

2012-CI-06899   JESSICA A FLORES VS. ANDREW A GUTIERREZ

2012-CI-08195   JOSE L SANCHEZ VS. ASHLEY SANCHEZ

2012-CI-08658   SYLVIA CASTILLO VS. ERNEST CASTILLO

2012-CI-09282   MARK CHAVARRIA VS. CHRISTINA CHAVARRIA

2012-CI-10690   GREGORY I MAINEZ VS. PRISCILLA H MAINEZ

2012-CI-11407   TIGH R LEWIS VS. LAUREN A LEWIS

2012-CI-12747   JESSE H MIRANDA VS. SANTA C MIRANDA

2012-CI-15867   JULIE E GREGORY VS. MICHAEL GREGORY

2012-CI-16256   INT OF ISAIAH C GARZA

2012-CI-18658   AMANDA S PENA VS. DAVID PENA

2012-CI-19137   EDGARDO ROBLES VS. OLGA ROBLES

2012-CI-19543   ALEJANDRO MORALES VS. VANESSA V MORALES

2012-CI-19619   INT OF CHANCE SAUNJAY DOWNING

Case Number: 2011CI16579     Document Type: ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION     Page 2 of 7

MR 000049



2012-CI-19888   MARIO A TAPIA VS. MARIA E TAPIA

2013-CI-02571   MICHAEL W MUNSELLE JR VS. DIANA J DURAN

2013-CI-03134   CASEY J FUENTEZ VS. GENIE M E FUENTEZ

2013-CI-03705   INT OF TRENTTON L MICHEL

2013-CI-03918   JEREMY D KRAUSE VS. TIA V KRAUSE

2013-CI-04479   JENNIFER A BURK VS. ROBERT J BURK

2013-CI-04812   MICHELLE MORENO VS. DAVID MARTINEZ

2013-CI-04918   GLENNA S HATHAWAY VS. CHARLES W HATHAWAY JR

2013-CI-05494   NORMA GALMICHE ET AL VS. CAROLYN MIRELEZ

2013-CI-05537   DANIEL D MOYNIHAN VS. KAMERON A BEAN

2013-CI-06795   INT OF UNBORN CHILD

2013-CI-06839   EDWARD J VIDAL VS. MARTA H VIDAL

2013-CI-07056   CLAUDIA I PEREZ VS. AMIN U NAZARI

2013-CI-07170   THUMBELINA V RAMON VS. SHAWN M BURNEY

2013-CI-08140   DOLORES MORENO VS. RAMIRO MORENO

2013-CI-08224   JAMES D CRESPO VS. JACQUELYN M CRESPO

2013-CI-08736   CARMEN Y RODRIGUEZ VS. NICOLE ALDERETTE

2013-CI-08920   DEBRA R BUCKLEY-SIMS VS. CHRISTOPHER L SIMS

2013-CI-09370   INT OF PEDRO H VARGAS JR

2013-CI-09416   KIMBERLY C WILLIAMS VS. ANTHONY D WILLIAMS

2013-CI-09460   CHRISTOPHER K SCOTT VS. ERIC B SCOTT

2013-CI-09473   JENNIFER A LOPEZ-SELFRIDGE VS. JOHN D SELFRIDGE

2013-CI-10305   JENNIFER D REEH VS. JOSHUA M CRIDDLE

2013-CI-10469   MARIA A D HUIZAR VS. TIMOTHY E HUIZAR

2013-CI-10693   CECILIA M CRUZ VS. LEE R CRUZ

2013-CI-10987   KEVIN D REININGER VS. JORDAN L HORN

2013-CI-11118   MICHELLE MARTINEZ VS. RICHARD MARTINEZ

2013-CI-11233   ATRECIA WERNER VS. ROBERT D WERNER

2013-CI-11436   INT OF SEBASTIAN A ORNELAS

2013-CI-11478   ARTHUR L GANDARA VS. MONICA GANDARA

Case Number: 2011CI16579          Document Type: ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION

MR 000050

# 66792

| Case Number | Parties |
|---|---|
| 2013-CI-11538 | RAFAEL E TORRES VS. MARTHA S TORRES |
| 2013-CI-11566 | INT OF MICHAEL A LEWIS |
| 2013-CI-11580 | TINA O'BRYAN VS. ANTHONY P O'BRYAN JR |
| 2013-CI-11613 | VICTOR L MARES VS. STEPHANIE M MARES |
| 2013-CI-11628 | ROSALINDA G JIMENEZ VS. LUIS D JIMENEZ-GONZALEZ |
| 2013-CI-11958 | JAYDE N PEOPLES VS. ALBERT L CORNELIUS |
| 2013-CI-12237 | KORY KEIFER VS. DIANNA KEIFER |
| 2013-CI-13065 | CHRISTOPHER MORENO VS. DENYS MORENO |
| 2013-CI-13323 | ELIZABETH C CAVAZOS VS. CESAR R CAVAZOS |
| 2013-CI-13441 | JESSICA A P RODRIGUEZ VS. ERIC P RODRIGUEZ |
| 2013-CI-13557 | ANASTACIO DELEON SR VS. JAZMINE HERNANDEZ |
| 2013-CI-13571 | NARCISO RODRIGUEZ VS. KRISTY L SMITH |
| 2013-CI-13630 | LISA A VASHEGHANI VS. NADER R VASHEGHANI |
| 2013-CI-13718 | ERIC HERNANDEZ VS. JENNIFER L HERNANDEZ |
| 2013-CI-13899 | RACHEL BETSILL VS. THOMAS BETSILL |
| 2013-CI-14074 | DAVID G MONTEMAYOR JR VS. SYLVIA R MONTEMAYOR |
| 2013-CI-14548 | SANDRA M SERVANTEZ VS. THOMAS SERVANTES |
| 2013-CI-14554 | VALERIE JAMES VS. CHARLES JAMES |
| 2013-CI-14733 | JOHN P LOERA VS. NANCY LOERA |
| 2013-CI-14748 | BRANDAN M GARZA VS. JOHN A GARZA |
| 2013-CI-15365 | MELVIN L HENDERSON VS. DIANE M MONTANA |
| 2013-CI-15480 | MARGARITA D GOMEZ VS. RAUL GOMEZ |
| 2013-CI-15835 | LAURA V MENDEZ VS. JUAN M MENDEZ |
| 2013-CI-15983 | MORGAN JENNINGS VS. PRESTON H JENNINGS |
| 2013-CI-15993 | VANESSA CANO VS. COLLIN G HILL |
| 2013-CI-16152 | ANGELO ARAGON VS. LYNN R ARAGON |
| 2013-CI-16423 | MARY E THATCHER VS. TIMOTHY THATCHER |
| 2013-CI-16479 | LILLIE SILVA VS. MARQUS F REYES |
| 2013-CI-16494 | KATHERINE L GUTIERREZ VS. JASON GUTIERREZ |
| 2013-CI-16780 | INT OF KRISTOPHER A HUNT |

# 66792

**407th   THE 21st DAY OF November, 2014 AT 8:30 AM       PAGE:**

| | |
|---|---|
| 2013-CI-16897 | MARIA G RODRIGUEZ VS. MARCOS A GARCIA |
| 2013-CI-17166 | GINA BROWN VS. CALVIN D DURHAM |
| 2013-CI-17181 | DAVID M ELIZONDO JR VS. CHRISTINA M ELIZONDO |
| 2013-CI-17373 | MARGARITA WEBB VS. WILLIAM B WEBB |
| 2013-CI-17528 | MELISSA R WALKER VS. TERRY S WALKER |
| 2013-CI-17559 | ALICE SANTACRUZ VS. NEFTALI MARTINEZ |
| 2013-CI-17571 | AMANDA HILDRETH VS. FRED R MARTINEZ |
| 2013-CI-17585 | MARIA L SANCHEZ VS. JULIO SANCHEZ SR |
| 2013-CI-17661 | VERONICA HERNANDEZ VS. WERNER A G ROSARIO |
| 2013-CI-17690 | KAREN D VAN ZANT VS. KYLE T RABY |
| 2013-CI-17719 | DONALD BLANCHARD VS. LETISHIA HENDERSON |
| 2013-CI-17979 | YVONNE E SANDOVAL VS. ALBERT ARREDONDO |
| 2013-CI-18035 | YVONNE T MUNOZ VS. JOSE A MUNOZ |
| 2013-CI-18283 | BEATRICE A AVILA VS. ROSALIO M AVILA |
| 2013-CI-18527 | INT OF JONATHAN D TRINIDAD |
| 2013-CI-18668 | JULIO R GONZALES VS. MARIA V B GONZALES |
| 2013-CI-18711 | CARISA A SILVESAN VS. THEODORE W SILVESAN |
| 2013-CI-18725 | JORGE MORA VS. MARIA O MORA |
| 2013-CI-18783 | ARTURO GONZALES VS. MARTHA V GONZALES |
| 2013-CI-18839 | TONYA WILDER-HARPER VS. JAMES M HARPER |
| 2013-CI-18910 | OLIVIA J LEVIS VS. EARL F LEVIS |
| 2013-CI-19055 | YESSICA GARCIA VS. DANIEL P ROBLEDO |
| 2013-CI-19113 | MARIA D C AYALA VS. JUAN M CASTILLO |
| 2013-CI-19128 | STEVEN BERMEA VS. ANGELA A BERMEA |
| 2013-CI-19580 | HANNAH L BEVIL VS. DUSTY L WITHERWAX |
| 2013-CI-19665 | MICKEY W BESS VS. ROBERT T BESS |
| 2013-CI-19797 | MICHELE A JIMENEZ VS. ALFREDO JIMENEZ |
| 2013-CI-20446 | IESHA M DISHMAN VS. LARRY E DISHMAN II |
| 2013-CI-20564 | ELOISA V SALAZAR VS. MARIANO SALAZAR III |
| 2013-CI-20723 | BRENDA B KELLER VS. BERNARD S KELLER |

Case Number: 2011CI16579   Document Type: ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION

MR 000052

**66792**

2013-CI-20978   RACHEL Y HINDERMAN-ODOMS VS. DANIEL ODOMS JR

2014-CI-00878   JOANNE LOPEZ VS. FRANK A LOPEZ

2014-CI-01168   GREGORY W GREER II VS. HEATHER A GREER

2014-CI-01519   INT OF KYNLEE D NICOLAY A CHILD

2014-CI-01719   DANIEL AGUILAR VS. ELOINA AGUILAR

2014-CI-02371   JESSICA B DELEON VS. PAUL DELEON JR

2014-CI-02821   RAQUEL T MORENO VS. MICHAEL MORENO JR

2014-CI-02907   ESPERANZA L G ABRIEL VS. JAMES J ABRIEL

2014-CI-02977   INT OF JOSIAH HUMPHREYS A CHILD

2014-CI-03584   JOHN T MALAISE VS. CELESTE G MALAISE

2014-CI-03684   JUAN J MOLINA JR VS. AMANDA GONZALEZ

2014-CI-03712   TANYA M GARCIA VS. ABEL C GARCIA

2014-CI-03884   ROBERT E JARAMILLO VS. APRIL E DAVILA

2014-CI-04729   MONICA GONZALEZ VS. JAMES GARCIA

2014-CI-05846   SONYA D HELAIRE VS. EDMOND HELAIRE JR

2014-CI-06026   CIRIO RICONDO VS. ASHLEY RICONDO

SIGNED THIS THE 21st DAY OF November, 2014

_Janet Littlejohn_

JUDGE JANET LITTLEJOHN

**66792**   Document Type: ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION

MR 000053



CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

**66792**

ORDER DISMISSING CAUSES FOR THE WANT OF PROSECUTION
IN THE 407th JUDICIAL DISTRICT COURT OF BEXAR COUNTY, TEXAS

ON THE 21st DAY OF November, 2014 CAME ON TO BE CALLED AT
8:30 AM, THE FOLLOWING ENTITLED AND NUMBERED CAUSES SPECIALLY
SET ON THE DISMISSAL DOCKET IN THE MANNER PROVIDED BY LAW; AND

IT APPEARING TO THE COURT THAT THERE IS GOOD AND SUFFICIENT
REASON FOR DISMISSAL OF THESE CASES FOR WANT OF PROSECUTION;

IT IS THEREFORE, ORDERED THAT THE CAUSES OF ACTION LISTED
BELOW, BE, AND THE SAME ARE HEREBY, DISMISSED FOR WANT OF
PROSECUTION WITH COSTS ASSESSED AGAINST THE PLAINTIFFS FOR WHICH
EXECUTION SHALL ISSUE.

| | |
|---|---|
| 2002-CI-06618 | RICHARD A MEYER VS. KARLA Y MEYER |
| 2008-CI-20218 | INT OF DREW M TARTALONE |
| 2009-CI-19229 | INT OF ANTHONY L MOREIRA |
| 2009-CI-19757 | INT OF JAREN R HADDEN |
| 2010-CI-01242 | RUBY A HERNANDEZ VS. BRIAN A CHAVEZ |
| 2010-CI-01612 | MARIA MARTINEZ VS. RUBEN MARTINEZ III |
| 2010-CI-05134 | JOSEPH B HALL VS. ANGELA A P HALL |
| 2010-CI-06205 | INT OF ALEXIS B DYER |
| 2010-CI-09490 | INT OF BRIANNA A GARCIA |
| 2010-CI-17587 | CYNTHIA A CORONADO VS. JOSE A CORONADO JR |
| 2011-CI-00361 | INT OF DANIEL ESCALERA |
| 2011-CI-00420 | INT OF CARLOS J FLORES III |
| 2011-CI-00540 | INT OF ISABELLA ORTA |
| 2011-CI-01166 | JEREMIAH REYES VS. AMANDA R REYES |
| 2011-CI-01939 | INT OF JOHN NOLAN CASEY |
| 2011-CI-09486 | ASHLEY M KELLEY VS. RICHARD A FISSETTE |
| 2011-CI-09777 | CRYSTAL GUTIERREZ VS. JESUS GUTIERREZ |
| 2011-CI-10869 | ERASMO GUTIERREZ III VS. AYAKO GUTIERREZ |

# 66792



| Case Number | Cause |
|---|---|
| 2011-CI-12044 | INT OF DESTINY L MCWRIGHT |
| 2011-CI-14637 | CAROLINA F SEGUNDO VS. DANIEL A SEGUNDO |
| 2011-CI-14974 | IDALIA DIAZ VS. MANUEL DIAZ |
| 2011-CI-15161 | WILLIAM S GOEN VS. ALICIA M GOEN |
| 2011-CI-15291 | ROBERT H AVERY VS. TERRY L HOLDEN |
| 2011-CI-15726 | MELINDA K CHASE VS. SCOTT W CHASE |
| 2011-CI-15896 | BRENDA P ARREOLA VS. ADRIAN ARREOLA |
| 2011-CI-16579 | INT OF BRYCE A HENRY |
| 2011-CI-17805 | MARTIN V MCATEE VS. NATALIE A MCATEE |
| 2011-CI-18406 | INT OF ADRIAN D M RAMOS |
| 2011-CI-20111 | APRIL F RODRIGUEZ VS. ANDREW J HERRERA |
| 2011-CI-20199 | JOSEPH GEORGE VS. AMANDA GEORGE |
| 2012-CI-00183 | MONICA C SHELTON VS. LAWRENCE DIXON |
| 2012-CI-00480 | INT OF TORIBIO S GOMEZ IV ET AL |
| 2012-CI-00540 | INT OF Z N S |
| 2012-CI-03755 | PAUL J RUDDER VS. APRIL R RUDDER |
| 2012-CI-06379 | JENNIFER MORALES VS. DAVID A MORALES |
| 2012-CI-06899 | JESSICA A FLORES VS. ANDREW A GUTIERREZ |
| 2012-CI-08195 | JOSE L SANCHEZ VS. ASHLEY SANCHEZ |
| 2012-CI-08658 | SYLVIA CASTILLO VS. ERNEST CASTILLO |
| 2012-CI-09282 | MARK CHAVARRIA VS. CHRISTINA CHAVARRIA |
| 2012-CI-10690 | GREGORY I MAINEZ VS. PRISCILLA H MAINEZ |
| 2012-CI-11407 | TIGH R LEWIS VS. LAUREN A LEWIS |
| 2012-CI-12747 | JESSE H MIRANDA VS. SANTA C MIRANDA |
| 2012-CI-15867 | JULIE E GREGORY VS. MICHAEL GREGORY |
| 2012-CI-16256 | INT OF ISAIAH C GARZA |
| 2012-CI-18658 | AMANDA S PENA VS. DAVID PENA |
| 2012-CI-19137 | EDGARDO ROBLES VS. OLGA ROBLES |
| 2012-CI-19543 | ALEJANDRO MORALES VS. VANESSA V MORALES |
| 2012-CI-19619 | INT OF CHANCE SAUNJAY DOWNING |

66792

**66792**

2012-CI-19888   MARIO A TAPIA VS. MARIA E TAPIA
2013-CI-02571   MICHAEL W MUNSELLE JR VS. DIANA J DURAN
2013-CI-03134   CASEY J FUENTEZ VS. GENIE M E FUENTEZ
2013-CI-03705   INT OF TRENTTON L MICHEL
2013-CI-03918   JEREMY D KRAUSE VS. TIA V KRAUSE
2013-CI-04479   JENNIFER A BURK VS. ROBERT J BURK
2013-CI-04812   MICHELLE MORENO VS. DAVID MARTINEZ
2013-CI-04918   GLENNA S HATHAWAY VS. CHARLES W HATHAWAY JR
2013-CI-05494   NORMA GALMICHE ET AL VS. CAROLYN MIRELEZ
2013-CI-05537   DANIEL D MOYNIHAN VS. KAMERON A BEAN
2013-CI-06795   INT OF UNBORN CHILD
2013-CI-06839   EDWARD J VIDAL VS. MARTA H VIDAL
2013-CI-07056   CLAUDIA I PEREZ VS. AMIN U NAZARI
2013-CI-07170   THUMBELINA V RAMON VS. SHAWN M BURNEY
2013-CI-08140   DOLORES MORENO VS. RAMIRO MORENO
2013-CI-08224   JAMES D CRESPO VS. JACQUELYN M CRESPO
2013-CI-08736   CARMEN Y RODRIGUEZ VS. NICOLE ALDERETTE
2013-CI-08920   DEBRA R BUCKLEY-SIMS VS. CHRISTOPHER L SIMS
2013-CI-09370   INT OF PEDRO H VARGAS JR
2013-CI-09416   KIMBERLY C WILLIAMS VS. ANTHONY D WILLIAMS
2013-CI-09460   CHRISTOPHER K SCOTT VS. ERIC B SCOTT
2013-CI-09473   JENNIFER A LOPEZ-SELFRIDGE VS. JOHN D SELFRIDGE
2013-CI-10305   JENNIFER D REEH VS. JOSHUA M CRIDDLE
2013-CI-10469   MARIA A D HUIZAR VS. TIMOTHY E HUIZAR
2013-CI-10693   CECILIA M CRUZ VS. LEE R CRUZ
2013-CI-10987   KEVIN D REININGER VS. JORDAN L HORN
2013-CI-11118   MICHELLE MARTINEZ VS. RICHARD MARTINEZ
2013-CI-11233   ATRECIA WERNER VS. ROBERT D WERNER
2013-CI-11436   INT OF SEBASTIAN A ORNELAS
2013-CI-11478   ARTHUR L GANDARA VS. MONICA GANDARA

**66792**

66792

2013-CI-11538    RAFAEL E TORRES VS. MARTHA S TORRES
2013-CI-11566    INT OF MICHAEL A LEWIS
2013-CI-11580    TINA O'BRYAN VS. ANTHONY P O'BRYAN JR
2013-CI-11613    VICTOR L MARES VS. STEPHANIE M MARES
2013-CI-11628    ROSALINDA G JIMENEZ VS. LUIS D JIMENEZ-GONZALEZ
2013-CI-11958    JAYDE N PEOPLES VS. ALBERT L CORNELIUS
2013-CI-12237    KORY KEIFER VS. DIANNA KEIFER
2013-CI-13065    CHRISTOPHER MORENO VS. DENYS MORENO
2013-CI-13323    ELIZABETH C CAVAZOS VS. CESAR R CAVAZOS
2013-CI-13441    JESSICA A P RODRIGUEZ VS. ERIC P RODRIGUEZ
2013-CI-13557    ANASTACIO DELEON SR VS. JAZMINE HERNANDEZ
2013-CI-13571    NARCISO RODRIGUEZ VS. KRISTY L SMITH
2013-CI-13630    LISA A VASHEGHANI VS. NADER R VASHEGHANI
2013-CI-13718    ERIC HERNANDEZ VS. JENNIFER L HERNANDEZ
2013-CI-13899    RACHEL BETSILL VS. THOMAS BETSILL
2013-CI-14074    DAVID G MONTEMAYOR JR VS. SYLVIA R MONTEMAYOR
2013-CI-14548    SANDRA M SERVANTEZ VS. THOMAS SERVANTES
2013-CI-14554    VALERIE JAMES VS. CHARLES JAMES
2013-CI-14733    JOHN P LOERA VS. NANCY LOERA
2013-CI-14748    BRANDAN M GARZA VS. JOHN A GARZA
2013-CI-15365    MELVIN L HENDERSON VS. DIANE M MONTANA
2013-CI-15480    MARGARITA D GOMEZ VS. RAUL GOMEZ
2013-CI-15835    LAURA V MENDEZ VS. JUAN M MENDEZ
2013-CI-15983    MORGAN JENNINGS VS. PRESTON H JENNINGS
2013-CI-15993    VANESSA CANO VS. COLLIN G HILL
2013-CI-16152    ANGELO ARAGON VS. LYNN R ARAGON
2013-CI-16423    MARY E THATCHER VS. TIMOTHY THATCHER
2013-CI-16479    LILLIE SILVA VS. MARQUS F REYES
2013-CI-16494    KATHERINE L GUTIERREZ VS. JASON GUTIERREZ
2013-CI-16780    INT OF KRISTOPHER A HUNT

66792

# 66792

| Case Number | Parties |
|---|---|
| 2013-CI-16897 | MARIA G RODRIGUEZ VS. MARCOS A GARCIA |
| 2013-CI-17166 | GINA BROWN VS. CALVIN D DURHAM |
| 2013-CI-17181 | DAVID M ELIZONDO JR VS. CHRISTINA M ELIZONDO |
| 2013-CI-17373 | MARGARITA WEBB VS. WILLIAM B WEBB |
| 2013-CI-17528 | MELISSA R WALKER VS. TERRY S WALKER |
| 2013-CI-17559 | ALICE SANTACRUZ VS. NEFTALI MARTINEZ |
| 2013-CI-17571 | AMANDA HILDRETH VS. FRED R MARTINEZ |
| 2013-CI-17585 | MARIA L SANCHEZ VS. JULIO SANCHEZ SR |
| 2013-CI-17661 | VERONICA HERNANDEZ VS. WERNER A G ROSARIO |
| 2013-CI-17690 | KAREN D VAN ZANT VS. KYLE T RABY |
| 2013-CI-17719 | DONALD BLANCHARD VS. LETISHIA HENDERSON |
| 2013-CI-17979 | YVONNE E SANDOVAL VS. ALBERT ARREDONDO |
| 2013-CI-18035 | YVONNE T MUNOZ VS. JOSE A MUNOZ |
| 2013-CI-18283 | BEATRICE A AVILA VS. ROSALIO M AVILA |
| 2013-CI-18527 | INT OF JONATHAN D TRINIDAD |
| 2013-CI-18668 | JULIO R GONZALES VS. MARIA V B GONZALES |
| 2013-CI-18711 | CARISA A SILVESAN VS. THEODORE W SILVESAN |
| 2013-CI-18725 | JORGE MORA VS. MARIA O MORA |
| 2013-CI-18783 | ARTURO GONZALES VS. MARTHA V GONZALES |
| 2013-CI-18839 | TONYA WILDER-HARPER VS. JAMES M HARPER |
| 2013-CI-18910 | OLIVIA J LEVIS VS. EARL F LEVIS |
| 2013-CI-19055 | YESSICA GARCIA VS. DANIEL P ROBLEDO |
| 2013-CI-19113 | MARIA D C AYALA VS. JUAN M CASTILLO |
| 2013-CI-19128 | STEVEN BERMEA VS. ANGELA A BERMEA |
| 2013-CI-19580 | HANNAH L BEVIL VS. DUSTY L WITHERWAX |
| 2013-CI-19665 | MICKEY W BESS VS. ROBERT T BESS |
| 2013-CI-19797 | MICHELE A JIMENEZ VS. ALFREDO JIMENEZ |
| 2013-CI-20446 | IESHA M DISHMAN VS. LARRY E DISHMAN II |
| 2013-CI-20564 | ELOISA V SALAZAR VS. MARIANO SALAZAR III |
| 2013-CI-20723 | BRENDA B KELLER VS. BERNARD S KELLER |

 

# 66792

2013-CI-20978   RACHEL Y HINDERMAN-ODOMS VS. DANIEL ODOMS JR

2014-CI-00878   JOANNE LOPEZ VS. FRANK A LOPEZ

2014-CI-01168   GREGORY W GREER II VS. HEATHER A GREER

2014-CI-01519   INT OF KYNLEE D NICOLAY A CHILD

2014-CI-01719   DANIEL AGUILAR VS. ELOINA AGUILAR

2014-CI-02371   JESSICA B DELEON VS. PAUL DELEON JR

2014-CI-02821   RAQUEL T MORENO VS. MICHAEL MORENO JR

2014-CI-02907   ESPERANZA L'G ABRIEL VS. JAMES J ABRIEL

2014-CI-02977   INT OF JOSIAH HUMPHREYS A CHILD

2014-CI-03584   JOHN T MALAISE VS. CELESTE G MALAISE

2014-CI-03684   JUAN J MOLINA JR VS. AMANDA GONZALEZ

2014-CI-03712   TANYA M GARCIA VS. ABEL C GARCIA

2014-CI-03884   ROBERT E JARAMILLO VS. APRIL E DAVILA

2014-CI-04729   MONICA GONZALEZ VS. JAMES GARCIA

2014-CI-05846   SONYA D HELAIRE VS. EDMOND HELAIRE JR

2014-CI-06026   CIRIO RICONDO VS. ASHLEY RICONDO


SIGNED THIS THE 21st DAY OF November, 2014

_____

JUDGE JANET LITTLEJOHN



CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT. WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*October 20, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

BRENDA TRUJILLO, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*



2011CI16579 -P00043

**Donna Kay McKinney**

Bexar County District Clerk

101 W. Nueva, Suite 217

San Antonio, TX 78205



BY:

DEPUTY

2014 DEC 12 P 4:49

FILED
DONNA KAY McKINNEY
DISTRICT CLERK
BEXAR COUNTY

DOCUMENT SCANNED AS FILED

MR 000062

FIRST-CLASS MAIL
neopost
12/03/2014
US POSTAGE $00.34⁰
ZIP 78205
041L12000

RETURN SERVICE REQUESTED

* OFFICIAL NOTICE *
* * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * *

KELLY A STAPLER

ATTORNEY AT LAW

6 DESTA DR 5900

NIXIE    799    CE  1    1809    2212/08/14

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC:  78253411G7    *6210-00347-..........

IN THE DISTRICT COURT  407th

JUDICIAL DISTRICT OF:

BEXAR COUNTY, TEXAS

CASE NO.   2011CI16378

HT OF BRYCE A HENRY

VS

NOTICE OF DISMISSAL WANT OF PROSECUTION

ON THE  21ST DAY OF NOVEMBER, 2014, DISMISSAL FOR

WANT OF PROSECUTION WAS SIGNED BY THE

HONORABLE JANET LITTLEJOHN

IN THE ABOVE CAUSE.

DISTRICT C

BEXAR COU

KIMBERLEY

DOCUMENT   SCANNED   AS   FILED

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*October 26, 2015*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

MARIA PALACIOS, Deputy District Clerk

*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

# Tab B

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 2011-CI-11645

IN THE INTEREST OF          ) IN THE   DISTRICT   COURT
B.A.H., A CHILD             )
                            ) BEXAR   COUNTY,   TEXAS
                            )
                            ) 150TH JUDICIAL DISTRICT

*******************************
HEARING SEPTEMBER 16, 2015
*******************************

On the 16TH day of SEPTEMBER, 2015 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Karen Pozza, Judge of the 407th District Court of Bexar County, Texas:

Proceedings reported by Machine Shorthand.

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000065

A P P E A R A N C E S

MR. CHARLES HARDY & MR. DAVID EMORY
12000 HUEBNER ROAD, STE. 200
SAN ANTONIO, TX  78230
SBOT # 08985550 & 06612100
Phone:  210-349-9933
ATTORNEY FOR MR. JAMES DAVID HENRY

MS. PAM JULIAN
2420 MCCULLOUGH, STE. 122
SAN ANTONIO, TX  78212
SBOT # 11048800
Phone:  210-735-4910
ATTORNEY FOR MS. STEPHANIE MARKELL

MR 000066

INDEX

PAGE

CAPTION --------------------------------------------- 1

APPEARANCES ----------------------------------------- 2

INDEX ----------------------------------------------- 3

PROCEEDINGS ----------------------------------------- 4

REPORTER'S CERTIFICATE ------------------------------ 86

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000067

WITNESS INDEX

| WITNESS | DIR | CR | RED | REC |
|---|---|---|---|---|
| JOHN HENRY | 13/28 | 22 | | |
| DR. DINA TREVINO | 30 | 47 | | |
| STEPHANIE MARKELL | 53/74 | 66/80 | | |

MR 000068

EXHIBIT INDEX

|                    | OFFER | ADMIT |
|--------------------|-------|-------|
| Petitioner's Ex. 1 | 18    |       |
| Petitioner's Ex. 3 | 34    | 34    |
| Petitioner's Ex. 4 | 34    | 35    |
| Petitioner's Ex. 5 | 38    |       |

MR 000069

(Proceedings)

THE COURT: 2011-CI-11645. So we have a Motion to Transfer and temporary orders?

MR. HARDY: Yes, Your Honor. Charles Hardy here on behalf of David Henry, the Movant. We are ready.

THE COURT: Okay. And are we hearing everything or just where the child goes for right now?

MS. JULIAN: Just a Band-aid and the Motion to Transfer, I guess.

THE COURT: Just the Band-aid, okay.

MR. HARDY: And Judge, we filed a Motion to Transfer and a Motion to Modify for temporary orders. That's before the Court. Would you like a copy of it?

THE COURT: Yes, sir. Thank you. Okay. On the Motion to Transfer?

MR. HARDY: Did you want to hear that first, Judge?

THE COURT: I will hear that first, but I think we are still going to hear the temporary, temporary order part. Right?

MR. HARDY: Yes, ma'am.

THE COURT: Okay.

MR. EMORY: Judge, in regards to the Motion to Transfer, I would like to call Mr. Henry to

MR 000070

the stand.

THE COURT: Okay.

MR. HARDY: Judge, did you want to hear opening remarks on the case?

THE COURT: I will hear brief remarks and then I will just hear everything all at the same time, since I'm going to have to decide both issues anyway. Okay?

MR. HARDY: That would be great. Thank you, Judge.

MS. JULIAN: Judge, we also have the child here.

THE COURT: Okay. I'm going to hear it all together since I have to decide both issues anyway. Yes, sir?

MR. HARDY: If it please the Court, as I mentioned this morning, this is a case involving the custody of a 13 year old boy. I represent David Henry, who is the father, who has had custody of this child for the last three and a half years. So the Court will understand, attached to my motion is a copy of the order establishing his paternity of the child. There was a subsequent action filed about four years ago in this matter, that appointed my client as the temporary sole managing conservator. That action was Dismissed for

MR 000071

Want of Prosecution. My client had a lawyer from out of town and he was not aware that it was set on the dismissal docket and apparently it was dismissed in December. What happened was the father and the child lived with his wife and other children in Midland, Odessa -- in Midland, Texas. The child was attending school out there and they moved to Flower Mound, unbeknownst to my client about three and a half weeks ago, the mother drove from San Antonio, we think, to Dallas, and picked up the child in the middle of the night, at about midnight in the parking lot of the hotel they were staying in. I guess that's all going to come out, as far as what happened. And the mom has had the child under the circumstance for the last three and a half weeks. The child, prior to Dad taking custody three and a half years ago, was a chronic truant. He was about to be held back a year in high school. He had terrible disruptive problems in class. His goal was to be a gang member. That was his goal in life. And he had made several suicide threats that he was actually hospitalized for. The mother at the time of that temporary conservatorship, sole managing conservatorship, was a chronic prescription drug abuser and had a history of mental illness. She did not have a car at the time or even a driver's license. Apparently

MR 000072

it had been suspended. Dad has enrolled the child in a another private school in Flower Mound, where he lives now, and has paid for the year, and obviously our goal is to get the child back immediately and maintain the status quo of this situation. We got -- The fact that the case was Dismissed for Want of Prosecution, does not impact the fact that Dad has had custody of this child for the last three and a half years and has done a good job with the child, has turned his life around. His grades are better, he's no longer having the problems that he had before. We have to testify today, my client, who is concerned about his son. We have Doctor Dina Trevino, who has pored through the medical records, investigative reports, that are on file. We understand that the child is here, as well.

Judge, the other issue that needs to be decided today is the venue issue. Now, all the witnesses in this case over the last three and a half years, are in Midland. As a matter of fact, I think Doctor Trevino is going to testify that she's spoken with the teachers in Midland who have known this child for the last three and a half years. I believe there's been mental health professionals in Midland. Everything is in Midland. And David Emory is going to address that issue on the Motion to Transfer venue. But we believe

MR 000073

it is appropriate, although my client has moved to Flower Mound, we believe it is appropriate for this case to be transferred to Midland, to proceed after today's hearing. So what we are asking the Court to do is to immediately return the child to status quo and to make such other orders as may be in the child's best interest, as far as evaluations and so forth. But subsequently to transfer this case to Midland. Thank you.

MS. JULIAN: May I, Your Honor?

THE COURT: Yes, ma'am.

MS. JULIAN: I'm sorry. As I told the Court this morning, I was just retained, and so I'm probably not nearly as fresh as Mr. Hardy. But there have been a few things that I managed to determine. I managed to determine that this is a very bright 13 year old boy. They want to talk about custody. Dad has custody. Oh, yeah, he has custody. He's taken the child, he's brought him out of being on near drugs and gangs and took away from Mom, who is totally unreliable. None of that is true. He never -- He does not have custody. This whole case was DWOPed for want of prosecution. And as part of the case that was DWOPed, from what you see they filed with the Court attached to their petition, as well as their amended petition, is a

MR 000074

copy of the order that was entered within that case, that was filed originally a long time ago, that subsequently was DWOPed, in order to establish his paternity. When that was all dismissed, it was all dismissed. All right. Now, for three years, when he got temporary custody, the father takes off with this child and refuses to let the mother have any kind of possession, see or speak with her son. He blocked his phone number. The child cannot speak to mom and the mom has not been able to speak with the child. She's been up to his home in Midland on several occasions, with the police, and they will not get involved. There has been absolutely no contact until about a month ago. About a month ago at 10:00 at night, mother is in San Antonio and child is in, supposedly, Midland. She gets a call at 10:00 at night from her son. Her son had gotten off of his grandfather's telephone, and gotten a phone number of his mother. Called his mother from a hotel room late at night, and begged her to come and get him. Mom gets in the car here in San Antonio, and picks up the son, unattended and alone, in a hotel room, in Dallas. She brought him back here, he's been in school ever since. He is in every athletic thing there is a boy can be in, in school. His grades are good and he's doing great. The allegations made against Mom in the

MR 000075

original proceeding are unfounded. The allegations made about the son are unfounded. It was part of a massive hoax to get custody wrestled away from mother. And just as a little added thing, Your Honor, there was a legal father and an order was entered that made him the father. And after that, they had to file a paternity suit, get all of that squared away. But it was dismissed. And my client took advantage of the fact that it was dismissed, not able to see her son, not able to do anything. And when he called, she went to his aid. And he is going to -- he is going to parrot that very same story. Being left alone, he has a father who never goes to a single practice, never goes to a single ballgame, never does anything and he is happy here with his mother for the first time in years. And I think that will bear out when you speak with him, no matter how many lawyers you have and no matter how many psychologists you have, this little boy is an exceptional young man, and I know the Court is going to see that right away.

THE COURT: Okay. Your first witness?

MR. HARDY: We call David Henry.

THE COURT: Good afternoon. Raise your right hand, please.

(Judge swore in the witness).

MR 000076

THE WITNESS: I do.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. HARDY:

Q State your full name for the Court please, sir.

A James David Henry.

Q Mr. Henry, what is your address?

A It is 2505 Pelican Court, Flower Mound, Texas.

Q Pull the microphone a little bit closer.

A 2505 Pelican Court, Flower Mound, Texas.

Q What is your occupation?

A I'm in private equity. So I buy companies and run them.

Q And what do you do outside of your work?

A I have a family. I have -- I'm on the board of United Way. I'm a founding member of Rotary in our town, and I'm on two foundations.

Q Sir, how long have you had custody of Bryce?

A About three and a half years.

MS. JULIAN: Objection, Your Honor, he does not have custody, he has possession.

THE COURT: Okay. Well, non-legal custody whatever.

BY MR. HARDY:

Q How long have you had possession of Bryce?

MR 000077

A    About three and a half years.

Q    At what point did you know that you had a son?

A    When he was nine, I get a call from Stephanie, she thought she was talking to my Dad, but she was asking about a thyroid disorder, and if it ran in my family. And that's when I found out about Bryce, when he was nine years old.

Q    Sir, what were his circumstances when you sued for custody?

A    I was really worried about him. He was doing bad in school. He had -- I recall the number somewhere around 40 unexcused absences, and I was concerned for his well-being. One, he was in -- first he was living with Stephanie's stepmom and dad, and -- Rick Woody - Rick Woody had hit Bryce, and so they moved out. And then he was moved into a house on the Country Club in Midland. And at that point there was -- we did a background check on the owners, and there was a convicted child molester in that house, and I was concerned about that. And then from there --

MS. JULIAN:    Objection, Your Honor, assuming facts not in evidence. When it talks about he did a check in there, he discovered --

THE COURT:    Hearsay sustained.

MR 000078

BY MR. HARDY:

Q   Other than that, what other concerns did you have about his situation?

A   Well, then from there she moved him to San Antonio, and in San Antonio she was moved into a house that she wasn't up on the payments on, later got foreclosed on, and she moved him into -- His room had a wasp nest in it. The windows were broken around the house and I came and checked on him several times, and you know, for over a month the windows were never replaced. I was, you know, concerned for his safety, honestly. I mean, anybody could walk into that house. They were ground floor windows that were broken out.

Q   Is it your contention at that point that she had a prescription drug abuse issue?

A   Yes.

Q   Is it your contention that she had mental health issues?

A   Yes.

Q   When you were granted sole managing conservatorship of Bryce, when you took custody of him, can you tell the Court what you did to help him?

A   Well, you know, my wife and I really had to work with him, and my wife is a saint for doing this. He had, you know, psychological issues, we got him to

MR 000079

see a psychologist. We did --

Q   In Midland?

A   In Midland. We did a neurotherapy sessions with him.

Q   Was that in Midland, too?

A   Uh-huh. And he had some repressed memory issues, and things like that. And you know, just general bad behavior. And he, you know, kind of lacked empathy and there were a lot of issues. So we worked through those and, you know, he started doing better in school. His grades improved, his demeanor improved. You know, like, he didn't want to be touched and, you know, if you patted him on the shoulder, he would just kind of freeze up. And he was, you know, hording food. We had to stop him from overeating, because he would get a plate of food or, you know, we'd have food in the middle of the table, and he would just keep and keep eating, you know, stuffing himself, and just was really concerned, in general, about him.

Q   Was he a discipline problem when you took custody?

A   Yes. He definitely was.

Q   Yes, sir.

A   And so -- sorry -- to deal with those, you know, at school, if he got in trouble at school, he got

MR 000080

in trouble at home, also. And so, you know, like when I was growing up, my dad made me pull weeds in the garden if I got in trouble. So I did the same thing with him. If he got in trouble, I get him to pull weeds. One, it teaches a work ethic, but also it, you know, helped him, burn off some energy. He was a hyper kid. But also, you know, I noticed significant decreases in his disciplinary issues at school.

Q   Now, where did you put him in school in Midland?

A   At Midland Christian.

Q   Midland Christian?

A   Uh-huh.

Q   And they have all the grade reports of how he's done over the last three and a half years?

A   Yes.

Q   I want to hand you what's been marked Exhibit 1 and ask if you can identify that as his cumulative grade record for it appears, was this last year?

A   Yeah. This -- Yeah, it looks to be.

Q   And this is from Midland Christian University; is that correct?

A   Yes. Midland Christian School. Yes.

Q   This is for the 2014, 2015 year?

A   Yes.

MR 000081

MR. HARDY: We'll offer Exhibit 1.

THE WITNESS: Yes. And it is, you know, A's and B's, some hundreds, 90.

MR. HARDY: Yes, sir. Hold on one second.

MS. JULIAN: Objection, hearsay.

THE COURT: Sustained. He can use it to refresh his memory and testify from it.

MR. HARDY: That's fine.

BY MR. HARDY:

Q   Sir, what are his -- How has he been doing last year in school?

A   He's done great. I mean, the problems have gotten less and less and, you know, you are not getting calls from the principal about having to talk to him about it. He is doing real well.

Q   How are his grades?

A   His grades have done well.

Q   I'm sorry?

A   He's done well in his grades. He is getting A's and B's. You still have to work with him every once in awhile, he will get, you know -- you have to push him like you would any teenage kid, but you know, hey, his grades are not high enough on -- so you know, my wife and I will talk to him and hey, you know.

MR 000082

Q   Was he having emotional outbursts in school before you took custody?

A   Yes.

Q   Is he having emotional outbursts with you?

A   No.

Q   Was he throwing chairs at school before you took custody?

A   Yes.

Q   Is he throwing chairs now?

A   No.

Q   Have there been any suicide threats since you've had him?

A   No.

Q   Were there suicide threats before you took custody?

A   Yes.

Q   Sir, what were his aspirations when you first took custody?

A   He was kind of enamored, wanted to be a gangster.

Q   A gangster or a gang member?

A   A gang member.  He -- he -- he -- you know, when we got him at the Court, when they did the writ of attachment, he showed up in Court in a hoody and just kind of looked like -- I mean, a thug, honestly.

MR 000083

Q   Was he wearing a hoody in the court?

A   Yes.

Q   Okay.  And what are his aspirations now?

A   He wants to play pro football.

Q   Is he involved in sports?

A   Yes.  He is in football, basketball and track.

Q   Was he sent to a mental health facility before you took custody?

A   Yes.

Q   Has that been necessary since then?

A   No.

Q   Was he about to be dropped back a grade before you took custody?

A   Yes.

Q   Has that been the issue since you have had him for the last three and a half years?

A   If I would not have taken him -- When I transferred him to Midland Christian, it wiped out his unexcused absences, otherwise, he would have failed the grade.

Q   Describe your house in Midland for the Court.

A   It is a four bedroom, five bath house.  It is on four acres.  We have a garden, we have a shop, we have a pool.  So it is a nice place to live.  We've got gates on the front, so the kids can ride their bikes

MR 000084

around on the driveway, without having go in the street.

Q   And you are moving to Flower Mound now?

A   Yes.

Q   Describe the house that you are moving into in Flower Mound.

A   It is -- I don't know how many bathrooms.  It has six or seven bedrooms.  It is in a gated community.

Q   He'll have his own bedroom?

A   Yes, he will.

Q   And where have you enrolled him to attend school in Dallas?

A   Liberty Christian.  So he doesn't do well with change, so I was trying to put him in a school as close to Midland Christian as I could, so....

Q   Have you -- have you paid for the year for him to attend there?

A   Yes.  Would you mind, Judge, if I grabbed my water?  My mouth is a little dry.

THE COURT:  Not at all.

THE WITNESS:  Thank you.

BY MR. HARDY:

Q   Sir, is it your contention that it is in the best interest of your son at least for now to move back to Flower Mound with you and the family?

A   Yes.  I'm very concerned if he stays here, the

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000085

same problems are going to pop up again.

Q   Would you ever use self help methods that she used in this case?

A   No.   I'm not in the habit of doing -- taking off with kids in the middle of the night.

Q   Are you asking the Court to let you take your son back to Dallas today?

A   Yes, please.

MR. HARDY:   I will pass the witness.

MS. JULIAN:   Thank you, Your Honor.

CROSS EXAMINATION

BY MS. JULIAN:

Q   How many hours a week do you work at your regular job?

A   It varies.

Q   Okay.   Have you looked at his grades, his current grades, since he started school here?

A   No, I have not.

Q   Would you be surprised to learn that they are considerably better than they were in Midland?

A   Well, it might be an easier school.

Q   You no longer live in Midland.   Correct?

A   No.

Q   Why did you move?

A   For work.

MR 000086

Q    For work?

A    Uh-huh.

Q    The -- all of the various foundations and other activities that you belong to, --

A    Uh-huh.

Q    -- how many nights a week do you devote to that?

A    They are usually at lunch.

Q    Just lunches?

A    Yeah.

Q    Are you coaching any of his teams or activities?

A    No, I'm not.  But it is through the school, they have paid coaches.

Q    Isn't it true that you blocked my client's phone from having access to your phone or her son's phone?

A    Yes.

Q    Yes or no?

A    When we originally got him --

Q    Just yes or no.  Excuse me, just yes or no.

A    Yes.

Q    You did?  And she's been -- You know that she's been to your door numerous occasions with the police.  Correct?

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000087

A    Two or three times, yeah.

Q    Wanting to see her son?

A    Uh-huh.

Q    What did you do to enable her to see her son on those occasions?

A    I didn't let her.

Q    You didn't let her, did you?

A    Uh-uh.

Q    Now, this past three years that you maintained possession, you have since discovered that this case that was originally filed here, was DWOPed, Dismissed for Want of Prosecution, didn't you?

A    I did not know about that until she came and got him. I didn't know about it.

Q    So you had no Court order giving you temporary custody or any kind of custody. Correct?

A    I had a temporary orders, yes.

Q    Well, when this case was dis WOPed -- DWOPed, those temporary orders went bye-bye?

A    I didn't know about them.

Q    But they have, haven't they?

A    Yes.

Q    Even though you didn't know it, they've gone bye-bye, so she had every legal right to come and get her child?

MR 000088

MR. HARDY: Excuse me, Judge, I object. I think that calls for a legal conclusion on the part of the witness.

MS. JULIAN: I will rephrase, Your Honor.

BY MS. JULIAN:

Q Mr. Henry, the night your child was picked up by his mother at the hotel --

A Uh-huh.

Q -- in Dallas, where were you?

A We were moving our office and the house at the same time, and I was going on my way to go back to Midland to move the office. He was with my family.

Q Well, he was in a hotel, who was in that hotel with him?

A My parents, my wife's parents, my wife, our other children.

Q They were all in the hotel?

A Yes, they were all staying there.

Q Well, then how could they not know that he called his mother and his mother came and got him?

A My father-in-law had gone down to get some medicine. I guess he was sick or something.

Q Mr. Henry, nobody knew he was gone until after 2:00 in the morning. Where were all these people?

A Well, the police called us, and when the police

MR 000089

notified us, that's when we found out.

Q That's because my client took the child to the police station, correct, and they phoned you?

A Uh-huh.

Q How often do you leave him alone in hotel rooms or alone anywhere?

A Well, we don't leave him alone very often.

Q Let me just ask you: You moved to another place all together?

A Uh-huh.

Q This is the Court of continuing jurisdiction. My client lives here. You now have moved from Midland, correct?

A Uh-huh.

Q Why are you wanting this case to be transferred to Midland?

A We maintain the residence in Midland and all the witnesses are there.

Q How much money do you earn a year?

A It varies.

Q How much money did you earn in 2014?

A We haven't filed a tax return yet, so I don't know.

Q How much did you earn in 2013?

A I would have to look.

MR 000090

Q   How much did you pay your lawyers a retainer for this suit?

A   $20,000.

Q   What did you bring psychologists to court with you this afternoon for?

A   On the recommendation of my attorneys and to look over -- there were so many medical files and things like that.

Q   Medical files and things like that. Do you recall when this was -- you filed this originally several years ago, you wanted the Court to have my client undergo psychological evaluation. Do you recall that?

A   Yes.

Q   Have you looked at that psychological evaluation?

A   I don't believe I ever did. Our psychologist did.

Q   You never asked to look at it? I mean, after the psychological evaluation came back perfectly normal, you never thought about saying, hey, listen, maybe mom would like to have some visitation? That thought never crossed your mind?

A   I don't recall.

Q   Okay. Do you want the Court to order your son

MR 000091

to go back and live with you even if he doesn't want to?

A Yes. I think it is a better place for him.

Q Do you know anything about my client's life, how she lives, where she lives, where she works? Anything?

A The past few years I don't know much about what she's been doing.

Q And you made it impossible for her to contact you or stay in touch with you. Correct?

A She's called.

Q I thought you blocked her number?

A She called the house.

Q When was that?

A Let's see. She called about a year ago, and then about a month ago, a little over.

MS. JULIAN: Pass the witness.

REDIRECT EXAMINATION

BY MR. HARDY:

Q Okay. Why did you block her phone?

A I was busy at work and she called me, I counted it one day, 16 times in a day, and you know, I didn't have -- Bryce was at home or at school. I didn't have the time to answer all these phonecalls.

Q So she was calling you at work while Bryce was at home trying to talk to Bryce. Did you explain to her

MR 000092

that he was not with you?

A    Yes.

Q    Would she call multiple times?

A    Yes.

Q    Was it harassing?

A    Yes.

Q    Was it in violation -- Well, did she ever go back to court to ask for visitation?

A    No.

Q    Did the order appointing you sole managing conservator, limit her access?

A    It gave me full authority.

Q    Okay.  And she's never come to court, to your knowledge?

A    No.

Q    She just laid behind the log and found out the case was dismissed and used some self help --

MR. HARDY:  Objection, Your Honor.  Leading the witness.

THE COURT:  Sustained.

MR. HARDY:  I have nothing else for this witness, Judge.

THE COURT:  Thank you, sir.

MR. HARDY:  I call Dina Trevino.

THE WITNESS:  Do I come down?

MR 000093

THE COURT: Yes, sir. Good afternoon.

(Judge swore in the witness).

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. HARDY:

Q    State your name for the Court, please.

A    Dina Trevino.

Q    And what is your occupation?

A    I'm a psychologist licensed in Texas.

MR. HARDY: Do you waive qualifications, counsel?

MS. JULIAN: Yes.

BY MR. HARDY:

Q    Okay. What have you've been retained in this case to do?

A    I was asked to review the records for Bryce Henry prior to living with his father, and during the time he was living with his father, and also to review medical records and other data I was provided on the mother, Ms. Stephanie Markell.

Q    Are they voluminous?

A    Yes, I did hours of --

Q    Lots of medical records, lots of school records, school reports, psychological records and so

MR 000094

forth; is that correct?

A    Multiple medical records than anything.  Also school records, some psychological records on mother, yes.

Q    So we are clear, the records regarding Stephanie, the mom in this case, all refer back to her condition three and a half years ago when dad was appointed sole managing conservator and took possession of this child; is that correct?

A    They referred to a period of time between 2005 and 2012 when father took possession.

Q    What are your concerns with what you've seen?

A    The records that I reviewed and I have not met any of the parties, I've not met mother and I have not met Bryce, and I talked to father and I reviewed records, reveal mother being on a number of different medications, pain medications that didn't seem to resolve chronic pain issues, back fusions.  She was on hydrocodone, she was on Narco, she was on Valium -- excuse me, Xanax, Valium.  These were relatively high doses, but in all together, it was a great deal of medication.  She had a number of brain scans, she had a chronic pain consult.  She complained of the medication not being able to control her symptoms.  She was on anti-depressant medications.  Just -- I reviewed text

MR 000095

messages showing mother to be on such, so many medications that she couldn't be awoken. She couldn't be -- she was nonresponsive, unable to take care of the child. I saw some police reports where the older two children that mother had from two other men, were wandering the streets, so people requested help because mother was passed out and was not able to be responsive.

Q   In fairness, do you know her medical condition now?

A   I do not. I have no idea of what has been the resolution of the chronic pain or back fusion issue, since 2012.

Q   You don't know if things have improved in her life or not?

A   And I don't know mother and I have no information, even if these are accurate records. They are all hospital and doctor's records that you provided, Yes.

Q   I'm sorry?

A   That you provided me.

Q   Was there actually a doctor who rejected her as a patient, at this point?

A   Yes, too difficult to manage, yes.

Q   I'm sorry?

A   Too difficult to manage.

MR 000096

Q    That she was too difficult to manage?

A    Or her case. I'm not sure. Yes.

Q    Okay. Do you have concerns about her mental health during this time period?

A    Well, she was referred to Doctor John Reid for a psychological evaluation. It was referred three times, and she eventually -- this was all in 2012. She was eventually seen by Doctor Reid, but the evaluation was incomplete. Doctor Reid's report describes some real serious concerns about loss of reality testing. That was later that I corroborated through reading police reports, where she seems to be either hallucinating or having some sort of medical, psychological reaction. Doctor Reid said he wasn't able to finish the evaluation as the order is written in a way that he wasn't able to meet all the parties.

MR. HARDY: May I approach the witness, Judge?

THE COURT: Yes, sir.

BY MR. HARDY:

Q    I'm going to hand you what's been marked as Exhibit 3 and ask if you can identify the exhibit is an order on a Motion for Medical Examination of Stephanie Suzanne Markell?

A    Yes. This is an order -- this is the first

MR 000097

order.  I think there were two orders all together. This was the first order in January of 2012, where there was a long paragraph about what needed to be evaluated, and Doctor John Reid, it says Kenneth Reid, but Doctor John Reid was appointed to do it.

MR. HARDY:  We'll offer Exhibit 3, Judge.

MS. JULIAN:  No objection, Your Honor.

THE COURT:  Admitted.  Thank you.

(Petitioner's Exhibit 3 admitted)

BY MR. HARDY:

Q   Now, ma'am, was this order -- As a psychologist, if you received an order of this type, was this sufficient to do what was necessary to be done and intended to be done in this case?

A   No, it was not.

Q   And why is that, ma'am?

A   Well, Judge Littlejohn signed the order, but in all fairness to Judge Littlejohn, in 2012, we were writing orders as we kind of saw them.  The attorneys, were, I think were a lot tighter than how we write orders now, but it says we need a physical and psychological evaluation to establish whether or not she should be a JMC, whether she should have supervised visits, and whether the child's relationship with mother is in the best interest.  And it didn't -- it didn't

MR 000098

allow for father to be ordered to be a part of that. That's essentially a custody evaluation. And the child was involved in it, so Doctor Reid really wasn't able to do what the Court ordered. What he did was a little bit of testing and some parenting assessment.

Q    Okay.  I will hand you what has been marked Exhibit Number 4.

A    I have two 4's.

Q    And ask if you can identify that as the psychological evaluation that Doctor Reid conducted?

A    Yes.  This was a psychological evaluation that Doctor Reid did in April and May of 2012.

MR. HARDY:  Judge, we'll offer Number 4.

MS. JULIAN:  No objection.

(Petitioner's Exhibit 4 admitted)

BY MR. HARDY:

Q    Now, this was -- and so just so we understand, there were actually several orders, subsequent orders for mental examination when she failed to first appear, there was at least one other order for mental examination compelling her to appear; is that correct?

A    Yes.

Q    What do you find significant about the evaluation that was prepared by Doctor Reid, or not significant?

MR 000099

A    Well, there were no collateral, and again, I'm not, this isn't a criticism of the -- of the evaluation, but this is sufficient for psychological evaluation. But it -- there was material that it didn't seem that Doctor Reid had access to somehow, the multiple medications that she was on through various physicians at that same time, was one. The other thing is that it talks -- one of the concerns are that -- I'm trying to find here -- I'm missing a page.

Q    Whoops.

A    On this one, I got page 2, 3 and 6. The one I looked at was six pages.

Q    Let me continue while he is finding that. We'll come back to that. Was there anything else that you recall?

A    Well, the part that's really concerning in that report, there were two in the file, there was the one was six pages and it is in the file with the medical school records. Doctor Reid talks about problems with reality testing, difficulty living in a fantasy life, difficulty in assessing reality. And that was based on an MMPI and a Rorschach, and so really, more testing would have been helpful and more collateral information would have been helpful, but he talks about inability to maintain ahold on reality, which is very concerning.

MR 000100

Q    He talks -- say that again.

A    He talks about a difficulty in maintaining ahold of reality, living in a fantasy life, which was very concerning, especially in the light of some police reports around that same time.

Q    Did you have the opportunity to review a police report involving this lady?

A    Several police reports, I did review.  One in particular, yes.

Q    I'm going to hand you what's been marked Exhibit 5.

A    That was by the -- the Converse Police Department.

Q    And ask if you can identify this as a copy of police report?

A    Yes.

Q    Issued by the Converse Police Department?

A    Yes.

Q    And have you had an opportunity to review that report?

A    Yes.

Q    Does it give rise to an opinion you have in this case?

A    Yes.

MR. HARDY:  We'll offer Exhibit 5, Judge.

MR 000101

MS. JULIAN: Objection, Your Honor, hearsay.

MR. HARDY: Judge, this is a police report that gives -- that offers a basis for an opinion that this expert has and we believe that's an exception.

THE COURT: Well, she can rely on it in forming the basis of her opinion, but I don't think that makes it admissible, so she can testify if --

MR. HARDY: Thank you, Judge.

BY MR. HARDY:

Q   Ma'am, can you tell the Court what concerns you have about this police report?

A   Well, this was in June 2011, and the oldest daughter, from a relationship that mother had in high school named -- the oldest daughter was named Sierra, was trying to flag down a police officer in the middle of the street and said that her mother had gone into a closet and was talking to herself and couldn't get her mother out of the closet and she had been sitting on the floor in the closet, talking to herself being very upset. The child was -- the young adolescent was very upset. The police went to the house, went into the closet, moved some clothes around, found a person, mother, spent some time really trying to talk her out of some hysteria. Was able -- Mother didn't seem to know

MR 000102

where she was. Mother didn't know she had daughters. Mother didn't know -- it was around the time that a grandfather, I don't know if it is mother's grandfather or the mother's father, someone had died. She looked as though she was in some kind of psychiatric distress. She was talking about voices in a box, telling her to do bad things, to telling her bad things. They transported her to the hospital to have a psychiatric evaluation. She didn't know who she was, where she was, what year it was. She was paranoid, thought people were trying to hurt her. She had some sort of acute psychotic break at that time.

Q Do you know if her situation has improved since then?

A I don't know.

Q You don't know anything about her circumstance?

A No.

Q Do you have other -- any other concerns about her mental health situation?

A Aside from the multiple pain medications that I think can cause all sort of emotional distress and the possibility of anything else that could be contributing to this, that what happened in 2012, I have no other knowledge.

Q Do you have any opinion as to whether this

MR 000103

lady's ability to care for this child is any different today than it was three and a half years ago when dad took possession of this child?

A   I don't know anything, no.

Q   Okay.

MR. HARDY:   Judge, if I could replace that exhibit with --

THE COURT:   Okay.

BY MR. HARDY:

Q   Did you want to glance over number 4 again?

A   Sure.   Yes, this is a six page psychological evaluation that Doctor Reid did in April and May of 2012.

Q   Okay.   Is there anything else that stands out in that report?

A   Other than that we talk about the impairment of her reality testing, which is really, really serious, it is difficulties separating reality from fantasy, that he talks about, that she maintains such strict control over emotion, that she has a hard time relating to people, has a time hard time reacting to situations and has a tendency to misperceive events for mistaken impressions of people, and to have significance of their actions. Having had an impairment -- an impairment in reality testing, is probably one of the most concerning things

MR 000104

that could happen, although I can't tell you what it comes from. It could come from extreme stress, it could come from medication overuse. I don't know.

Q Now, ma'am, have you had an opportunity to look at Bryce's grade situation from three and a half years ago, versus now?

A I did, and some -- there is some school records he was in danger of failing a class -- failing a grade. I'm still confused about where and how he went to school with mother and father, a third grade, when father found out about him, father had him in school at the Christian school. I spoke to the Christian school principal, teacher, of the third grade. Fourth grade and fifth grade he was back with mother. The records show that he was in danger of failing, he had had so many absences, I don't remember the number, but it was an incredible, I mean, over 30 absences and --

Q Was it more like 40?

A It was a lot, yes. And I don't know -- He had had voluminous medical records. I don't know if his absences were related to medical records, medical issues. There were concerns about his thyroid issues, attention deficit. He had behavior problems, he was acting out.

Q Throwing chairs at school?

MR 000105

A     Engaging in acting out, yes. I also talked to the, let's see, sixth grade he was back with father in the Christian School. I spoke to the sixth grade principal. And seventh grade he was back, he was with father in a Christian school, and I spoke to that principal. Now he is in the eighth grade and I believe he attends Hill Middle School in Northeast ISD, would be my belief.

Q     Okay. So he had -- and I'm going to ask you to look at number 2, again, his grade report.

A     I have number 1.

Q     Is that number 1?

A     I'm sorry. Number 1, the grade report.

Q     And did you review that in --

A     I did. This was seventh grade last academic year.

Q     Last year. How did he do last year?

A     His grades were really fairly good. He had a low of 86, 82 in English. He had 90s, 87. He was fairly a high B, low A student.

Q     Couple of hundreds?

A     Well, yes, in P.E., but yes.

Q     Football?

A     Yes.

Q     Was there any indication from the teachers that

MR 000106

there were any discipline problems over the last three years?

A   Two years would be sixth and seventh grade.   In talking to the teachers, the principal of sixth grade and seventh grade at Midland Christian school, they said he --

MS. JULIAN:   Objection, Your Honor, hearsay.

MR. HARDY:   I will withdraw it.   I will change the question, Judge.

BY MR. HARDY:

Q   Overall, from a psychological standpoint, is his educational situation improved over the last three years, as opposed to that part of the last three and a half years?

A   There were no concerns about his functioning at the Christian school.

Q   Three and a half years ago?

A   Correct.

Q   Has the situation improved drastically over the last three and a half years?

A   Based on the records I reviewed and based on talking to the teachers, yes.

Q   Okay.   Ma'am, can you explain to the Court how a change of Bryce's custody or possession to his mother,

MR 000107

will effect his -- effect him structurally?

A I can't. I can't talk about -- about what a change would do. I can talk about, because I don't know, I don't know Bryce, I don't know his mother, I don't know what kind of situation they are in now. I can just say that there was such chaos and concerns about this young boy's behavior and listening to father's statements, it sounded as though there were signs that he may have had some kind of reactive attachment kind of symptomology that was really concerning, and that he seemed to do so well with his father, that I just have concerns about how -- what the situation is like returning to his mother and wondering if it is the same as it was before.

Q Is regression a valid concern of the father?

A Father's concerned about him regressing, if he is not with father. I would have those same concerns based on the limited data I have.

Q Ma'am, if a dad does not coach football, does that make him a bad father?

A Not necessarily.

Q What -- And I realize you can't testify as the best interest, the ultimate question in this case, but I would like to know what recommendations you do have in this case, as far as proceeding.

MR 000108

A    Well, I think it would be important, I do have recommendations. Doctor Reid's report raises some serious concerns, and I think it would be helpful to have that updated and to find out if there are indeed still concerns, and to have that done in a way that Doctor Reid can do a full evaluation, either of everybody or of mother, but it sounds as though he attempted to do a little bit of each and really wasn't able to. I also would have some concerns based on what father described as his son's behaviors when he got him, the things that they have done with him, his ADD, his period of time in some neurofeedback kind of therapy, to do an evaluation of the child to see what particular needs he has either therapeutically or in terms of living structure.

Q    So your recommendation is mental examination of the mother?

A    Yes.

Q    Or an update of her examination; is that correct?

A    Yes.

Q    And how would you recommend it be done differently than Doctor Reid was ordered to do it?

A    Just either a full psychological evaluation of mother or full psychological evaluation of everyone.

MR 000109

Q   I'm sorry?

A   It was asked -- The way I would recommend it differently is just that the order says a full psychological evaluation of mother to make custody recommendations, and you can't do it based on one person.

Q   I understand.  Do you recommend that the child be evaluated, as well?

A   I do have some concerns about Bryce, particularly being 13 years old, whether he's had access to his mother, what kind of relationship with both parents, what would be most helpful to him.  If he has -- Based on what I hear, and based on what I know about psychological theory, it is not good for a child to be away from either parent, particularly, and what his treatment needs and educational needs are unknown, in my opinion.

Q   Now, ma'am, you testified that you have read the records dealing with Bryce's absences three and a half years ago.

A   Yes.

Q   Are you aware of his -- Where did you say he was attending school now?

A   He is at Hill Middle School Northeast ISD.

Q   This was where mom enrolled him three weeks

MR 000110

ago?

A   I don't know.  I just looked up the address, looked up what school that would be, called the school and got attendance records.

Q   Okay.  Are you familiar with his attendance situation over the last three weeks?

A   He has two absences.  One is unexcused, and one is excused.  So 15 days of school, approximately, he's had two absences.

MR. HARDY:  Thank you, I will pass the witness.

CROSS EXAMINATION

BY MS. JULIAN:

Q   Doctor Trevino, have you ever met with my client?

A   No, ma'am.

Q   So you were hired by Mr. Hardy.  Correct?

A   Yes.

Q   And you were hired by Mr. Hardy four years ago, correct, when that original suit was filed?

A   I don't think so.

Q   You don't think so.  So you were just hired to just review things?

A   Yes.  I don't think -- It is possible, I forget, but I don't think so.  I don't think I've

MR 000111

ever --

MR. HARDY: Judge, if I can help, I've been involved in this case for three weeks.

BY MS. JULIAN:

Q How do you know that this child has missed two days of school since he's been with mother?

A Father called the school and asked them, and she was on speaker phone and I heard.

Q Father got the school on the phone?

A Yes.

Q And put it up to your ear?

A Put it on speaker phone.

Q And they said that he's missed two days?

A Yes, ma'am. It might have been another Bryce Henry, I don't know.

Q It might have been another what?

A Bryce Henry. He said this is Mr. Henry, I'm Bryce's father, can you give me his attendance information, and she did.

Q Who paid you to do all this work today?

A Father.

Q So your objective is to kind of help dad get custody. Right?

A No, no. My objective is to provide information about the records that I've seen. Neither of these

MR 000112

people are worth my license, no.

Q Have you talked with Bryce?

A No, never have.

Q So you don't really know what his life has been like?

A No, exactly. I don't know what his life has been like.

Q And you don't know over the past three or four years what mother's life has been like either, do you?

A I don't.

Q You don't know if she has a stable home and a work history. Correct?

A Correct.

Q You don't know if medications were previously prescribed for her for a reason?

A Well, I'm sure they were prescribed for a reason, the medical records say that she's had some significant --

Q Oh, I thought maybe you were suggesting that she was out buying drugs from various people.

A No, no, no. No, no, prescribed Hydrocodone, medication for back fusion. It sounds like it was a serious pain issue.

Q Thank you. She has since had at least one point some ailment that caused a severe pain problem?

MR 000113

A   Yes.

Q   That needed to be dealt with?

A   Yes, yes.  No, I know nothing about anything illegal or no.

Q   Were you aware of the fact that for the past over three years, the father has blocked mother's phone and prevented any phone contact at all?

A   I did not know that he had blocked him until I heard it on the stand today.  I did know that he discouraged phonecalls, and did not believe that when Bryce talked to his mother, that it made Bryce upset and worried about his mother, and anxious, and didn't see that as helpful.  That's what I knew.  I'm not saying I agreed with that, but that was the information I had.

Q   Have you looked at Bryce -- when you had the principal on the phone, did you ask about his grades at his current school?

A   I didn't have the principal on the phone.  Dad talked to the attendance clerk, and the attendance clerk gave him the attendance records.  That's all.

Q   Just the attendance records?

A   Yes, ma'am.

MS. JULIAN:  May I approach the witness?

THE COURT:  Yes, ma'am.

MR 000114

BY MS. JULIAN:

Q   I believe this is the document you looked at previously.  Correct?

A   Yes.

Q   Now, this is his grades current to date, the past three years of his current school.  Would you have a look at those?

A   Past three weeks?

Q   Uh-huh.

A   Of his current school?

Q   Uh-huh.

A   Semester one, semester two.  Wait a second.  So this was -- Oh, grade 6, grade 7, this is grade 8.

Q   That's grade 8, week one, week two.

A   So S1 and S2, I'm not sure what that means.

Q   But the grades are all in the 90's and high 80's.  Correct?

A   This is comparing a final year of school and this is comparing three weeks.

Q   Certainly.

A   I'm just trying to make sense.

Q   Certainly.  But he's not skipping school, he is not flunking out?  The grades are quite admirable, aren't they?

A   The grades are comparable, yes, to -- the three

MR 000115

weeks in the eighth grade are comparable to all year of the seventh grade, yes.

Q   Actually a little better, correct?

A   As low as 85 in English and the other year around year's grade is an 82 in English.  Tiny bit, but not sure it is significant.

Q   Not significant.  But not enough to say mom never gets to visit him again or see him or maybe have him live with her.  Correct?

A   Yes, grades look good.

Q   Are you aware of how mother got possession of this child after this three year period?

A   Only what I heard, and that was essentially the same thing I heard when I talked to father.

MS. JULIAN:  Pass the witness.

MR. HARDY:  Nothing else.

THE COURT:  Thank you.

MR. HARDY:  Thank you.

THE COURT:  Your next witness?

MR. HARDY:  Could I have just a moment?

THE COURT:  Yes, sir.

MR. HARDY:  We call Stephanie Markell to the stand.

MS. JULIAN:  You rest?

MR. HARDY:  No, we call your client to

MR 000116

the stand.

THE COURT: Good afternoon. Raise your right hand, please.

(Judge swore in the witness).

THE WITNESS: I do.

MR. HARDY: May I proceed?

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. HARDY:

Q State your name for the record, please, ma'am.

A Stephanie Markell.

Q I cannot hear you. I'm so sorry.

A Stephanie Markell.

Q You are the mother of Bryce in this case; is that correct?

A Yes, sir.

Q Ma'am, you have heard the testimony of several witnesses regarding your mental health of three and a half years ago. Is that testimony correct?

A No, sir.

Q Did you have prescription medication addiction three and a half years ago?

A No, sir. I was on -- I was prescribed medication, but I actually didn't even take as much as the doctor prescribed me, because he did prescribe me an

MR 000117

insane amount. I had just had a back fusion, but I did not take as much as he prescribed for me to take, and I have actually taken a drug test to prove that I did not have a pain prescription problem.

Q When did you take drug tests?

A When I believe David called Child Protective Services saying that I was addicted to my pain medication. They sent people out like two or three different times to check and they even said that it doesn't mean you come back saying that you take as much as you are prescribed.

Q What timeframe was this, ma'am?

A It was back during that time, probably 2011, 2012. I have not been on any of that medication. I was seen by Doctor Kingman and he kind of -- he wouldn't listen to me and I kept telling him the medicines weren't what I needed, so I have not taken any of that medication since 2012, and I stopped seeing that doctor. And since then, and since I quit taking what little bit I did take, I have felt so much better.

Q What medication are you taking now, ma'am?

A I'm -- Advil, if necessary.

Q Pay for any prescription medication?

A No, sir.

Q Ma'am, you've heard the testimony regarding

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000118

55

your son's situation at school; is that correct?

A   Uh-huh.

Q   Did he have 40 absences from school?

A   I do not believe he did, but he did have doctor's notes for every time he was absent.  I never allowed him just to be absent, to be absent.  Every time there was truly something wrong, he did have a thyroid problem, his thyroid was going up and down, and we were in the process of trying to get that under control.  And he was seeing a psychologist, and so he had doctor's notes for all of those absences, and he had a psychologist that was coming to the house to talk with him and meet with him, because he was upset during that time, because David was trying to take him away and that's not what he wanted.

Q   Were they preparing to put him in alternative school?

A   No, they were not.

Q   Did you put him in a mental health facility?

A   Yes, I did several years before that.

Q   And where was that?

A   In San Angelo.

Q   What was the name of the mental health facility?

A   I don't remember off the top of my head.

MR 000119

Q  Okay.  And how long was he there?

A  Like two weeks.

Q  I'm sorry?

A  Like two weeks.

Q  What was the nature of the reason for that institutional or that hospitalization?

A  We had went through some severe family changes and he was having a hard time dealing with them, and he was having panic attacks.  And I was concerned about him.  If I wasn't concerned about him, I would have never done it.  And he did try to harm himself, and the doctors told me then, it was because his thyroid was out of wack and stuff like that, and once they got that under control he was doing much better.  He did have some behavior problems and stuff, but we were working through that.  And that's part of why he was seeing a counselor and why the counselor was coming to the house.  I have two other children that don't have those issues and we were all working together to try to get him where he needed to be.

Q  He has had vast improvement in grades over the past three and a half years?

A  He had good grades before.

Q  It is your testimony he had good grades before the last three and a half years?

MR 000120

A   They weren't perfect, no, but he was trying. He was having a hard time concentrating and that last year when he was in third grade at Crestview Elementary, the teacher that he had, it happened to be her first year teaching, and instead of teaching him, she would send him straight to the office, so he wasn't learning what he needed to learn. And I was voicing those concerns with the school at that time.

Q   So her complaints and the school's complaints about frequent outbursts were not valid?

A   I didn't say he didn't have frequent outbursts. That's why he was seeing a counselor and that's why we were trying to do what we needed to do to get him where he needed to be.

Q   And there were complaints about him throwing furniture in the middle of class, was that valid?

A   I don't recall there was a time where he threw furniture. There was a time that he got upset and he kicked his desk, but he didn't throw anything from what I was -- what I remember.

Q   And there are complaints about his repeated disruptive behavior; is that correct?

A   Yes. He would be playing with his pencil in his desk and she would say he was disrupting class.

Q   Ma'am, there was a report -- Well, have there

MR 000121

been several police reports involving him?

A   There was a report, yes.

Q   Okay.  Can you tell the Court what happened in Converse that we discussed with the Converse Police Department, police report?

A   Honestly, my grandfather had just passed away and I did have a panic attack.  It wasn't like the end of the world, I was still -- I mean, I did.  I had a panic attack.  I had a very bad panic attack.  I went to the hospital, I was able to calm down, and I was fine after that.  But I did have a very bad panic attack.  My grandfather raised me.  He was the only male figure I ever had in my life, and it was very hard on me.  But I just -- it was a hard -- I mean, it is like your parent passing away.  You know, we all get sad, things happen and sometimes we may not -- I may not have handled it the best way.  I did have a panic attack and I regret that; but it was never an intentional thing.  And it wasn't like I tried to hurt my son or hurt my kids or threaten to kill myself or anything like that, because I would have never done that.

Q   Is it true that you were sitting with your knees to your stomach and your head in front of your legs behind the clothes in the closet?

A   I was sitting in the closet.

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000122

Q   Is it true that you told the police you weren't aware that you had two daughters?

A   That is not what I told them.

Q   So when the police said --

A   I told them I didn't know where they were.

Q   When they said -- when they asked you about your daughters, is it true or false that you said, quote, I have a daughter, unquote?

A   Well, of course I have daughters.  I have two daughters and a son.  Of course I could tell them I had a daughter.

Q   Is it true or false that you told the police, the voices inside the box keep telling me all these bad things?

A   That is not what I said, no.

Q   Were you on prescription medication at that time, ma'am?

A   I was taking the medications I was prescribed, yes.

Q   Okay.  Were you abusing those medications?

A   No, sir.  Never have I abused my medication.

Q   Now, ma'am, I understand that you learned that -- the case that the temporary orders were issued in, that appointed David as sole managing conservator and gave you limited access was dismissed in December of

MR 000123

2014; is that correct?

A Yes.

Q And I'm guessing that you were notified of this dismissal in December of 2014; is that correct?

A No, sir.

Q You weren't notified of that?

A No.

Q How did you find out?

A I went to the Court to find out what was going on, because I was trying to figure out what I needed to do to get my son back, because I was tired of him being hid from me and kept from me, so -- But attorneys are expensive.

Q Yes, ma'am. When was that?

A In August.

Q Okay. And it was at that point you decided to go to Dallas to pick up Bryce?

A Actually, no.

Q Tell the Court what happened.

A What happened was I spoke to an attorney and I took him all the papers that I had and showed her what I had, and she told me that technically I had custody of my son, and on her advice she said --

Q I don't want to hear what the lawyer told you I'm fascinated or another attorney?

MR 000124

A    A different attorney.

Q    When did you first talk with Pam Julian?

A    A couple of weeks ago.

Q    Okay. So you talked to Pam Julian several weeks ago?

A    Yeah.

Q    Okay. When did you hire her?

A    Just this last weekend.

Q    Okay. Okay. So tell me what happened as far as you're going to Dallas and picking up Bryce in the middle of the night.

A    Okay. So I spoke to this attorney and she said that actually you have custody of your son, and she suggested that --

Q    Yes, ma'am. I'm asking that you not repeat what your lawyer told me, although I'm fascinated by that, thank you. I want to know what happened as far as with regard to your going to Dallas.

A    Okay. So I went to Midland actually to get -- to try and find my son, and when we got to Midland, we found out that they were in the process of moving to Dallas, and we went several places and called several people. And it was they were gone. And so we actually came back to San Antonio and I didn't think I was going to be able to find him, I didn't know where he was.

MR 000125

Somebody at Midland Christian happened to tell us that he was going to start school at Liberty Hill and I was like, well, I'll try --

Q  Ma'am, I don't want to know what somebody told you.  I'm just trying to figure out what happened.

A  Okay.  And that's what I'm trying to tell you.

Q  Thank you.

A  So we came home, and Wednesday afternoon, about 5:00, Bryce called me and says, Mama, I was like, yes, he was like, what are y'all doing, I was like, nothing, we are sitting here, what's going on.  And he goes, well I got your message off my grandpa's phone and it finally gave me your phone number and I wanted to call you.  And I told him, I said, are you doing okay, how are you, and everything, and he is like, I want to come home, I really want to come home.

Q  I don't want to hear what Bryce told you.  Trying to figure out the circumstances --

A  Bryce asked me to come get him.

Q  I don't want you to tell me what Bryce told you outside of the courtroom.  What I want to know is, where did you meet him?

A  I met him at his hotel.  He called me, asked me to get on the highway to pick him up.  Yes, I understand.

MR 000126

Q    And I just want to know the circumstances --

A    I picked him up at his hotel at 10:00 p.m, he was in a room by himself, I picked him up at his hotel at 10:00 p.m, and we went straight to the Grapevine Police Department.   I gave them all my court papers, I gave them everything I had, showing -- they tried knocking on all the Henry's doors, they tried phone calling everybody.

Q    Now, were you there when that happened?

A    Yes.

Q    You were there when they went around knocking on doors?

A    No, I was not there.

Q    Okay.

A    I was there when they were trying to call him.

Q    Yes, ma'am.  Again, I don't know to know what somebody outside the courtroom told you, I'm just trying to establish what happened.  So you picked up Bryce and you went to the Police Department at 10:00 at night; is that your testimony?

A    Yes.

Q    And where did you go next?

A    After they released us around 2:00, we came home.

Q    Okay.  And you've enrolled him in school?

MR 000127

A   Yes.

Q   And where is he attending school?

A   He goes to Tex Hill Middle School.

Q   What's it called?

A   Tex Hill.

Q   And he has already missed two days of school.

A   No, sir, he has not. He was late one day because we went to get a copy of his Social Security card.

Q   Okay.

A   And that was it. But he had to be there for that and that was the only time that he has been absent.

Q   Do you know why the school would tell his Dad that --

A   I have no idea.

Q   Do you know why the school would tell his Dad that he's already had two absences?

A   I have no idea. He has not been absent.

Q   Where do you reside, ma'am?

A   In Stone Oak.

Q   And where is that, ma'am?

A   Off of Bulverde, at Bulverde Oaks. We live in an apartment.

Q   Okay. What is your occupation?

MR 000128

A    I am a manager for Academy.

Q    And which Academy?

A    One off of 410.

Q    At Vance Jackson?

A    No, military.

Q    Okay. So you took Bryce and enrolled him in school. Did they allow you to enroll him in school?

A    Yes.

Q    What records did you use to get him enrolled?

A    His records from Midland Christian.

Q    Did you obtain those records from that school?

A    Yes.

Q    Just a moment. And just so we are clear, you understand that David signed an affidavit that he's had actual care, custody and control of Bryce in Midland since on or about April 10, 2012; is that correct?

A    Yes, I know he signed that.

Q    Ma'am?

A    Yes, I know he signed it.

Q    Yes, ma'am. But those statements are correct; is that right?

A    Yeah, he had him until August.

Q    And he resided there until on or about August 20th of 2015; is that correct?

A    Actually from what I was told, they moved

MR 000129

before then, but I don't know that for a fact.

Q   If it was not August 20th, it was August?  You don't know the date?

A   That David and them moved from Midland, no.  I know that they were gone.  We got there on August 16 and they were already gone.

Q   And Bryce attended Midland Christian School in Midland for the last three years; is that correct?

A   Yes.

Q   His primary residence since 2012 has been Midland County; is that correct?

A   It was, but it is not any longer.

Q   Okay.  But during that time period he was attending school at that school; is that correct?

A   Yes.

MR. HARDY:  Thank you.  Pass the Witness.

CROSS EXAMINATION

BY MS. JULIAN:

Q   Stephanie, do you have a criminal record?

A   No, ma'am.

Q   Have you ever done anything that has harmed your child?

A   No, ma'am.

Q   When you first discovered you were pregnant, did you tell Mr. Henry?

MR 000130

A    Yes, ma'am.

Q    And what was his response?

A    He told me he wanted nothing to do with him.

Q    And how long was it that he held good on that word of having nothing to do with his son?

A    Nine years.

Q    Nine years.  Didn't see him?

A    No, ma'am.

Q    Call him?

A    No, ma'am.

Q    Send him a present?

A    No, ma'am.

Q    Support him?

A    No, ma'am.

Q    Pay for any of his medical bills?

A    No, ma'am.

Q    Attend any of his school activities?

A    No, ma'am.

Q    Do anything at all as a parent?

A    No, ma'am.

Q    When you got into this lawsuit with him -- When he finally decided he wanted to be a parent and you got into this lawsuit with him, did you have a lawyer?

A    No, ma'am.

Q    Who was his lawyer?

MR 000131

A   Rick Fletcher.

Q   Okay.  So he had a lawyer and you had no lawyer?

A   Yes, ma'am.

Q   Were you in court the day they ordered -- gave him managing conservatorship?

A   No, ma'am.

Q   What happened on that day?

MR. HARDY:   Well, Judge, excuse me, I think if she wasn't there, it would be speculation on her part.

MS. JULIAN:   Let me rephrase that, Judge.

THE COURT:   Yes, ma'am.

BY MS. JULIAN:

Q   How come you weren't there?

A   Because I wasn't notified.  I was asked to take -- to do the psychological exam.  I had contacted Rick Fletcher on several occasions to get the name of the doctor, because David Henry was supposed to pay for it, and they refused to give me that information.  And that is why --

MR. HARDY:   Judge, I think her testimony that they refused to give me that information, is clearly hearsay.

THE COURT:   Sustained.

MR 000132

MS. JULIAN: I will go on, Your Honor.

BY MS. JULIAN:

Q So then you discovered -- How did you discover that he had been given temporary custody?

A They showed up at my house with the police.

Q And took your son?

A No, my son actually ran away, because he didn't want to go with David.

Q How did they get ahold of him?

A My son hid in the woods for two days, and then he came home. And once he came home, I called Converse PD and I had a conversation with them, and at that point, after them talking to Bryce on his own, they were not going to make Bryce go with him, but then --

MR. HARDY: And I think that calls for hearsay, Judge.

BY MS. JULIAN:

Q Did Bryce eventually go?

A Yes.

Q Now, after Bryce went with his father, when was the next time that you had visitation with him?

A I was never allowed to see him again.

Q Never allowed to see him again. What about talk to him on the phone?

A I talked to him a couple of times, and then he

MR 000133

blocked our numbers. I only called at night, and I called just to talk to him, and he either wouldn't answer or if it was a time, because we set up a time so I could call on Tuesdays and Thursday, and the next thing I know my phone number is blocked and I can't talk to him, I can't anything. So at that point I started having the police go do well checks. David is very affluent individual in Midland, and the police wouldn't even call me back on the well checks.

Q So how many times do you think you tried to get your son from Midland?

A I don't think I can count. A bunch. I went several times to try to see him, try and talk to him. Even just be able to see how he was doing. Me and both my daughters, my oldest is away at college right now, but my other daughter here in the hallway, we tried several times -- we tried calling from other phone numbers, and they would never answer and it would just go to voicemail. And I would leave voice messages and voice messages, just begging for him to let us talk to Bryce. And if Bryce didn't want to come home, my intention was never to make him come home. He asked me, please, I want to come home, I want to live with y'all.

Q Okay. So you have -- You're living in an apartment?

MR 000134

A   Yes.

Q   How many bedrooms?

A   It is currently two bedroom. We are in the process of transferring to a three bedroom as soon as it opens up, but I have given him my room and I'm staying in Taylor's room.

Q   How is Bryce doing in school?

A   He is doing great. He really loves it. He's playing football. He had a game last night. He was excited. They won 28 to 6.

Q   What other activities is he planning on being in?

A   He plans on playing basketball, and he's excited for track. He says that's his favorite, because he is really fast and nobody can catch him. He is thinking about whether he wants to play soccer again. I coached his soccer his entire time growing up, like every single year, even when they took him, no matter how much I hurt or how much pain I had been in, because I did have two back surgeries, I still coached his team. I was still on the Board of Directors for SAYSA, which is San Antonio Youth Soccer Association for over ten years.

Q   Okay. So he is with you now and he is doing well?

MR 000135

A   Yes, ma'am.

Q   And been there nearly four weeks?

A   Yes, ma'am.

Q   How many times has his father called him?

A   He hadn't, and then I had my daughter try to get ahold of him, because we had been trying to call and all our numbers were still blocked. He did finally call Bryce after Sierra text him -- David several times to call, that Bryce just wanted to let him know that he was doing okay, it was less than a five minute conversation, he didn't tell Bryce he loved him or how he was, he just was like, I think you made a bad decision, and that was it. And Bryce felt really defeated after that. He was like I just want him to accept that I want to live here. He still wants to see them, he still wants to be a part of their life. I have no intentions of keeping them out of his life. I think we should be parents, but he wants to live with me, so that's -- and that's where we would love for him to live.

Q   So if he tells the Judge he really doesn't, he just want didn't want to hurt your feelings, he really wants to live with dad, are you willing to do that?

A   If that's what he tells the Judge he wants to do. Bryce is old enough to talk for himself and speak for himself. You've spoken with him. He is a smart

MR 000136

kid. Even when he was having problems in school, he was still a very smart kid. And I would respect that decision. I mean, he knows what's okay and he is old enough to say, hey, that's not right, or hey, you know, I would never want him to do something or be somewhere he doesn't want to be.

Q How much money do you earn?

A How much money do I earn? Approximately 50,000 a year.

Q Okay. So do you actually have the disposable money to hire a fancy law firm and psychologists?

A No, I do not. My oldest goes to Rice University, which she has a full -- she did get a full academic scholarship, but it still costs a lot of money. And his sister cheers and tumbles. She's on the top world's team. She's one of the top gymnasts in her category. So all of my disposable income is put back into my children.

Q So you can't really afford this, can you?

A Not really. It is taking away from them.

Q Okay. Do you make anywhere near the same money that Mr. Henry does?

A No.

Q Okay. Are you asking the Court as part of the order that they order Mr. Henry to pay interim legal

MR 000137

fees for your benefit to even out the playing fields and allow you to get --

A  No, ma'am. I don't even -- at this point, I don't even care if he pays child support. I just want my son. My son wants to be at home, that's all I want.

Q  You want the Court to speak with your son in chambers?

A  I would love for the Court to speak alone with my son in chambers.

MS. JULIAN:  Pass the witness.

REDIRECT EXAMINATION

BY MR. HARDY:

Q  Ma'am, you testified about Bryce's grades and you said that he is doing just as well now as he was three and a half years ago. Is that your testimony?

A  No. He is -- his grades are better. I'm not saying he was struggling. He was having a hard time. He was having a hard time with that teacher, but he does -- he is very smart. Were his grades perfect? No. He probably had several C's. He wasn't failing, I mean, he may have been failing, but it was because he forgot to turn in his work and he would always turn in his work at the last minute. But it wasn't -- it is not like I could go to school and hold his hand, and be like, make sure you turn this in. You know, instead it

MR 000138

was like, okay, seriously, you have to turn this in, and you could go through the backpack and the work would be there, and then he'd turn it in.

Q   I may have misunderstood your answer.  I thought you said he was doing the same, when I asked if he was doing considerably better?  Is he doing --

A   He is making really good grades now.  He's got A's and B's.  I never said he didn't.  He was struggling.  He was having medical issues and stuff like that.  He was absent, because he had medical issues.  So and then he would be in class for five minutes and he would be playing with his pencil and she would send him to the office.  So no, his grades weren't as grades in the third grade, but the years before that, he did do okay.  He made A's, B's, C's.  They weren't perfect, but at the same time, he grew up.

Q   Keep going.  He was making C's and D's back then?

A   But he's grown up.

Q   He is an A/B student since he's been living with his father; is that right?

A   I am assuming so, yes.  He is now, too.

Q   Yes, ma'am.  And additionally, as far as his rating on the scale of one to five, he was rated as having a one, which is a poor behavior, regarding his

MR 000139

ability to cooperate with others and comply with teacher requests, one, is adapting to new situations without getting upset, a one, that's poor; is that right?

A   He was having problems, yes, I never said he wasn't --

THE COURT:  Wait.  Wait.  Wait.

MR. HARDY:  Okay.  Let me finish.

BY MR. HARDY:

Q   Accepting responsibility for his own actions.

MS. JULIAN:  Objection, Your Honor, assuming facts not in evidence, if he would like to offer it into evidence, we can look at it.

MR. HARDY:  What exhibit are we up to?

BY MR. HARDY:

Q   I will hand you what's been marked Exhibit 7 and ask if you can identify that as a grade report from school when Bryce was living with you?

A   I have not seen this.

Q   Does that appear to be Bryce's grade report from one of his teachers in 2010?

A   It is educational screening.

Q   Okay.  And how is he doing?

A   According to this --

Q   Did I describe the one as being correct?

A   I guess so.

MR 000140

Q   So although you testified that he was doing pretty well back then --

A   I didn't say he was doing.   I -- We all know, like I said several times, he was having problems.   We had had a major -- some major life changes, that he had a hard time dealing with, and I was getting him the help, he was seeing a counselor, and I was working very closely with the teachers and the school to get him back on track where he needed to be.

Q   Yes, ma'am.   And when I asked you about his being about to be sent to an alternative school, do you recall that?

A   Yes.

Q   And do you recall he was about to be sent to an alternative school?

A   He was not.   Not -- They never told me he was going to be sent to an alternative school, so if they told David he was going to be sent to an alternative school, that's different.   I have every school paper that was ever sent to me and I don't have anything on him being sent to alternative school.

Q   You have every school paper and you are not aware that he was sent to an alternative school, and you decided to withdraw him from school and homeschool him for the last several weeks of school?   That doesn't ring

MR 000141

a bell?

A  He wasn't going to an alternative school.  I did withdraw him, and I was going to homeschool him because I was at home and I had the homeschooling knowledge, I had to homeschool his older sister, because so I had all the books and stuff, because his older sister has an immune deficiency disorder, so she had spent some time at home, where the school itself had put her on homebound.  So I pulled him because he had missed so much.  Due to the fact that he was going to the doctor, he was, I was trying to get him where he needed to be and he was having a hard time adjusting and he had this new teacher that didn't know how to handle kids like that.

Q  Okay, ma'am, just so we are clear on this, withdrawing and homeschooling in the alternative school designation, are you aware that he was supposed to report to DAEP alternative school for 20 days, starting Monday on April 2nd, but he never showed up?  And that you called and said you were withdrawing Bryce and planning to homeschool him and actually withdrew him on April 2nd, 2012?

A  I did not -- I did not know that he was supposed to appear there.  That was a decision I made after talking with his counselor at the time that had

MR 000142

been coming to the house, and he wasn't getting where he needed to be at school, and the counselor was going to start coming and visiting with him more and working with him more. So that was a decision that I had made at that time, because I did have the books for him to do. And I figured at that point because we were having such issues with his behavior and stuff, I knew how to control it, I knew how to control him. Contrary to what he says, I did, you know, what David says, he does listen to me.

Q Now, ma'am, did David know how to contact Bryce over the last three weeks?

A Yes.

Q And how was that?

A Because we had the same phone number forever. I've given David my phone number so many times. I tried to e-mail him, I left my phone number everywhere, he still has our phones blocked. Bryce still has -- Bryce has had his own phone that he had, I kept his line --

Q I'm sorry. I just asked a simple question, it needs a yes or no.

A Yes.

Q Okay. And you testified that he called within the last three weeks to check on Bryce?

A He did call one time after my daughter

MR 000143

contacted him.

Q   And I think you testified that he didn't tell him he loved him?

A   He did not.  Bryce had the phone on speaker phone.  He did not.

Q   Okay.  And he told him he made a bad decision?

A   He did tell him that.

Q   And you monitored that entire conversation?

A   I did.

Q   Did you think that was appropriate, ma'am?

A   Do you think it was appropriate that David monitored every conversation -- the couple of conversations I got to talk with Bryce?

Q   So you're paying him back, I guess?

A   No, it wasn't that.  Bryce asked me to sit there.  He was scared to talk to him.  He was terrified to talk to him.  But Bryce has talked to his grandpa, his grandpa had his number, he's been texting with his sister, Hope, who sent Bryce text messages saying that she was sorry, but she just didn't feel that David loved them, and David knew how to be a dad, and she felt that David hated both of them.

MR. HARDY:  Thank you, ma'am.  I have nothing else.

MR 000144

RECROSS EXAMINATION

BY MS. JULIAN:

Q    Are you asking the Court to name you the primary caretaker of your son?

A    Yes, ma'am.

Q    And allow him to stay here with you?

A    Yes, ma'am.

Q    Allow him to continue school here?

A    Yes, ma'am.

MS. JULIAN:  Pass the witness.

MR. HARDY:  Nothing else, Judge.  We rest.

MS. JULIAN:   I rest, Your Honor.

THE COURT:  Okay.  You can make your closing remarks and then I will meet briefly with Bryce.

CLOSING STATEMENTS

MR. HARDY:  Judge, our close is brief.  I think we've addressed the issues in this case.  The child has been living with his father for the last three and a half years.  We think that -- I personally think that kids should be allowed to make a decision that's important as to where they are going to live when they turn 30.  I realize the law allows children to make their wishes known to the Court at the age of 12.  It is still a best interest test, and we have to look at

MR 000145

what's in the best interest of Bryce. And clearly it is Bryce's best interest to continue to live where he's lived for the last three and a half years with his father. I will defer to my co-counsel on the issue of venue, if that's okay with the Court.

MR. EMORY: Your Honor, if it please the Court, my name is David Emory, along with co-counsel, Mr. Hardy, I've been asked to do the closing argument dealing with venue only. I want the Court to take the -- drawing the Court's attention to our Motion to Transfer in that we make reference to the Texas Family Code, Section 155.201, whereby the statute in our Family Code makes it a mandatory transfer, if at the time of filing a Motion to Modify, the child has resided in another county, other than the county of the exclusive continuing jurisdiction county for a period of six months. I draw your attention to our pleadings and the supporting affidavit. I also draw the Court's attention to the fact that Mr. Henry, by way of affidavit, has represented to this Court that the child has had actual care, custody and control of the child, since two and a half -- three and a half years. It's also as you noticed with the testimony before the Court, that that issue is undisputed. Now, I bring the Court's attention to opposing counsel's counter petition, whereby she

MR 000146

states in her sworn affidavit or sworn pleading that the child has only lived in Bexar County for two months; however, evidence has shown that the child only lived here for approximately three or four weeks, at best. I then would like to present to the Court if I may the case of In Re: Leyva. I present to the Court that case now, --

THE COURT: Thank you.

MR. EMORY: -- and tender to opposing counsel. This is a San Antonio Fourth Court of Appeals case, in which the 45th District Court here in Bexar County accidentally denied the mandatory Motion to Transfer, and the Fourth Court read, and I quote, In a suit to modify a parent/child relationship, the trial court has mandatory, statutory, ministerial duty to transfer this suit to the county where the child has lived for six months or longer, or when the trial court fails a timely transfer, a mandamus relief is appropriate. Our feeling, Judge, is the facts before this Court, the statute and the case law brings forward the mandatory request that this case gets transferred to Midland, and allow the Midland Court to sort this out. Thank you.

MS. JULIAN: May I?

THE COURT: Yes.

MR 000147

MS. JULIAN: I would like to first address the Motion to Transfer venue. I understand and I've read just like the Court has read probably a million times that statute, but there's got to be more to that statute, including some common sense. Father did not have custody, not really, and to hide the child from the mother and to secrete him away from Bexar County, the Court of continuing jurisdiction, up to another county, and keep him from mother, keep him away from any other court proceeding, and then say, it wasn't controverted, he lived with dad, and he was having a wonderful little life. It was controverted. It was controverted every time my client went to that child's door step, went to the police and had them go to that child's doorstep, tried to get him on the phone. It was controverted from day one. Secondly, he doesn't even live there. He doesn't even live there. He has moved. That would be tantamount to say, well, yeah, I lived there for six months, that was about three years ago. Where do you draw the line? Lived there three years ago, now you want the child to move back there, because they lived there three years ago? He has moved. He is in Dallas or some place else. That is ridiculous. This is the Court of continuing jurisdiction. It is a child that has been taken away, not voluntarily given away.

MR 000148

Taken away. I think also going back to the original proceeding four years ago, remember, my client did not have a lawyer. Mr. Henry had a lawyer, had the money to hire psychologists, had the money to do all kinds of testing, to have hearings that she didn't even know about. And knowing that she didn't know about these hearings and they are talking back and forth about where do I go for my psych eval, no one is talking to her about hey, you got a hearing next Tuesday, you need to come prepared. None of this stuff. So they are sitting here today and they are presenting a case based on all the stuff from four years ago -- three to four years ago, when all of this happened, when my client never had a chance to present anything. This was all ramrodded. I think that the Court is going to see a very clear picture when you talk to this boy. I started to call him -- when you talk to this little boy, but you are going to see he is a very mature young man. Thank you.

THE COURT: Okay. Thank you for excellent presentations. I'm going to let you withdraw your exhibits and your copies and hold those as officers of the Court and the parties can take a drug test on three while I am talking to Bryce.

(Proceedings adjourned)

MR 000149

STATE OF TEXAS        )

COUNTY OF BEXAR       )

       I, TRACY RAY PLUMMER, Official Court Reporter in and for the 407th District Court of Bexar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

      I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

TRACY RAY PLUMMER, Texas CSR #3586
Expiration Date 12/31/15
Official Court Reporter, 407th District
Bexar County, Texas
100 Dolorosa Street
San Antonio, Texas   78205
(210) 335-2895

TRACY RAY PLUMMER - OFFICIAL COURT REPORTER
407TH DISTRICT COURT (210) 335-2895

MR 000150

# Tab C

320 S.W.3d 905
Court of Appeals of Texas,
Texarkana.

In re: Candi COOPER.

No. 06–10–00084–CV. | Submitted Sept. 2, 2010. | Decided Sept. 3, 2010. | Rehearing Overruled Sept. 21, 2010.

**Synopsis**
**Background:** After the parties divorced, father filed a motion to modify the conservatorship of child and mother filed a motion to transfer venue. The 115th District Court, Upshur County, Paul Banner, J., denied the motion. Mother filed a petition for a writ of mandamus.

**Holdings:** The Court of Appeals, Morriss, C.J., held that:

[1] mother lacked an adequate remedy by appeal;

[2] the trial court was required to transfer suit affecting the parent-child relationship (SAPCR) action to county where child has resided for more than six months; and

[3] mother's act of relocating out of county with child, in violation of the parties' divorce decree, did not forfeit her right to assert the benefit of statute governing mandatory transfer of venue.

Petition granted.

West Headnotes (8)

[1]     **Mandamus**
        🖝Modification or vacation of judgment or order

        Mother lacked an adequate remedy by appeal, in action that sought a writ of mandamus compelling the trial court to grant mother's motion to transfer venue of father's suit affecting the parent-child relationship; no final

judgment had been signed by the court in father's suit affecting the parent-child relationship. V.T.C.A., Family Code § 155.201.

1 Cases that cite this headnote

[2]     **Mandamus**
        🖝Remedy at Law
        **Mandamus**
        🖝Nature of acts to be commanded

        Mandamus issues only when the mandamus record establishes (1) a clear abuse of discretion or the violation of a duty imposed by law, and (2) the absence of a clear and adequate remedy at law.

3 Cases that cite this headnote

[3]     **Child Custody**
        🖝Change of venue

        The trial court was required to transfer suit affecting the parent-child relationship (SAPCR), on father's motion to modify conservatorship, to county where child has resided for more than six months, where mother did not violate divorce decree by relocating with child, as father consented to the relocation, and statute governing transfer of venue to county where child had resided for six months or longer was mandatory. V.T.C.A., Family Code § 155.201.

1 Cases that cite this headnote

[4]     **Venue**
        🖝Grounds for change in general

        Upon a showing that the child has resided in another county for six months, transfer of a suit

affecting the parent-child relationship (SAPCR) is mandatory. V.T.C.A., Family Code § 155.201.

1 Cases that cite this headnote

[5] **Child Custody**
⟳⟶Change of venue

Mother's act of relocating out of county with child, in violation of the parties' divorce decree, did not forfeit her right to assert the benefit of statute governing mandatory transfer of venue to county where child had resided for six months or longer, in suit affecting the parent-child relationship (SAPCR) on father's motion to modify conservatorship, where mother relocated after obtaining father's permission, mother gave father $100 to pay for securing an amended order allowing mother to relocate, and father admitted that he accepted mother's $100 but never amended the agreement. V.T.C.A., Family Code § 155.201.

1 Cases that cite this headnote

[6] **Child Custody**
⟳⟶Venue

In determining the county of principal residence in a child custody proceeding, the Court of Appeals focuses on elements of permanency for the children which are critical to establishing residency for venue purposes.

Cases that cite this headnote

[7] **Mandamus**
⟳⟶Nature of questions involved

In a civil case, the fact that the law is unsettled

does not affect whether mandamus relief is available.

Cases that cite this headnote

[8] **Mandamus**
⟳⟶Criminal prosecutions

In a criminal case mandamus is not available if the law is uncertain and unsettled.

Cases that cite this headnote

**Attorneys and Law Firms**

*907 Candi Cooper, Austin, pro se.

James R. Gill, Law Office of James R. Gill, Austin, for Appellant.

Todd Tefteller, Tefteller, Newsom & Tefteller, PLLC, Gilmer, for Appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

**OPINION**

Opinion by Chief Justice MORRISS.

Z.B.J.'s parents, Candace Joy Cooper and David Johnston, were divorced in 2007 and appointed joint managing conservators of their child. The divorce decree specified that Z.B.J.'s residence would be Upshur County or a contiguous county. Later, Cooper and Johnston agreed that Johnston would obtain a modification of the decree to allow Cooper to move to Travis County with Z.B.J. Cooper paid Johnston $100.00 as her part of the expected expense Johnston would incur in getting the modified decree. Contrary to the parents' agreement, Johnston failed to get the decree modified. Ignorant of

this failure, Cooper moved to Travis County with Z.B.J.

Some eighteen months after the move, Johnston filed, in Upshur County, a motion to modify the conservatorship of Z.B.J. and an application for "temporary ex parte relief," alleging the use of marihuana by Cooper's current husband endangered Z.B.J.[1] Cooper filed a motion to transfer venue to Travis County under Section 155.201 of the Texas Family Code, which provides for mandatory transfer of venue "if the child has resided in the other county for six months or longer." See TEX. FAM.CODE ANN. § 155.201 (Vernon 2008). On April 14, 2010, the Honorable Paul Banner, sitting for the 115th Judicial District Court of Upshur County, Texas, heard and denied the motion to transfer venue.

Cooper has filed a petition for writ of mandamus[2] asking this Court to order the trial court to grant her motion to transfer venue of Johnston's suit. Johnston, the real party in interest, has filed a motion for sanctions. The decision on the motion for sanctions was ordered carried with the case for disposition with the petition for writ of mandamus.

We grant Cooper's petition because, without a final judgment in Johnston's suit, (1) Cooper does not have an adequate remedy by appeal, and (2) venue transfer is *908 mandatory. We decline to assess sanctions against Cooper.

### (1) Cooper Does Not Have an Adequate Remedy by Appeal

[1] [2] A preliminary issue which must be addressed is whether Cooper has an adequate remedy by appeal. Mandamus issues only when the mandamus record establishes (1) a clear abuse of discretion or the violation of a duty imposed by law, and (2) the absence of a clear and adequate remedy at law. Walker v. Packer, 827 S.W.2d 833, 839 (Tex.1992); see In re Columbia Med. Ctr. of Las Colinas Subsidiary, L.P., 290 S.W.3d 204, 207 (Tex.2009) (orig. proceeding). The Texas Supreme Court has adopted a balancing test to determine whether a party has an adequate remedy by appeal. See In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 136 (Tex.2004) (orig. proceeding); see In re AIU Ins. Co., 148 S.W.3d 109, 115 (Tex.2004) (orig. proceeding).

Johnston has informed this Court that the trial in the trial court has been concluded and has provided this Court with a copy of the verdict form signed by the jury. Cooper did not request that this Court stay any proceedings in the trial court. The copy of the court's charge provided this Court with notice that the trial has already been concluded and we requested, sua sponte, that the district clerk provide a supplemental record of the final judgment. We were informed by the district clerk that no final judgment has been signed. We have yet to receive notice that a final judgment has been signed.

If the final judgment had been signed, Cooper would have an available remedy by direct appeal. See TEX. FAM.CODE ANN. § 109.002 (Vernon 2008); see, e.g., In re S.G.S., 53 S.W.3d 848, 852 (Tex.App.-Fort Worth 2001, no pet.). The final judgment, though, has not yet been signed, as far as we can determine at this time, and Cooper does not have a remedy by direct appeal until the final judgment has been signed. See TEX. FAM.CODE ANN. §§ 109.002, 155.201 (Vernon 2008), § 155.204(h) (Vernon Supp. 2009) (interlocutory appeal not available for denial of motion for mandatory transfer); see also Lehmann v. Har–Con Corp., 39 S.W.3d 191, 195 (Tex.2001) (party may normally appeal only from final orders or judgments). Mandamus is an available remedy when a trial court fails to grant a motion to transfer venue under Section 155.201 of the Texas Family Code. In re Kerst, 237 S.W.3d 441, 442–43 (Tex.App.-Texarkana 2007, orig. proceeding); In re Compton, 185 S.W.3d 526, 530 (Tex.App.-Houston [14th Dist.] 2006, orig. proceeding). We conclude Cooper does not have an adequate remedy by appeal under the facts contained in the record before us.

### (2) Venue Transfer Is Mandatory

[3] Cooper claims that the venue transfer was mandatory once she had shown that the child had resided in another county for six months or longer. The trial court concluded that Cooper's act of moving the child to Travis County violated the geographical restriction in the divorce decree.

[4] If a child has resided in another county for more than six months, the Texas Family Code requires that a SAPCR be transferred to the county of the child's residence. Section 155.201 of the Texas Family Code provides as follows:

(a) On the filing of a motion showing that a suit for dissolution of the marriage of the child's parents has been filed in another court and requesting a transfer to that court, the court having continuing, exclusive jurisdiction of a suit affecting the parent-child

relationship shall, within the time required by Section 155.204, transfer the proceedings *909 to the court in which the dissolution of the marriage is pending. The motion must comply with the requirements of Section 155.204(a).

(b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155.204, transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer.

(c) If a suit to modify or a motion to enforce an order is pending at the time a subsequent suit to modify or motion to enforce is filed, the court may transfer the proceeding as provided by Subsection (b) only if the court could have transferred the proceeding at the time the first motion or suit was filed.

TEX. FAM.CODE ANN. § 155.201. Upon a showing that the child has resided in another county for six months, the transfer is mandatory. *Brines v. McIlhaney,* 596 S.W.2d 519, 521 (Tex.1980) (orig. proceeding) (construing prior statute). The trial court has no discretion to deny the transfer if the child has resided in another county for six months or more and has a ministerial duty to grant the motion to transfer. *See, e.g., Proffer v. Yates,* 734 S.W.2d 671, 673 (Tex.1987) (orig. proceeding) (construing prior statute); *In re Powell,* 79 S.W.3d 814, 816 (Tex.App.-Fort Worth 2002, orig. proceeding); *In re Wheeler,* 177 S.W.3d 350, 354 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding); *In re Nabors,* 276 S.W.3d 190, 193 (Tex.App.-Houston [14th Dist.] 2009, orig. proceeding). The uncontested evidence introduced at the hearing established that Z.B.J. had resided in Travis County for eighteen months at the time Johnston filed his action.

[5] Johnston argued to the trial court and to this Court in the prior petition for writ of mandamus that Cooper forfeited her rights under the mandatory venue provision by violating the divorce decree. The divorce decree in this case specified:

> the primary residence of the child shall be Upshur or contiguous counties, and the parties shall not remove the child from Upshur or contiguous counties for the purpose of changing the primary residence of the child until modified by

further order of the court of continuing jurisdiction or by written agreement signed by the parties and filed with the court.

Johnston relies on *Huey v. Huey,* 200 S.W.3d 851 (Tex.App.-Dallas 2006, no pet.). The Dallas Court of Appeals concluded, in *Huey,* that the mother forfeited her rights under the mandatory venue provision by intentionally violating the final decree of divorce which "expressly restricted her choice of residence for the children to Collin County, Texas or any county contiguous to Collin County." *Id.* at 852. The court reasoned:

> Appellant's conduct of moving her children to Howard County directly contravenes the existing divorce decree. In effect, appellant's conduct is an attempt to establish the children's residence in a county proscribed by judicial decree. As such, we conclude Howard County is not a proper county to which transfer must be made by the trial court invested with continuing, exclusive jurisdiction.
>
> Moreover, permitting appellant to obtain the benefit of an otherwise mandatory transfer based on the children's residence in Howard County, when such residence is solely the result of appellant's intentional disregard and violation of the divorce decree, would condone appellant's violation of the divorce decree and encourage others to do the *910 same in similar circumstances. Also, compelling a transfer on facts such as presented here would promote forum shopping. We conclude appellant's act of removing the children to a county not expressly permitted by the trial court's decree constitutes a waiver of the right to give notice of transfer under section 155.204 and a forfeiture of the right to have the case transferred.

*Id.* at 853.

In this case, the evidence was uncontested that Cooper moved only after Johnston agreed to get the decree modified to approve the move. *Huey* emphasized that its decision was based on "appellant's intentional disregard and violation of the divorce decree." *Id.* The divorce decree stated the residency restriction could be modified by filing a written agreement of the parties with the court. Johnston admitted he agreed to the move and agreed to secure an amended order permitting the residence of Z.B.J. to be established in Travis County, Texas. Johnston

further admitted that he accepted Cooper's $100.00 check to pay for filing the agreement, but that he never filed the agreement. A copy of the check was introduced as evidence at the hearing. Cooper also introduced a taped telephone call in which Johnston admits receiving the check but not making any attempt to file the agreement.[3]

This case is distinguishable from *Huey*, because the uncontested evidence establishes Cooper did not intend to violate the divorce decree. In fact, Cooper was reasonable in expecting the decree to have been modified to approve her move to Travis County. Cooper's conduct in moving can be questioned only in her failure to confirm that the written agreement was actually filed and a modified decree actually obtained. Because there was no evidence Cooper intentionally violated the decree's geographical restriction, the trial court could reasonably have reached only one decision. *See Walker,* 827 S.W.2d at 839–40 ("[R]elator must establish that the trial court could reasonably have reached only one decision."). Because Cooper's violation of the divorce decree was not intentional, we are unable to conclude she forfeited the benefit of mandatory transfer.[4]

[6] Absent any intent by Cooper to violate the decree, we see no reason the mandatory transfer provisions of Section 155.201 should not apply. "In determining the county of principal residence we focus on elements of permanency for the children which are critical to establishing residency for venue purposes." *Nabors,* 276 S.W.3d at 197. The purpose of having a court of continuing jurisdiction is to *911 "avoi[d] forum shopping, races to the courthouse, child snatching, and the harassment of a parent by the other parent's filing suits in random courts." *Trader v. Dear,* 565 S.W.2d 233, 235 (Tex.1978) (orig. proceeding). The Texas Legislature has made the choice that, in general, the county of the child's residence is in the best position to determine the "best interests" of the child. This policy is reflected in Section 155.201 of the Texas Family Code. *See* TEX. FAM.CODE ANN. § 155.201.

[7] [8] Admittedly, the trial court's ruling concerned an unsettled area of law. In a civil case, the fact that the law is unsettled does not affect whether mandamus relief is available. The Texas Supreme Court has held that a trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion.[5] *Huie v. DeShazo,* 922 S.W.2d 920, 927–28 (Tex.1996); *In re Ramsey,* 28 S.W.3d 58, 61 (Tex.App.-Texarkana 2000, orig. proceeding). It was error to deny Cooper's motion to transfer venue, and Cooper is entitled to mandamus relief.

Because the parties have not provided this Court with a record that the trial court has signed the final judgment, Cooper does not have an adequate remedy by appeal, and mandamus relief is available. A trial court does not ordinarily have discretion to deny a motion for mandatory transfer under Section 155.201 of the Texas Family Code. *See* TEX. FAM.CODE ANN. § 155.201. While Texas courts have recognized a party may forfeit mandatory transfer through an intentional disregard and violation of a geographic restriction in a court order, the record does not support the conclusion that Cooper's violation of the geographic restriction was intentional. Thus, the trial court had a ministerial duty to grant the motion to transfer. While Cooper's conduct has not been exemplary, we decline to assess sanctions against Cooper at this time.[6]

*912 We grant the petition for writ of mandamus, direct the trial court to vacate the order denying the motion to transfer, and direct the trial court to transfer this suit to Travis County.

**All Citations**

320 S.W.3d 905

Footnotes

1    Johnston's action is classified as a suit affecting the parent-child relationship, commonly referred to as a SAPCR. *See* TEX. FAM.CODE ANN. § 101.032 (Vernon Supp. 2009).

2    This is the second mandamus petition Cooper has filed with this Court complaining of the trial court's order denying her motion to transfer. On June 28, 2010, Cooper, proceeding pro se, filed a petition for writ of mandamus with this Court. We denied the petition because Cooper failed to provide this Court with an adequate record. *In re Cooper,* No. 06–10–00057–CV, 2010 WL 2680091, 2010 Tex.App. LEXIS 5173 (Tex.App.-Texarkana July 7, 2010, orig. proceeding). Cooper filed a pro se motion for rehearing attempting to supplement the record. We denied Cooper's motion for rehearing concluding Cooper had failed to establish "unusual circumstances" sufficient to permit

supplementation after an opinion had been rendered. *In re Cooper,* No. 06–10–00057–CV, 2010 WL 3136958, 2010 Tex.App. LEXIS 6526 (Tex.App.-Texarkana Aug. 6, 2010, orig. proceeding) (op. on reh'g). On August 9, 2010, Cooper filed this petition for writ of mandamus. Cooper is represented by counsel in this original proceeding. Cooper has requested that this Court consider "previously certified documents" which were filed in the prior mandamus proceeding, including the transcript of the hearing. We grant Cooper's motion and take judicial notice of the record in the prior mandamus action.

3       Johnston did not contest whether the tape recording was legally obtained or whether the tape recording was admissible.

4       *Huey* uses the terms waiver and forfeiture in describing this situation. We wonder about the particular usage of waiver here. The concept of waiver is concerned with the conduct of the party who is alleged to have waived a right. The Texas Supreme Court has defined waiver as follows:

> Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right.... The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right.

> *Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex.2008) (citations omitted). If applicable here, waiver would require Cooper's conduct (violating the decree) to be intentional and inconsistent with the right in question (mandatory transfer of venue). We believe her violation of the decree was unintentional.

5       In a criminal case, however, mandamus is not available if the law is uncertain and unsettled. *State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana,* 236 S.W.3d 207, 210 (Tex.Crim.App.2007) (orig. proceeding).

6       Johnston has filed a motion for sanctions requesting sanctions be assessed against Cooper. Johnston notes this mandamus was filed on the same day jury selection began in the underlying suit. Johnston alleges, "it is apparent that this 'new' Petition for Writ of Mandamus is filed solely in an attempt to delay the underlying proceedings, and grossly omitted an obviously important and material fact in her Petition, i.e., that trial was pending at the same time her Petition was filed in this Honorable Court." Johnston cites *Twist v. McAllen Nat'l Bank,* 248 S.W.3d 351, 364 (Tex.App.-Corpus Christi 2007, orig. proceeding) (single opinion disposing of both an appeal and an original proceeding), and *In re Lincoln,* 114 S.W.3d 724, 727–28 (Tex.App.-Austin 2003, orig. proceeding) (sanctions assessed under Rule 52.11 of the Texas Rules of Appellate Procedure). *See* TEX.R.APP. P. 52.11. Rule 52.11 permits an appellate court to assess sanctions on a party or attorney who is not acting in good faith. *See* TEX.R.APP. P. 52.11. Although the timing of Cooper's petitions are questionable and Cooper could have been more diligent in obtaining relief, Cooper's claims have merit as discussed above. We are not persuaded the mere act of filing a petition for writ of mandamus on the eve of trial constitutes bad faith. An appellate court should exercise the discretion afforded by Rule 52.11 with caution and only after careful deliberation. *In re Lerma,* 144 S.W.3d 21, 27 (Tex.App.-El Paso 2004, orig. proceeding).

> Johnston also alleges Cooper has filed, pro se, a forty million dollar lawsuit in federal court against the trial judge in this case. Johnston alleges Barry Cooper, Cooper's husband, has publically claimed, "if you are in a civil trial and need a new judge, file a cheap lawsuit pro se and file a motion so that the judge will be forced to recuse his or herself." Johnston has attached a copy of the lawsuit and Cooper's motion requesting the trial judge in this case to recuse himself from this case. Whether this conduct merits sanctions is best left to the discretion of the courts in which the allegedly frivolous proceedings were filed. We believe it is appropriate to consider only Cooper's conduct in this Court. We are not willing to exercise our discretion under Rule 52.11 to assess sanctions against Cooper.

---

276 S.W.3d 190
Court of Appeals of Texas,
Houston (14th Dist.).

In re James Madison NABORS and Julia Nabors,
Relators.

No. 14–08–00380–CV. | Jan. 16, 2009.

**Synopsis**
**Background:** After Texas Department of Family
Protective Services (TDFPS), which had removed
children from foster parents' home, concluded foster
parents had no role in the alleged abuse, foster parents
filed petition for adoption, motion to modify parent-child
relationship, and motion to transfer venue. The 315th
District Court, Harris County, Michael Schneider, J.,
denied motion to transfer venue, and foster parents filed
petition for writ of mandamus.

**Holdings:** The Court of Appeals, Charles Seymore, J.,
held that:

[1] mandamus was available to compel a transfer of a suit
affecting a parent-child relationship to the county in
which child had resided more than six months, and

[2] children's residence was foster parents' home, for
purposes of motion to transfer venue to county in which
children resided more than six months, as children had
lived with foster parents for 17 months before TDFPS
removed them.

Petition conditionally granted.

Kem Thompson Frost, J., dissented and filed opinion.

West Headnotes (8)

[1] **Appeal and Error**
⬥Interlocutory Motions, Orders, and Judgments

An oral ruling on the record satisfies
requirement in rules of appellate procedure for a
certified or sworn copy of any order complained
of, or any other document showing the matter
complained of. Rules App.Proc., Rule
52.3(j)(1)(A) (2007).

1 Cases that cite this headnote

[2] **Mandamus**
⬥Remedy by Appeal or Writ of Error
**Mandamus**
⬥Matters of discretion

In order to obtain mandamus relief, the relator
must show that the trial court clearly abused its
discretion, and the relator has no adequate
remedy by appeal.

1 Cases that cite this headnote

[3] **Appeal and Error**
⬥Nature and Extent of Discretionary Power

A trial court has no discretion in determining
what the law is or applying the law to facts.

Cases that cite this headnote

[4] **Infants**
⬥Jurisdiction and venue
**Mandamus**
⬥Change of venue and transfer of causes

The transfer of a suit affecting the child-parent
relationship to a county where the child has
resided for more than six months is a mandatory
ministerial duty, and therefore mandamus is

available to compel such a transfer. V.T.C.A., Family Code §§ 103.001(c), 155.201(b).

5 Cases that cite this headnote

[5] **Infants**
⟵Jurisdiction and venue

Transfer procedures under the Texas Family Code are the exclusive mechanism for transferring suits affecting the parent-child relationship and are designed to supplant the regular venue rules. V.T.C.A., Family Code §§ 103.001(a), 155.201, 155.204.

6 Cases that cite this headnote

[6] **Infants**
⟵Jurisdiction and venue

A motion to transfer a suit affecting the parent-child relationship does not have to be verified or supported by an affidavit. V.T.C.A., Family Code § 155.204.

2 Cases that cite this headnote

[7] **Infants**
⟵Jurisdiction and venue

Children's residence was foster parents' home, for purposes of motion filed by foster parents to transfer venue of suit affecting parent-child relationship to county in which children resided for more than six months after Texas Department of Family Protective Services (TDFPS), which had removed children from foster parents' home, concluded that foster parents had no role in alleged abuse but did not return children; though TDFPS was the appointed sole managing conservator for the

children and children had resided in another county for two weeks before foster parents filed change in venue motion, children had lived with foster parents for 17 months before TDFPS removed them, and change in venue statute did not require that the affected children currently reside in the county to which the change in venue was sought. V.T.C.A., Family Code §§ 103.001(c), 155.201(b), 155.202(a), 155.203.

1 Cases that cite this headnote

[8] **Infants**
⟵Jurisdiction and venue

In determining the county of principal residence for children, on a motion to transfer venue of suit affecting parent-child relationship to county in which the children resided for more than six months, courts focus on elements of permanency for the children which are critical to establishing residency for venue purposes. V.T.C.A., Family Code §§ 155.201(b), 155.202(a), 155.203.

4 Cases that cite this headnote

**Attorneys and Law Firms**

*192 David Perwin, Rosenberg, for Appellants.

Sarah Stallberg, Houston, Trevor A. Woodruff, Austin, for Appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## MAJORITY OPINION

CHARLES SEYMORE, Justice.

In this original proceeding, relators, James Madison Nabors and Julia Nabors, seek a writ of mandamus ordering the respondent, the Honorable Michael Schneider, to transfer the underlying case from Harris County to Fort Bend County. We conditionally grant the writ.

## BACKGROUND

On May 16, 2006, the Texas Department of Family Protective Services ("TDFPS") placed T.D.P. and D.E.P. with the Naborses, who became their foster parents. On August 22, 2007, the trial court signed a final order in a suit to terminate the parental rights of T.D.P. and D.E.P.'s biological parents. TDFPS was named the sole managing conservator. On October 26, 2007, the children were removed from the Naborses' home on allegations of abuse. TDFPS informed the Naborses that "[b]ased on the information gathered, it was determined that you had no role and the investigation was closed." The children were not returned to the Naborses' home.

[1] On November 9, 2007, the Naborses filed, in Harris County, a petition for adoption and motion to modify the parent-child relationship with an accompanying motion to transfer venue to Fort Bend County.[1] In their motion, the Naborses alleged that Fort Bend County has been the children's principal residence and "has been in that county during the six-month period preceding the commencement of this suit."[2] On December 19, 2007, TDFPS filed an answer. Prior to a hearing on February 4, 2008, TDFPS filed a response to the motion to transfer supported by an affidavit. The trial court denied the motion to transfer venue.[3]

## *193 STANDARD OF REVIEW

[2] [3] [4] In order to obtain mandamus relief, the relator must show that the trial court clearly abused its discretion, and the relator has no adequate remedy by appeal. *In re Sw. Bell Tele. Co., L.P.*, 226 S.W.3d 400, 403 (Tex.2007) (orig.proceeding). A trial court has no discretion in determining what the law is or applying the law to facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992). The transfer of a suit-affecting the child-parent relationship to a county where the child has resided for more than six

months is a mandatory ministerial duty. *Proffer v. Yates,* 734 S.W.2d 671, 673 (Tex.1987). Therefore, a writ of mandamus is available to compel the mandatory transfer of a suit affecting the parent-child relationship. *Id.* at 672.

## MOTION TO TRANSFER VENUE

Because the 315th District Court of Harris County was the court of continuing jurisdiction based on the suit to terminate parental rights, the Naborses filed their motion to modify, petition for adoption, and motions to transfer in that court. *See* Tex. Fam.Code Ann. §§ 103.001(a) (Vernon 2002) (an original suit shall be filed in the county where the child resides unless another court has continuing exclusive jurisdiction); 155.001 (Vernon 2002) (a court acquires continuing, exclusive jurisdiction over the matters provided for by this title in connection with a child on the rendition of a final order). The Naborses sought to transfer the case to Fort Bend County on the assertion that the children had resided there for more than six months preceding the filing of the motion to modify and the petition for adoption. Section 155.201 of the Texas Family Code provides for the mandatory transfer of a proceeding on a motion to modify as follows:

> (b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155.204, transfer the proceeding to another county in this state if the child has resided in the other county *for six months or longer.*

Tex. Fam.Code Ann. § 155.201(b) (Vernon Supp.2008) (emphasis added).

The Naborses contend the trial court had a ministerial duty to sever and transfer all proceedings pertaining to the children to Fort Bend County because the children had lived with them in Fort Bend County for the requisite length of time. TDFPS contends the Naborses did not present any evidence to support their motion to transfer venue to Fort Bend County, arguing that the Naborses failed to submit an affidavit that contained sufficient averments.

## VENUE RULES

[5] TDFPS contends the rules governing transfer of venue in a suit affecting parent-child relationship are a combination of the Texas Family Code, the Texas Civil Practice & Remedies Code, and the Texas Rules of Civil Procedure. Relying on the venue statute found in Chapter 15 of the *194 Texas Civil Practice & Remedies Code and the Texas Rules of Civil Procedure, TDFPS asserts that venue questions are decided solely on the pleadings and affidavits, not on live testimony. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.064 (Vernon 2002) ("The court shall determine venue questions from the pleadings and affidavits."); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 n. 4 (Tex.1992) (orig.proceeding) (explaining that live testimony may not be considered at a venue hearing under Rules 87 and 88 of the Texas Rules of Civil Procedure). However, transfer procedures under the Texas Family Code are the *exclusive* mechanism for transferring suits affecting the parent-child relationship and were designed to supplant the regular venue rules.[4] Therefore, we need not consider the Naborses' motions to transfer venue under other statutes or the Rules of Civil Procedure. *See Mendez,* 761 S.W.2d at 521 (rejecting contention that trial court should have considered motion to transfer, which was filed in contempt proceeding for failure to pay child support, under Rule 86 of the Texas Rule of Civil Procedure and Chapter 15 of the Texas Civil Practice and Remedies Code).

[6] Section 155.204 of the Family Code provides that the "motion must contain a certification that all other parties, including the attorney general, if applicable, have been informed of the filing of the motion." Tex. Fam.Code Ann. § 155.204(a) (Vernon 2002). Section 155.204 does not require that the motion be verified or supported by an affidavit. *See In re Sanchez,* 1 S.W.3d 912, 915 (Tex.App.-Waco 1999, orig. proceeding) ("[A] motion to transfer [under section 155.204] does not have to be verified nor must it be supported by an affidavit.").[5]

## THE CHILDREN'S RESIDENCE

At the hearing on the motion to transfer, relator, James Nabors, testified that TDFPS placed the children with him and his wife on May 16, 2006, and the children resided with them in Fort Bend County for seventeen months. The Naborses contend TDFPS failed to controvert their venue averments.

[7] TDFPS contends its affidavit controverts the Naborses' venue facts. We note that TDFPS did aver that the children were "not currently residing with the Naborses, and have not since October 26, 2007." However, there is no dispute that the children resided in Fort Bend County for approximately seventeen months before TDFPS removed them from the Naborses' household. TDFPS contends that it designated the Naborses' home as the children's residence on a temporary basis only. The TDFPS bases a major portion of its venue argument on the assertion that the "principal residence" of the children has always been Harris County because *195 section 103.001(c) provides that a "child resides in the county where the child's parents reside." Tex. Fam.Code Ann. § 103.001(c). TDFPS contends it should be denominated the "parent" of the children because it was appointed sole managing conservator.

However, the Texarkana and the Amarillo Courts of Appeals have rejected similar arguments made by TDFPS. First, *In re Kerst,* 237 S.W.3d 441, 442 (Tex.App.-Texarkana 2007, orig. proceeding), presents a somewhat similar scenario in which TDFPS sought and obtained termination of the parental rights. TDFPS placed the children with the Kersts who lived in Bowie county. *Id.* After a disagreement arose between TDFPS and the Kersts, the children were removed from the Kersts' home. *Id.* Subsequently, the Kersts filed a motion to modify the conservatorship and motion to transfer venue from Hopkins county (where the court had continuing jurisdiction) to Bowie County. *Id.* In their motion, the Kersts alleged that the children had lived in Bowie County for more than six months. *Id.* It was undisputed that the children had lived with the Kersts, in Bowie County, for approximately seventeen months prior to the date the Kersts filed their motion to transfer venue, which the trial court denied. *Id.*

The court of appeals rejected TDFPS's assertion that the Legislature never intended for the proceedings to be transferred to the county where the foster parents resided with the children. *Id.* at 443–44. TDFPS argued that, until the statute was amended, foster parents had no standing to assert these rights and, when the Legislature granted such standing, it was not contemplated that foster parents would be allowed to seek and obtain a transfer to the county where they resided with the children. *Id.* But, the court of appeals concluded that the statute requiring the

mandatory transfer of a suit affecting the parent-child relationship to the county where the child has resided for six months or longer is straightforward and clear, and declined to accept TDFPS's invitation to surmise that the statute has some other meaning. *Id.* at 444.

The appellate court further rejected TDFPS's argument that the children had not "resided" in Bowie County, but were placed there merely for foster care, reasoning "[i]t cannot be argued that they were only temporarily absent from another, more permanent residence, since these children had no other home or residence." *Id.* at 444–45. The court of appeals held that the children had resided in Bowie County for more than six months and directed the trial court to transfer the proceedings. *Id.* at 445.

Second, *In re Gore* presents the same scenario in which the original court of continuing jurisdiction in Potter County named TDFPS the managing conservator. No. 07–07–0290–CV, 2007 WL 2403366, at *1 (Tex.App.-Amarillo Aug. 23, 2007, orig. proceeding) (mem.op.). TDFPS placed the child in the foster care of the Gores in Swisher County. *Id.* After the child had lived with the Gores for more than six years, the Gores filed a petition seeking termination of the parent-child relationship between the child and her parents in the court in Potter County. *Id.* After the case had been transferred to Swisher County, TDFPS sought and received a discretionary transfer of the case back to Potter County. *Id.* Because it was undisputed that the child had resided in Swisher County more than six months, the court of appeals held that Swisher County was the only county of proper venue and the case should not have been transferred back to Potter County. *Id.* at *2.

Similar to *Kerst* and *Gore,* it is undisputed that the children had resided in Fort *196 Bend County with the Naborses for more than six months preceding the date the motion to modify and petition for adoption were filed. Therefore, we reject TDFPS's argument that the children resided in Harris County and their residence in Fort Bend County was temporary. *See Kerst,* 237 S.W.3d at 444–45.

## CONVENIENCE OF THE PARTIES

The Naborses pleaded, alternatively, that the district court in Fort Bend County would be more convenient because all parties and witnesses reside in Fort Bend County. Section 155.202(b) provides that, "[f]or the convenience of the parties and witnesses and in the interest of justice, the court, on the timely motion of a party, may transfer the proceeding to a proper court in another county in the state." Tex. Fam.Code Ann. § 155.202(b) (Vernon 2002). At the hearing, the trial court stated that the motion to transfer was discretionary, and it was denied. However, as we have concluded, the issue in this case is mandatory venue transfer because it is undisputed that the children lived with the Naborses in Fort Bend County for six months or longer. *See Kerst,* 237 S.W.3d at 443 (rejecting TDFPS's argument that forum non conveniens may be relied upon to deny mandatory transfer of proceedings).

## CONSTRUCTION OF SECTION 155.201(B)

TDFPS focused its appellate argument on the contention that this court should deny the petition because relators failed to comply with applicable rules of procedure. In other words, TDFPS argues that the trial court could not consider anything other than the contentions in the Naborses' motion to transfer venue supported by timely filed affidavits. We have addressed those arguments, however, the dissent opines that our disposition violates certain venue provisions in the family code because the children did not reside in Fort Bend County on the day or at the moment the Naborses filed their motion to transfer venue. *See post* at 199. We respectfully disagree.

The children resided with the Naborses for approximately seventeen months before TDFPS moved them to Harris County. They were placed in Harris County approximately two weeks before the Naborses filed their motion to transfer venue. Obviously, at the time of the hearing, the children had resided in the "other county for six months or longer." Tex. Fam.Code Ann. § 155.201(b); *see also Kerst,* 237 S.W.3d at 445 n. 6. ("Generally, one designates residence by selecting a home and living in it. Here, the Department designated that the children would live at the Kersts' home, where they remained for seventeen months. It was their principal residence for the six-month period preceding the commencement of the suit to modify.").[6]

*197 In support of her proposed interpretation of venue provisions in the family code, our dissenting colleague analyzes and compares the verb tense "*has resided* " in the last phrase in the provision for mandatory venue under section 155.201(b) with the verb tense "*resides* " in the provision for discretionary venue under section 155.202(a). The dissent relies heavily on verb tense employed by the Legislature in section 155.202(a)—the discretionary venue transfer provision—to support her

conclusion that a section 155.201(b) mandatory transfer is necessarily based on an allegation that " 'the child *resides* in another county.' " *See post* at 202–03. First, in interpreting the express provisions of section 155.201(b), we have not supplied additional words.[7] In section 155.201(b), the Legislature conspicuously did not express any requirement that the children presently or currently reside in the other county. If the Legislature had desired that the child currently reside in the other county at the time a proceeding is commenced, it could have included such language. Second, any attempt to interpose additional requirements for mandatory venue by suggesting that legislative intent is implicit because of a verb tense employed in the discretionary transfer subsection, strains the rules of statutory construction.[8] Under the plain language in section 155.201(b) the Legislature does not require that the children *currently reside* in the other county, only that they "*have resided*" there for six months or longer when the modification suit is filed. *See id.*[9]

The majority chooses to follow the Legislature's clear instructions for determining the county of the children's residence prescribed as follows:

[8] Determining County of Child's Residence

In computing the time during which the child has resided in a county, the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence during the six-month period preceding the commencement of the suit.

Tex. Fam.Code Ann. § 155.203 (Vernon Supp.2008)

Our interpretation and application of the above language properly focuses on determination of the children's "*principal residence* " during the six month period. We duly regard the Legislature's instructions not to focus on time and location of the children on a particular day. In determining the county of principal residence we focus on elements of permanency for the children which are critical to establishing residency for venue purposes. *See Martinez* *198 820 S.W.2d at 940–41 (applying former section 11.06(b), which had language similar to sections 155.201(b), 155.202(a) and 155.203, and opining that child's principal residence is not determined by this six-month period, but six-month period may be a guide in determining whether new county of residence is intended to be principal, as opposed to merely temporary residence). The record in this case indicates the Naborses

fed, clothed and provided a home for the children in Fort Bend County during the relevant period of time. Our dissenting colleague places emphasis on the last phrase in section 155.203 in order to justify her verb tense analysis of sections 155.201(b) and 155.202(a) with the suggestion that "*during the six month period preceding the commencement of the suit* " means the children must currently reside in the other county or venue will not be mandatory in the other county. The dissent's interpretation is repugnant to the purpose of section 155.203. The dissent implicitly concludes that the children's principal residence will never be in the county where they were actually residing during the statutory six month period if they are simply spirited away from that residence to another county before a motion to transfer venue is filed.

The dissent contends our interpretation of section 155.201(b) conflicts with *In re T.J.L.,* 97 S.W.3d 257 (Tex.App.-Houston [14th Dist.] 2002, no pet.). We are referred to page 264 of that opinion with our dissenting colleagues's statement that this court construed section 155.201(b) to "require that the child be a resident of the other county at the time the suit to modify was filed." *See post* at 205. First, *T.L.J.,* pertained to the question of whether transfer of venue as to one child is required when not all children of a marriage live in the county to which transfer is sought. Our court concluded that Section 155.207(b) of the Family Code requires a court to transfer the proceedings affecting a child to the county where the child resides, even if it retains jurisdiction over another child of the marriage who does not live in the transferee county. The *T.L.J.* court did not interpret or apply section 155.201(b) to answer the specific question presented in this case. Moreover, the court relied on *Cassidy v. Fuller,* 568 S.W.2d 845 (Tex.1978) when it referred to section 155.201(b).[10]

Finally, our dissenting colleague's effort to construe sections 155.201(b) and 155.203 by relying on certain language in *Blacklock v. Miller* is likewise misplaced. 693 S.W.2d 651 (Tex.App.-Dallas 1985, orig. proceeding). In that case, the Dallas Court of Appeals cited and relied on *Chem–Spray Aerosols, Inc. v. Edwards*[11] to support its conclusion that "[t]he critical time with regard to the existence of venue *199 facts is the time of filing suit." *Id.* at 652. However, *Chem–Spray Aerosols* is not a family law case,[12] and it is well-established that the Family Code's transfer provisions supplant the rules of procedure and statutes governing venue challenges in other types of civil cases. *See Leonard,* 654 S.W.2d at 441. Therefore, the general rules for establishing venue in civil cases are

not applicable to suits affecting the parent-child relationship. *See, e.g., In re Sanchez,* 1 S.W.3d at 914–15 (rejecting argument that motion to transfer venue was untimely because affidavit in support of motion was not served until long after answer date as Family Code does not require that motion to transfer be verified or supported by affidavit); *Mendez,* 761 S.W.2d at 521 (refusing argument that trial court should have considered motion to transfer venue under Rule 86 of Texas Rules of Civil Procedure and Chapter 15 of Texas Civil Practice and Remedies Code).

## CONCLUSION

We hold venue for these proceedings is mandatory in Fort Bend County. Once the Naborses established that the children continuously resided in Fort Bend County for more than six months preceding the filing of the motion to modify and petition for adoption, the trial court had a ministerial duty to transfer the underlying case to Fort Bend County under section 155.201(b) of the Family Code. *See Proffer,* 734 S.W.2d at 673. We therefore conditionally grant the petition for a writ of mandamus and direct the trial court to vacate its order denying the Naborses' motion to transfer, and grant the same.

The writ will issue only if the trial court fails to act in accordance with this opinion.

FROST, J., dissenting.

## DISSENTING OPINION

KEM THOMPSON FROST, Justice.

The majority correctly determines that relators James Madison Nabors and Julia Nabors were not required to present an affidavit in support of their motion to transfer venue and that the Texas Department of Family Protective Services ("Department") is not the "parent" of T.D.P. and D.E.P. (hereinafter the "Children"). But the majority

incorrectly determines that the Naborses are entitled to a mandatory venue transfer upon a showing that the Children's principal residence was in Fort Bend County for more than six months at any time in the past. Instead, under the applicable statute as well as precedent from the Supreme Court of Texas and this court, to have been entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code, the Naborses had to prove that the Children's principal residence was in Fort Bend County throughout the six-month period ending on the date the Naborses filed the suit to modify. Because the uncontroverted evidence shows that the Children's principal residence was in Harris County during the last fourteen days of this period, the Naborses did not show entitlement to a mandatory venue transfer under the only ground asserted in their motion or under the applicable statute. Accordingly, the trial court did not clearly abuse its discretion by denying the Naborses' motion to transfer, and this court should deny the petition for writ of mandamus.

## *200 FACTUAL AND PROCEDURAL BACKGROUND

The Naborses filed both their suit to modify and their motion to transfer venue on November 9, 2007 (the "Filing Date"). In their motion, the Naborses correctly stated the legal standard for a mandatory venue transfer under section 155.201(b) of the Texas Family Code: "[t]he principal residence of the children is in **Fort Bend County, Texas,** and has been in that county during the six-month period preceding the commencement of this suit."[1] This is the only basis upon which the Naborses sought a transfer; yet, they presented no proof that the principal residence of the Children was in Fort Bend County through the Filing Date. Rather, the undisputed evidence before the trial court on February 4, 2008, the date the trial court denied the motion to transfer venue, showed the following:

• Between May 16, 2006 and October 26, 2007, the principal residence of the Children was in Fort Bend County, Texas, with the Naborses.

  • Between October 26, 2007, and February 4, 2008, the principal residence of the Children was in Harris County, Texas.

The Children's supervisor at Harris County Children's

Protective Services testified as follows:

- The Department has been the sole managing conservator of the Children since August 8, 2007.

- The Department placed the Children with the Naborses as foster parents.

- On October 26, 2007, the Department removed the children from the Naborses' home due to allegations of physical abuse and policy violations that were later validated.

- The Children were then placed in a home in Harris County.

- The Children have not resided with the Naborses since October 26, 2007.

- Since October 26, 2007, the Children have continuously resided in Harris County.

This testimony was not controverted. The evidence before the trial court showed that, from October 26, 2007 forward, including on the Filing Date, the Children's principal residence was in Harris County. Simply stated, the Naborses did not prove the factual predicate asserted in their motion to transfer venue.

## THE NABORSES' BURDEN OF PROOF

The Naborses are relators in this original mandamus proceeding. As such, they have the "heavy" burden of presenting a record and petition that show they are entitled to mandamus relief to correct a clear abuse of discretion by the trial court.[2] The inquiry mandated by precedent *201 is whether the Naborses have established their entitlement to the extraordinary relief of a writ of mandamus, not whether the real party in interest (the Department) has shown that the relators are not entitled to mandamus relief.[3] Indeed, though a court of appeals may not grant mandamus relief without requesting a response, a real party in interest is not required to file a response, and any action or inaction on their part in responding to the mandamus petition is not a proper basis for granting mandamus relief.[4]

According to the majority, the only arguments that the Department asserts in its briefing as to why mandamus should be denied are its arguments as to why the

procedures from Chapter 15 of the Texas Civil Practice and Remedies Code apply.[5] The majority states that, even though the Department "limited its appellate argument" to these matters, the majority addresses the proper interpretation of section 155.201(b) because this issue is raised in this dissenting opinion.[6] There is both a factual defect and a legal defect in this reasoning.

Factually, the Department's procedural argument is not the only argument the Department has asserted in this court. Though the Department stresses its procedural argument, it also asserts that Harris County should be considered the Children's county of residence because the Department should be treated as a parent of the Children. In addition, in its briefing, the Department notes that, in its response in the trial court, the Department pointed out the fact that the Children have been residing in Harris County since October 26, 2007, and have not been residing with the Naborses since that date.

Legally, the majority's reasoning reverses the burden of proof in a mandamus proceeding from the burden imposed by mandatory precedent. There are several possibilities when an appellate court asks a real party to file a response: (1) a real party may brief one or more arguments showing why the relators are not entitled to mandamus relief; (2) a real party may brief one or more arguments in opposition to mandamus relief, none of which have merit; or (3) a real party may exercise its right not to file a response at all. Regardless of which course the real party takes, the relator keeps the "heavy" burden of presenting a record and petition that show the relator is entitled to mandamus relief to correct a clear abuse of discretion by the trial court.[7] The Naborses assert that the trial court clearly abused its discretion by not granting their motion to transfer venue to Fort Bend County under section 155.201(b) of the Texas Family Code. The Naborses have the burden to show that the denial of their motion was a clear abuse of discretion and that they are entitled to mandamus relief to correct it. Therefore, this court needs to address the issue of the proper construction of section 155.201(b) of the Texas Family Code, regardless *202 of the arguments asserted by the Department.

### THE LANGUAGE OF SECTION 155.201(B)

When a party files a modification suit and a motion for mandatory transfer, the party is entitled to a mandatory transfer "if the child has resided in the other county for six months or longer."[8] Therefore, for the Naborses to be entitled to a mandatory transfer to Fort Bend County, the

Children must "have resided" in Fort Bend County for six months or longer as of the Filing Date. The verb forms "has resided" and "have resided" are in the present perfect tense. This tense either (1) represents an action as having been completed at some indefinite time in the past, or (2) indicates that an action continues to the present.[9] If the first sense of the present perfect tense applies to section 155.201(b), then a child may have resided in various counties for at least six months at some indefinite time in past, prior to the filing of the modification suit. If the second sense of the present perfect tense applies, then the child would have had to reside in the other county for at least six months up to and including the date on which the modification suit was filed.[10] To see which sense was intended, this court should look to other parts of the statute.

Under section 155.202(a), "[i]f the basis of a motion to transfer a proceeding under this subchapter is that the child *resides* in another county, the court may deny the motion if it is shown that the child has resided in that county for less than six months at the time the proceeding is commenced."[11] Section 155.201(b) provides the only basis for transferring a proceeding under this subchapter that is based on the residence of the child. Therefore, in section 155.202, the legislature describes a transfer under section 155.201(b) as being based on an allegation that "the child *resides* in another county."[12] Thus, section 155.202(a) is strong support that the legislature intended the second sense of the present perfect tense in section 155.201(b).

The language in section 155.201(b) "if the child has resided in *the other county* for six months or longer" shows that the legislature envisioned that there would be only one other county.[13] This language is consistent with the legislature intending the second sense of the present perfect tense in section 155.201(b), and it is inconsistent with the legislature intending the first sense of the present perfect tense in section 155.201(b).

Under section 155.203, courts determining a child's residence must examine the child's principal residence throughout the six-month period preceding the commencement of suit.[14] Section 155.203 shows that the legislature intended the second sense of the present perfect tense in *203 section 155.201(b), rather than the first sense.[15] The majority incorrectly concludes that the legislature intended the first sense of the present perfect tense, which would mean that the child only has to have resided in the other county for at least six months at some indefinite time in the past, before the modification suit

was filed.[16]

Based on the language of Texas Family Code section 155.201(b) and related statutory provisions, for the trial court to have been required to transfer venue to Fort Bend County, the Children's principal residence must have been in Fort Bend County throughout the six-month period ending on the Filing Date.[17] The majority states that this analysis adds to the statute words not contained therein and that, if the legislature wanted to require the child to be residing in the transferee county when suit was filed, it could have said so.[18] However, no words have been added to the statute in this dissenting opinion; rather, the objective of this statutory analysis is to seek the meaning of the words used. Courts should not ignore what is, based on what might have been.[19] That is, the fact that the legislature could have used more precise or clearer words does not change the court's mission to give effect to the words actually used. Because there is sufficient evidence to support an implied finding *204 that the Children's principal residence was not in Fort Bend County for the last fourteen days of this period, the trial court did not abuse its discretion by denying the motion to transfer.[20] Therefore, this court should deny the mandamus petition.[21]

### CONFLICT WITH PRECEDENT FROM THE SUPREME COURT OF TEXAS

The majority's analysis and disposition conflicts with the Supreme Court of Texas's decision in *Cassidy v. Fuller*.[22] In *Cassidy*, a father filed a motion to modify the divorce decree slightly more than six months after the decree was rendered in Reeves County.[23] At the same time, the father filed a motion to transfer venue of the proceeding to Clay County based on the undisputed fact that his children resided there and had resided there for more than six months.[24] The trial court denied the motion to transfer, but the *Cassidy* court held that the trial court clearly abused its discretion in doing so.[25] The *Cassidy* court concluded that the legislature intended venue for suits affecting the parent-child relationship to generally be in the county in which the child resides.[26] The high court stated that usually the current circumstances affecting the child may be best shown in the county in which the child resides.[27]

When *Cassidy* was decided, former section 11.06(b) contained language similar to the language now contained in sections 155.201(b), 155.202(a), and 155.203 of the

Texas Family Code.[28] The *Cassidy* court held that former section 11.06(b) required transfer of the proceeding to the county in which the child was residing and had resided for more than six months; however, the trial court had discretion to deny motions for change of venue based on the child's residence in another county if the child had resided in the other county for less than six months.[29] The *Cassidy* court noted that this provision operated to "forestall *205 forum shopping."[30] Though the *Cassidy* court did not explicitly state how this statute did so, it is clear from the opinion that the high court concluded that the statute forestalled forum shopping by preventing a party from changing the child's residence for a brief period to obtain a mandatory venue transfer.[31] Instead, to obtain a mandatory venue transfer, the movant would be required to show the child was residing in the other county and had been residing in that county for at least six months at the time the petition to modify was filed.[32]

Under the majority's interpretation of section 155.201(b), instead of preventing forum shopping, the statute is construed to promote forum shopping, by allowing a party to obtain a mandatory venue transfer to any county in which the child resided for at least six months at some time in the past. Given our increasingly mobile society, children very well may reside in a number of different Texas counties for at least six months before they reach adulthood. Today's interpretation allows a party to shop among all of these counties before choosing which county the party would like to be the county in which the court of continuing, exclusive jurisdiction is located. In addition, if a party is not pleased with the trial judge in the first county to which the case is transferred, the party then could file a motion to enforce or perhaps a second petition to modify and invoke section 155.201(c) to mandate a second transfer to one of the other counties in which the child resided in the past for at least six months.[33] The majority's statutory construction conflicts with the *Cassidy* decision.

## CONFLICT WITH THIS COURT'S PRECEDENT

In addition, in *In re T.J.L.,* this court construed section 155.201(b) to require that the child be a resident of the other county at the time the suit to modify was filed before a party could be entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code.[34] This court held that the trial court erred in denying a party's motion to transfer under section 155.201(b)

based on the allegation and undisputed evidence that the child resided in another county during the six-month period ending on the date the petition to modify was filed.[35] By holding that section 155.201(b) does not require the child to reside in the other county when the petition to modify is filed, the majority creates a conflict with this court's prior decision in *In re T.J.L.*[36]

## CONFLICT WITH THE LANGUAGE OF THE STATUTE

In section 155.202(a), the legislature described a transfer under section 155.201(b) as being based on an allegation that "the child *resides* in another county."[37] By holding that section 155.201(b) does not require the child's principal residence to be in the other county when the petition to *206 modify is filed, the majority renders meaningless this language in section 155.202(a).

The majority's analysis also conflicts with language in section 155.201(b): "if the child has resided in *the other county* for six months or longer."[38] The italicized words clearly show that the legislature envisioned that there would be only one "other county." This is consistent with the requirement that the child be a resident of the other county at the time the suit to modify is filed before a party could be entitled to a mandatory venue transfer under section 155.201(b) of the Texas Family Code. It is inconsistent with the majority's analysis.

The majority's analysis also conflicts with the following emphasized language in section 155.203:

> In computing the time during which the child has resided in a county, the court may not require that the period of residence be continuous and uninterrupted but shall look to the child's principal residence *during the six-month period preceding the commencement of the suit.*[39]

In their motion, the Naborses asserted that the Children's principal residence was in Fort Bend County throughout the six-month period preceding commencement of the modification suit; however, the majority applies a different and incorrect standard, namely, whether the Children had a principal residence in Fort Bend County during any six-month period before commencement of the

suit.[40]

Under section 155.203, courts determining a child's residence must examine the child's principal residence throughout the six-month period preceding the commencement of suit and must not require uninterrupted or continuous presence.[41] Under the plain meaning of section 155.203, there may be more than one county of principal residence during the six months preceding the commencement of suit.[42] In this case, *207 the Children had a principal residence in Fort Bend County for most of the six-month period before commencement of suit; notably, however, they did not have a principal residence in Fort Bend County during the last fourteen days of this period.[43] Therefore, the trial court had discretion to deny the motion to transfer.[44] The trial court's denial does not constitute an abuse of discretion.

## CONCLUSION

The Naborses stated the correct legal standard in their motion to transfer venue but failed to establish the necessary factual predicate to prevail on their motion. Based on the evidence before it, the trial court did not abuse its discretion in denying their motion to transfer venue. Today, this court constructs a new legal standard that contradicts the language of the applicable statute as well as decisions from the Supreme Court of Texas and this court. Under the correct legal standard, the Naborses have not established their entitlement to mandamus relief. Therefore, this court should deny their mandamus petition. Because it does not, I respectfully dissent.

## All Citations

276 S.W.3d 190

## Footnotes

1    The original petition for adoption and the motion to transfer venue were filed under the original cause number—2005–07431J. On November 12, 2007, the Harris County District Clerk notified the Naborses' attorney that it was assigning a new cause number to the petition for adoption—2007–69035. The Naborses filed another motion to transfer under the new cause number. The motion to modify the parent-child relationship and the accompanying motion to transfer were filed under the original cause number—2005–07431J. It appears that the trial court proceeded on the motion to transfer filed with the motion to modify.

2    The Naborses averred that the children's principal place of residence *has been* Fort Bend County during the six month period preceding commencement of the suit. They did not allege or aver that the children currently reside in Fort Bend County.

3    We have not found the trial court's written order denying the Naborses' motion to transfer venue in the appellate record. However, at the end of the hearing, the trial court stated, "Okay. Then I'm going to deny your motion to transfer ... I am going to not transfer the case." Texas Rule of Appellate Procedure 52.3(j)(1)(A) requires "a certified or sworn copy of any order complained of, *or any other document showing the matter complained of* ..." Tex.R.App. P. 52.3(j)(1)(A) (emphasis added). An oral ruling on the record satisfies the requirements of Rule 52.3(j)(1)(A). *In re Bill Heard Chevrolet, Ltd.,* 209 S.W.3d 311, 314 (Tex.App.-Houston [1st Dist.] 2006, orig. proceeding); *In re Bledsoe,* 41 S.W.3d 807, 811 (Tex.App.-Fort Worth 2001, orig. proceeding); *In re Hamrick,* 979 S.W.2d 851, 852 n. 3 (Tex.App.-Houston [14th Dist.] 1998, orig. proceeding).

4    *See Leonard v. Paxson,* 654 S.W.2d 440, 441 (Tex.1983) (orig.proceeding); *In re Leder,* 263 S.W.3d 283, 286 (Tex.App.-Houston [1st Dist.] 2007, orig. proceeding); *Kirby v. Chapman,* 917 S.W.2d 902, 907 (Tex.App.-Fort Worth 1996, no writ); *Martinez v. Flores,* 820 S.W.2d 937, 938 (Tex.App.-Corpus Christi 1991, orig. proceeding); *Johnson v. Pettigrew,* 786 S.W.2d 45, 48 (Tex.App.-Dallas 1990, no writ); *Mendez v. Attorney Gen. of Tex.,* 761 S.W.2d 519, 521 (Tex.App.-Corpus Christi 1988, no writ); *Beyer v. Diaz,* 585 S.W.2d 359, 360 (Tex.Civ.App.-Dallas 1979, no writ).

5    The Naborses prepared and filed an affidavit in support of their petition for writ of mandamus. However, we do not consider this affidavit because it was not submitted to the trial court. *Cf. Nguyen v. Intertex, Inc.,* 93 S.W.3d 288, 293 (Tex.App.-Houston [14th Dist.] 2002, no pet.) ("The attachment of documents as exhibits or appendices to briefs is not formal inclusion in the record on appeal and, therefore, the documents cannot be considered.").

6     The dissent opines that our interpretation conflicts with the plain language in section 155.201(b) because the Legislature envisioned there would be "only one other county." *See post* at 206. Our colleague erroneously suggests the majority's interpretation contemplates that a transfer of venue includes any county in which a child had resided for a period of six months no matter how remote in time to commencement of the proceeding. Contrary to the dissent's criticism, our interpretation limits rather than "promotes" forum shopping. Apparently, in applying section 155.201(b), the dissent would conclude that a party could thwart a motion to transfer venue by removing children from one county to the other for few days or even a few hours. We disagree. If, as the dissent suggests, a motion to transfer should be denied because a child has resided in the county where the court has continuing jurisdiction for a single day, then the result may be altered by a battle or race to remove a child from one county to the other. Our dissenting colleague would allow the TDFPS to venue shop from one county to the other by exercising its authority to remove a child from any foster home in advance of adoption proceedings.

7     Notwithstanding the concerns of our dissenting colleague, there is no language militating that the children reside in the other county "*throughout*" the six month period or at the moment the motion to transfer is filed Apparently, the dissent is willing to add the word "*throughout*" to the statute. *See post* at 199.

8     Consistent with the legislature's instruction under the Code Construction Act, we should not focus on verb tense in determining legislative intent because words in the present tense include the future tense. *See* Tex. Gov't Code Ann. § 311.012 (Vernon 2005).

9     Under the Texas Code Construction Act, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011 (Vernon 2005). Our dissenting colleague ignores this basic rule by engaging in grammatical semantics. We choose to follow the legislative admonition and presumption that, "a just and reasonable result is intended," when a statute is enacted. *Id.*

10     In *Cassidy v. Fuller,* the Supreme Court addressed the predecessor statute to section 155.201(b)—section 11.06(b). 568 S.W.2d 845 (Tex.1978). When the Supreme Court issued *Cassidy,* section 11.06(b) required a showing that venue was proper in another county. *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414. Former section 11.04, which is currently section 103.001, required that an original suit affecting the parent-child relationship "shall be brought in the county where the child resides." *Id.* at 1413. The current section 155.201(b) does not require that the party seeking a transfer to show venue is proper in the transferee county and does not require that the child reside in the transferee county on the same day a motion to modify is filed. Tex. Fam.Code Ann. § 155.201(b). Here, a motion to modify and petition for adoption were filed, not an original suit affecting the parent-child relationship. Consequently, we see no conflict with our interpretation of the statutory language applicable to this case and the Supreme Court's opinion in *Cassidy.*

11     576 S.W.2d 478 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ dism'd).

12     *Id.* at 480. The general venue statute at the time of the *Chem–Spray Aerosols* opinion was located at Tex.Rev.Civ. Stat. Ann. art.1995, and is currently found in Section 15.002 of the Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. § 15.002 (Vernon 2002).

1     (Emphasis added). In quoting from the ground in the motion, the majority omits the part in which the Naborses allege that the "[t]he principal residence of the children is in Fort Bend County, Texas...." *See ante* at 192. The majority later states that the Naborses moved for a transfer based on the ground that the Children had resided in Fort Bend County for more than six months preceding the filing of the motion to modify. *See ante* at 193. These statements are incorrect. The Naborses did not request a venue transfer on these bases. The Nabors requested a venue transfer based on their allegation that the principal residence of the Children was in Fort Bend County, Texas, on the Filing Date and had been in that county during the six-month period preceding the Filing Date.

2     *See* TEX.R.APP. P. 52.3, 52.7; *Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 305 (Tex.1994) (orig.proceeding); *Walker v. Packer,* 827 S.W.2d 833, 837 (Tex.1992) (orig.proceeding); *In re Nelson,* No. 14–04–00578–CV, 2004 WL 1516156, at *1 (Tex.App.-Houston [14th Dist.] July 8, 2004, orig. proceeding) (mem.op.).

3     *See Canadian Helicopters, Ltd.,* 876 S.W.2d at 305; *In re Yamin,* No. 14–07–01035–CV, 2008 WL 442575, at *1 (Tex.App.-Houston [14th Dist.] Feb. 19, 2008, orig. proceeding) (mem.op.).

4     *See* TEX.R.APP. P. 52.4; *In re Yamin*, 2008 WL 442575, at *1 (denying mandamus petition because "[r]elator has not established his entitlement to the extraordinary relief of a writ of mandamus").

5     *See ante* at 196.

6     *See id.*

7     *See* TEX.R.APP. P. 52.3, 52.7; *Canadian Helicopters, Ltd.,* 876 S.W.2d at 305; *Walker,* 827 S.W.2d at 837; *In re Nelson,* 2004 WL 1516156, at *1.

8     TEX. FAM.CODE ANN. § 155.201(b) (Vernon 2008).

9     Bryan A. Garner, *Garner's Modern American Usage* 779 (Oxford University Press 2003).

10    While the majority criticizes this grammatical analysis of the applicable statute, it also cites the part of the Code Construction Act, in which the legislature states that "words and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX. GOV.CODE ANN. § 311.011(a) (Vernon 2005); *see ante* at 197.

11    *See* TEX. FAM.CODE ANN. § 155.202(a) (Vernon 2008) (emphasis added).

12    *See id.* (emphasis added).

13    *See* TEX. FAM.CODE ANN. § 155.201(b) (emphasis added).

14    TEX. FAM.CODE ANN. § 155.203 (Vernon 2008) (emphasis added).

15    The majority states that courts should not base their construction of a statute on the verb tense used by the legislature because the Code Construction Act states that "words in the present tense include the future tense." TEX. GOV.CODE ANN. § 311.012(a) (Vernon 2005); *see ante* at 197, n. 8. However, if section 155.201(b) also includes the future tense, then the part of the statute focusing the inquiry on the six-month period before filing of the suit would be rendered meaningless. Though the Code Construction Act was in effect when the Supreme Court of Texas decided *Cassidy v. Fuller,* the high court still construed the applicable statutes as requiring a transfer to the county in which the child resides and has resided for at least six months; the *Cassidy* court did not conclude that under the Code Construction Act, a transfer is also required to the county in which the child will have resided for more than six months in the future. *See* Act of May 24, 1967, 60th Leg., R.S., ch. 455, § 2.02, 1967 Tex. Gen. Laws 1036, 1037; *Cassidy v. Fuller,* 568 S.W.2d 845, 846–47 (Tex.1978). Research has not revealed any Texas case that has used section 311.012(a) of the Texas Government Code in interpreting a statute. *See Brown v. Blum,* 9 S.W.3d 840, 845–46 (Tex.App.-Houston [14th Dist.] 1999, pet dism'd w.o.j.) (declining to use section 311.012(a) of the Texas Government Code in interpreting a statute).

16    This is the principal legal standard articulated in the majority opinion. *See ante* at 193, 194, 196, 199 (stating that, for the Naborses to be entitled to a mandatory transfer to Fort Bend County, the Children must have resided in Fort Bend County for six months or longer "preceding" the filing of the modification suit).

17    *See* TEX. FAM.CODE ANN. §§ 155.201(b), 155.204(b); *Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d 257, 263–65 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *In re Wheeler,* 177 S.W.3d 350, 353–54 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding); *Blacklock v. Miller,* 693 S.W.2d 651, 652 (Tex.App.-Dallas 1985, orig. proceeding) (denying mandamus relief because, even though children's principal residence may have been in different county for more than six months in the past, the children's principal residence changed from that county 12 days before filing of suit to modify and therefore, their principal residence was not in that county on the day suit was filed). The majority suggests that the *Blacklock* court erroneously applied general venue principles that conflicted with the Family Code.

See *ante* at 199. This is incorrect. The *Blacklock* court quoted and applied former section 11.06(b); it did not apply general venue principles that are contrary to the requirements of the Family Code. *See Blacklock,* 693 S.W.2d at 652.

[18] *See ante* at 196–97.

[19] *See Air Routing Int'l Corp. (Canada) v. Britannia,* 150 S.W.3d 682, 700 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

[20] *See* TEX. FAM.CODE ANN. § 155.201(b); *Blacklock,* 693 S.W.2d at 652. The majority relies on *In re Kerst* and *In re Gore;* however, these cases involved children whose principal residence was in the other county during the six-month period preceding the commencement of suit. *See In re Kerst,* 237 S.W.3d 441, 442, 444–45 (Tex.App.-Texarkana 2007, no pet.); *In re Gore,* No. 07–07–0290–CV, 2007 WL 2403366, at *1–2 (Tex.App.-Amarillo Aug.23, 2007, orig. proceeding) (mem.op.). Therefore, these cases are consistent with the analysis in this dissenting opinion.

[21] In the same motion to transfer, the Naborses asserted in the alternative that they were entitled to a discretionary transfer under section 155.202(b). Though the Naborses seek mandamus as to the trial court's denial of their motion, which would include the denial of this relief, the Naborses' petition does not contain any argument, analysis, record citations or legal authority in support of the proposition that the trial court clearly abused its discretion in denying this part of the motion. *See* TEX.R.APP. P. 52.3(h). Therefore, they have waived this issue. *See In re Citizens Supporting Metro Solutions, Inc.,* No. 14–07–00190–CV, 2007 WL 4277850, at *4 (Tex.App.-Houston [14th Dist.] Oct. 18, 2007, orig. proceeding).

[22] *See* 568 S.W.2d at 846–47.

[23] *See id.*

[24] *See id.*

[25] *See id.*

[26] *See id.* at 847 (relying on statutory language similar to that currently codified at section 103.001 of the Texas Family Code).

[27] *See id.*

[28] *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414 (amended 1981, recodified 1995, amended 1999) (current version at TEX. FAM.CODE ANN. §§ 155.201(b), 155.202(a), 155.203).

[29] *See Cassidy,* 568 S.W.2d at 847.

[30] *Id.*

[31] *See id.*

[32] *See id.*

[33] *See* TEX. FAM.CODE ANN. § 155.201(c).

[34] *See In re T.J.L.,* 97 S.W.3d at 264.

35     *See id.* at 260, 264–65.

36     *See id.* In *In re Wheeler,* the First Court of Appeals adopted this court's analysis in *In re T.J.L. See* 177 S.W.3d 350, 353–54 (Tex.App.-Houston [1st Dist.] 2005, orig. proceeding). Therefore, the majority's analysis also conflicts with the First Court of Appeals's decision in *In re Wheeler. See id.*

37     *See* TEX. FAM.CODE ANN. § 155.202(a) (emphasis added).

38     *See* TEX. FAM.CODE ANN. § 155.201(b) (emphasis added).

39     TEX. FAM.CODE ANN. § 155.203 (Vernon 2008) (emphasis added).

40     *See ante* at 193, 194, 196, 199.

41     For example, if prior to October 26, 2007, the Naborses had spent two weeks visiting relatives in Harris County, that would not mean that the Children's principal residence would switch to Harris County during this period. In this case, the uncontroverted evidence shows that the Children were continuously present in Fort Bend County from May 16, 2006 through October 26, 2007, and continuously present in Harris County after October 26, 2007. Therefore, the trial court had no occasion to require continuous presence in the county of residence. The majority cites *Martinez v. Flores.* See 820 S.W.2d 937 (Tex.App.-Corpus Christi 1991, no writ). The *Martinez* court held that the children's extended visitation period with their father, who did not have the right to designate their residence, did not change the children's residence from the county designated by the Children's mother. *See id.* at 939–41. This holding is consistent with the analysis in this dissenting opinion. The *Martinez* court does state in an obiter dictum that the six-month period stated in the predecessor statute to section 155.201(b) is meant as a "guide" and that courts can look beyond the six-month period to determine whether the children's residence has changed to a new county. *See id.* at 940. This dictum is contrary to the plain meaning of the statute, and, prior to today's decision, had not been cited by any court.

42     *See* TEX. FAM.CODE ANN. § 155.203; *Blacklock,* 693 S.W.2d at 652 (denying mandamus relief because, even though children's principal residence may have been in different county for more than six months in the past, the children's principal residence changed from that county 12 days before filing of suit to modify and therefore, their principal residence was not in that county on the day suit was filed).
    In part of its opinion, the majority suggests that, under section 155.203, this court should look to the six-month period preceding suit and determine which county was the child's principal residence for the majority of this period. *See ante* at 197–98. This construction conflicts with the plain meaning of the statute and the *Blacklock* decision. *See* TEX. FAM.CODE ANN. § 155.203; *Blacklock,* 693 S.W.2d at 652. In addition, language substantially similar to the language of section 155.203 was contained in former section 11.06(b). *See* Act of May 25, 1973, 63rd Leg., R.S., ch. 543, 1973 Tex. Gen. Laws 1411, 1414. Therefore, this construction also conflicts with *Cassidy* and *In re T.J.L.,* which require the child to be currently residing in the other county, rather than to have a principal residence in that county for a majority of the six-month period prior to suit. *See Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d at 263–65.

43     The majority is simply wrong when it states that, under the analysis in this dissenting opinion, removing children from one county to another for a few days or a few hours would thwart an otherwise meritorious motion to transfer venue under section 155.201(b). *See ante* at 196–97, n. 6, 198. If parties were to engage in such manipulative behavior, the trial court would be justified in concluding that the children's principal residence had not changed. Of course, if the evidence shows that children in a particular case had a bona fide change of their principal residence back to the county of the original court of continuing jurisdiction shortly before a timely motion to transfer was filed, then the facts simply would not satisfy the bright-line rule established by the legislature for determining when the county for the court of continuing jurisdiction must be changed. *See* TEX. FAM.CODE ANN. § 155.201(b); *Blacklock,* 693 S.W.2d at 652.

44     *See* TEX. FAM.CODE ANN. § 155.201(b); *Cassidy,* 568 S.W.2d at 846–47; *In re T.J.L.,* 97 S.W.3d at 263–65; *In re Wheeler,* 177 S.W.3d at 353–54; *Blacklock,* 693 S.W.2d at 652.

End of Document © 2015 Thomson Reuters. No claim to original U.S. Government Works.

13 S.W.3d 126
Court of Appeals of Texas,
Waco.

PINNACLE GAS TREATING, INC., Appellant,
v.
Raymond Michael READ, Mark William Read,
Owners, and Thomas I. Fetzer, II, Lienholder,
Appellees.

No. 10–99–257–CV. | Feb. 2, 2000.

Corporation filed condemnation suit. After special commissioners made award of damages to condemnees, the 278th District Court, Leon County, Jerry Sandel, J., dismissed condemnation proceedings and directed cause to proceed to trial on condemnees' counter-claims. Corporation appealed. The Court of Appeals, Vance, J., held that order was not an appealable temporary injunction or order dissolving a temporary injunction.

Cause dismissed.

West Headnotes (3)

[1]     **Eminent Domain**
        👉Decisions Reviewable

        Trial court's interlocutory order dismissing condemnation proceedings and directing that the matter proceed to trial on remaining issues of condemnees' counterclaims was not an appealable temporary injunction or order dissolving a temporary injunction, nor was it an order which disposed of all parties and issues so as to be final, and thus was nonappealable. V.T.C.A., Civil Practice & Remedies Code § 51.014(a).

        1 Cases that cite this headnote

[2]     **Appeal and Error**

👉Necessity of Final Determination

Generally, appeals may be taken only from final orders or judgments, and interlocutory orders may be appealed only if permitted by statute.

1 Cases that cite this headnote

[3]     **Mandamus**
        👉Remedy by Appeal or Writ of Error

        Mandamus relief could not be sought alternatively in a direct appeal, as a petition for a writ of mandamus commences an original proceeding that is governed by different rules than the rules governing direct appeals. Rules App.Proc., Rule 52.

        2 Cases that cite this headnote

**Attorneys and Law Firms**

*126 Celia S. Flowers, Flowers, Davis, Fraser, Derryberry & Van Cleef, L.L.P., Tyler, for appellant.

Karl C. Hoppess, Karl C. Hoppess & Associates, Houston, Jack B. Ellison, Buffalo, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

**\*127 O P I N I O N**

BILL VANCE, Justice.

This is an appeal arising from a condemnation suit. Pinnacle Gas Treating, Inc. (Pinnacle) filed several condemnation suits in Leon County. Because Leon

County is in three judicial districts, the clerk rotated the petitions among them. TEX. PROP.CODE ANN. § 21.013(d) (Vernon Supp.1999). The District Clerk assigned the petition in this case to the 278th District Court. Judge Sam Bournias of the 87th District Court appointed special commissioners who gave notice, held a hearing, and made an award of damages to the condemnees (appellees in this appeal). Pinnacle "appealed" from the award. After Pinnacle deposited the amount of the award, Judge Bournias signed an order granting it a writ of possession. The condemnees then filed a plea to the jurisdiction and a motion to dismiss, asserting that the appointment of the special commissioners by Judge Bournias was void. Judge Jerry Sandel of the 278th District Court dismissed the condemnation proceedings and directed the cause to proceed to trial on the condemnees' counter-claims. Pinnacle attempts to challenge Judge Sandel's order through this direct appeal.

[1] Pinnacle asserts that we have jurisdiction under Section 51.014(a)(4) of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.1999). Section 51.014(a)(4) states:

A person may appeal from an interlocutory order of a district court, county court at law, or county court that:
...

(4) grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65;[1]....

*Id.*

[2] Generally, appeals may be taken only from final orders or judgments. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). Interlocutory orders may be appealed only if permitted by statute. *Id.* Although Judge Sandel's order dismisses the condemnation proceedings, it also directs that the matter proceed to trial on remaining issues. We do not believe that the order is an appealable temporary injunction or order dissolving a temporary injunction. Nor is it one which disposes of all parties and issues, so as to be final. *See id.* Accordingly, we have no choice but to dismiss this appeal.

[3] Pinnacle asserts in its brief that an alternative basis for granting relief would be to issue a writ of mandamus. Pinnacle has cited no authority, nor have we found any, to suggest that mandamus relief may be sought alternatively in a direct appeal. A petition for a writ of mandamus commences an original proceeding that is governed by different rules than the rules governing direct appeals. *See* TEX.R.APP. P. 52. We will not entertain this request.

This cause is dismissed for want of jurisdiction.

**All Citations**

13 S.W.3d 126

Footnotes

1    Chapter 65 deals solely with injunctions. TEX. CIV. PRAC. & REM.CODE ANN. §§ 65.001–.045 (Vernon 1997).

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

565 S.W.2d 233
Supreme Court of Texas.

Nancy Kay (Smith) TRADER, Relator,
v.
Honorable James F. DEAR, Jr., Respondent.

No. B-7340. | April 26, 1978.

Divorced mother brought habeas corpus proceeding to regain possession of her child. After the trial judge denied the petition for habeas corpus, the mother brought an original proceeding in mandamus. The Supreme Court, Pope, J., held that: (1) the court that acquired jurisdiction over the child in the divorce suit in which a final decree had been rendered was the court having continuing exclusive jurisdiction over the child; (2) the fact that the divorced parents had made an agreement whereby the mother permitted the father to have the child on a temporary basis did not oust the exclusive, continuing jurisdiction of the court that rendered the divorce decree, and (3) when the cause was first brought to the attention of the district court and it determined that the district court of another county had continuing jurisdiction, the former district court should have peremptorily granted habeas corpus to protect and enforce the jurisdiction of the court of continuing exclusive jurisdiction.

Ordered in accordance with opinion.

Daniel, J., concurred and filed opinion.

West Headnotes (10)

[1]     **Child Custody**
        ⇨Jurisdiction

        The first inquiry in any action to obtain a modification of parent-child orders is that of jurisdiction.

        1 Cases that cite this headnote

[2]     **Courts**
        ⇨Suits for Divorce

        Court of domestic relations which rendered final decree in parents' divorce suit had continuing exclusive jurisdiction over the divorcing parents' child, and all other courts in Texas were required to respect its jurisdiction. V.T.C.A., Family Code § 11.05(a).

        1 Cases that cite this headnote

[3]     **Habeas Corpus**
        ⇨Custody in General

        The section of the Family Code pertaining to habeas corpus was designed to overrule that body of law that previously permitted a habeas corpus proceeding to put in issue anew the right to custody of a child. V.T.C.A., Family Code § 14.10.

        3 Cases that cite this headnote

[4]     **Habeas Corpus**
        ⇨Infants; Custody Cases

        Under the Family Code, a habeas corpus proceeding to enforce an outstanding custody order may be filed in the courts of any county in which the child is found as well as in the court of continuing jurisdiction. V.T.C.A., Family Code § 14.10.

        3 Cases that cite this headnote

[5]     **Habeas Corpus**
        ⇨Infants; Custody Cases

Neither fact that temporary orders made in habeas corpus proceeding were purportedly based on the child's best interest nor fact that change in child's custody from mother to father had resulted from the parents' agreement was a sound legal basis to alter legislative scheme for orderly disposition of child custody disputes by permitting a court other than the court having continuing jurisdiction to act on the habeas corpus petition. V.T.C.A., Family Code § 11.05(a).

10 Cases that cite this headnote

[6]      **Child Custody**
⬤═Jurisdiction

Court having continuing jurisdiction of suits affecting parent-child relationship, so long as it has exclusive jurisdiction, is the only court that can make temporary orders modifying prior orders pending trial on merits. V.T.C.A., Family Code §§ 11.05(a), 11.11.

5 Cases that cite this headnote

[7]      **Child Custody**
⬤═Divorce or Dissolution Settlements

Where Court of Domestic Relations had acquired jurisdiction over divorcing parties' child in divorce suit in which a final divorce decree had been rendered, fact that the parents thereafter made agreement whereby the mother permitted the father to have the child on a temporary basis did not oust the continuing jurisdiction of that court. V.T.C.A., Family Code § 11.05(a).

2 Cases that cite this headnote

[8]      **Child Custody**
⬤═Jurisdiction

When there is an underlying agreement as to child custody but parents thereafter fall into disagreement, it is the court of continuing jurisdiction that must become the final arbiter as to the managing conservatorship. V.T.C.A., Family Code § 11.05(a).

3 Cases that cite this headnote

[9]      **Child Custody**
⬤═Agreements

A voluntary arrangement between divorced parents is a matter that a court should take into consideration in deciding who should be managing conservator of child and whether an existing order should be changed; however, only the court of continuing jurisdiction should make such a determination. V.T.C.A., Family Code § 11.05(a).

4 Cases that cite this headnote

[10]     **Habeas Corpus**
⬤═Infants; Custody Cases

When habeas corpus proceeding pertaining to child was first brought to attention of county district court and it determined that the district court of another county had continuing jurisdiction, the former court should have peremptorily granted habeas corpus to protect and enforce the jurisdiction of the court of continuing exclusive jurisdiction; by such an order, the court of continuing jurisdiction could have more promptly made both temporary and final orders. V.T.C.A., Family Code §§ 11.05(a), 14.10.

3 Cases that cite this headnote

## Attorneys and Law Firms

*234 London & Stokes, Joe Daniel Stokes, III, Austin, for relator.

Kent M. Rider and Jo Betsy Lewallen, Austin, for respondent.

## MANDAMUS

POPE, Justice.

Nancy Smith Trader and John Smith were divorced in Harris County in September 1976, and Nancy was awarded managing conservatorship of their daughter, Shannon Marie. On August 3, 1977, Nancy and John Smith signed an agreement by which Nancy agreed that John, who lives in Austin, Travis County, would have the temporary custody of Shannon and act as managing conservator for a period of one year, with an automatic month to month extension until either party gave notice in writing *235 to the other of the cancellation of the agreement. The agreement recited that the arrangement for the temporary custody was in the best interest of Shannon.

Nancy Trader, the mother, agreed to the change of the managing conservatorship because she was planning to go to Singapore for a year. She returned to Austin, however, on January 13, 1978, after she failed to receive reports on Shannon's progress. Four days later, upon John's refusal to surrender Shannon, Nancy instituted habeas corpus proceedings in Travis County. The trial judge of the 126th District Court of Travis County on January 19, 1978, denied the petition for habeas corpus. The court's order recited that there was then pending in both the original court of Harris County and also in Travis County a motion for the change of custody from Nancy to John Smith and "that it is in the best interest of Shannon Marie Smith that the custodial status quo be maintained until further order of this Court or the Court of Domestic Relations Number One of Harris County, Texas." Nancy

Trader now seeks a mandamus ordering the trial judge to grant the habeas corpus.

This is another case in which the trial court has failed to recognize the legislative scheme that the court of continuing jurisdiction is the one that has the exclusive power to reexamine its prior order which evaluated the best interest of the child. The Legislature by enacting the Family Code adopted a scheme for handling parent-child matters in a manner that avoids forum shopping, races to the courthouse, child snatching, and the harassment of a parent by the other parent's filing suits in random courts.
[1] The first inquiry in any action concerning a modification of parent-child orders is that of jurisdiction. Section 11.05(a) of the Family Code is explicit in fixing the continuing jurisdiction of a court:[1]

Except as provided in Subsections (b), (c), and (d) of this section, when a court acquires jurisdiction of a suit affecting the parent-child relationship, that court retains continuing jurisdiction of all matters provided for under this subtitle in connection with the child, and no other court has jurisdiction of a suit affecting the parent-child relationship with regard to that child except on transfer as provided in s 11.06 of this code. (Emphasis added.)

[2] The Court of Domestic Relations Number One, of Harris County, acquired jurisdiction over Shannon Smith in the divorce suit in which a final decree was rendered on September 27, 1976. That court is the one that had the continuing exclusive jurisdiction over Shannon, and all other courts of Texas are required to respect its jurisdiction. See Koons, Jurisdiction, Venue, and Transfers in Suits Affecting the Parent-Child Relationship (Where All Parties Reside in Texas), 9 Tex.Tech.L.Rev. 243, 244-48 (1978).

[3] Section 14.10 of the Family Code was designed to overrule that body of law which previously permitted a habeas corpus proceeding to put in issue anew the right to custody. Smith, Commentary on Title Two, Texas Family Code, 5 Tex.Tech.L.Rev. 389, 435-36 (1974). The section changed the rule applied in Herrera v. Herrera, 409 S.W.2d 395 (Tex.1966), and similar cases in which habeas corpus placed in issue the best interest of the child.

[4] The habeas corpus proceeding under the Family Code may be filed in the courts of any county in which the child is found, as well as in the court of continuing jurisdiction, to enforce an outstanding order. McElreath v. Stewart, 545 S.W.2d 955 (Tex.1977); Ex parte Jabara, 556 S.W.2d 592 (Tex.Civ.App. Dallas 1977). Its purpose is to uphold

the order of the court of continuing jurisdiction. Section 14.10 of the Family Code clearly expresses that purpose:
*236 s 14.10 Habeas Corpus[2]

(a) If the right to possession of a child is presently governed by a court order, the court in a habeas corpus proceeding involving the right to possession of the child shall compel return of the child to the relator if and only if it finds that the relator is presently entitled to possession by virtue of the court order.
(b) The court shall disregard any cross action or motion pending for modification of the decree determining managing conservatorship, possession, or support of or access to the child unless it finds that:

(1) the previous order was granted by a court that did not have jurisdiction of the parties; or

(2) the child has not been in the relator's possession and control for at least 6 months immediately preceding the filing of the petition for the writ.

(c) The court may issue any appropriate temporary order if there is a serious immediate question concerning the welfare of the child.

[5] Two features of this present case differ from those which this court has already decided: (1) the Travis County trial court recognized that the court in Harris County had continuing jurisdiction and was the one which should reexamine the best interest of Shannon, but nevertheless, made temporary orders based on the child's best interests, and (2) the change in Shannon's possession from the mother to the father resulted from the parents' agreement. Neither distinction is a sound legal basis for altering the legislative scheme for orderly disposition of these cases by the court that has continuing jurisdiction.

[6] The court of continuing jurisdiction, so long as it has exclusive jurisdiction, is the one that also makes the temporary orders pending the trial on the merits about modification of the prior order. Tex.Fam.Code Ann. s 11.11. Otherwise, we revert to the practice by which several courts are simultaneously making temporary and final orders about the same child.

[7] [8] After the Harris County court rendered its order in 1976, the parents made the agreement by which the mother permitted the father to have Shannon on a temporary basis. Our question is whether the parents'

agreement ousted the jurisdiction of that court which had continuing jurisdiction. We hold that it did not. 59 Am.Jur.2d Parent and Child s 33 (1971); 67 C.J.S. Parent and Child s 11d(3), at 645-46 (1950). When, as in this case, there is an agreement, but the parents have again fallen into disagreement, it is the court of continuing jurisdiction that must become the final arbiter about the managing conservatorship. "Unfortunately, experience has shown that the question of custody, so vital to a child's happiness and well-being, frequently cannot be left to the discretion of parents." Ford v. Ford, 371 U.S. 187, 193, 83 S.Ct. 273, 277, 9 L.Ed.2d 240 (1962). We have previously enforced the prior order of the court that had continuing jurisdiction in instances in which the parents had voluntarily relinquished a child. Saucier v. Pena, 559 S.W.2d 654 (Tex.1977); Lamphere v. Chrisman, 554 S.W.2d 935 (Tex.1977).

Our holding that a parental agreement does not defeat a court's continuing jurisdiction does not mean that the agreement has no significance. Many students of the parent-child relations make valid arguments that such matters as access, the details of visitation, and child rearing are often better resolved by responsible parents than by courts. Mayo, Access Child's Right or Parents' Privilege? Should Court or Custodian Decide?, 5 Anglo Am.L.Rev. 111, 123-27 (1976). The endless number of details incident to child rearing, the court's lack of time and its crowded docket, the court's lack of supervisory personnel, the inability to predict the future, and the advantages of resolving matters without the expense of court hearings, justify responsible parental arrangements, and we do not discountenance them nor declare them void.
*237 [9] [10] A voluntary arrangement between the parties is a matter which a court should take into consideration in deciding who should be the managing conservator and whether an existing order should be changed. That does not mean, however, that any available court may intervene to make that decision. The court which is the court of continuing jurisdiction is the only court that should make the determination. The jurisdiction of the court of continuing jurisdiction should not be interrupted, interferred with or divided by interim modification orders by other courts. When this cause was first brought to the attention of the district court of Travis County and it determined, as it did, that the Harris County District Court had continuing jurisdiction, it should have peremptorily granted the habeas corpus to protect and enforce the jurisdiction of the court of continuing exclusive jurisdiction. By such an order, the court of continuing

jurisdiction could have more promptly made both temporary and final orders in the best interest of the child. Saucier v. Pena, 559 S.W.2d 654 (Tex.1977); Lamphere v. Chrisman, 554 S.W.2d 935 (Tex.1977); McElreath v. Stewart, 545 S.W.2d 955 (Tex.1977); Standley v. Stewart, 539 S.W.2d 882 (Tex.1976). Jones, Child Custody Modification and the Family Code, 27 Baylor L.Rev. 725 (1975); Smith, Commentary on Title Two, Texas Family Code, 5 Tex.Tech.L.Rev. 389, 435-36 (1974).

It is assumed that Judge Dear will vacate his order denying Nancy Trader's application for habeas corpus and that he will grant the requested writ. A writ of mandamus will issue only if he declines to do so. Pursuant to Rule 515, Texas Rules of Civil Procedure, no motion for rehearing will be entertained.

Concurring opinion by DANIEL, J.

DANIEL, Justice, concurring.

I am compelled to concur in the opinion of the Court because the Legislature has enacted a law which, under the circumstances of this case, compels the trial court to grant the writ of habeas corpus without regard to the best interests of the child.[1]

It is obvious from the number of cases which have reached us on this same point that numerous members of the bar and trial judges have either overlooked Section 14.10 of the Family Code, effective January 4, 1974, or have chosen to ignore it.[2] The same is true to some extent with reference to Section 11.05(a) of the Family Code, which, subject to stated exceptions, provides that the original court acquiring jurisdiction of a parent-child relationship shall retain continuing jurisdiction and that "no other court has jurisdiction of a suit affecting the parent-child relationship" except upon transfer as provided in Section 11.06 of the Code.
Even a court of continuing jurisdiction, however, is bound by the mandatory language of Section 14.10. It must grant a writ of habeas corpus for the delivery of possession of a child in accordance with an existing court order without

any delay for separate or simultaneous consideration of a pending motion for modification of the existing custody order and without consideration of the best interests of the child. McElreath v. Stewart, 545 S.W.2d 955 (Tex.1977); Standley v. Stewart, 539 S.W.2d 882 (Tex.1976). There are certain exceptions which are set forth in Section 14.10 and in the Court's opinion this day handed down in Strobel v. Thurman, 565 S.W.2d 238 (Tex.1978).[3]

*238 It is understandable that some trial judges are slow to disregard the best interest of the child in any child custody proceeding, especially if they have not studied the important mandatory change made by the Legislature when it enacted Section 14.10 of the Family Code. For many years prior to that time the best interest of the child was the paramount consideration in both original child custody cases and habeas corpus proceedings relating thereto. Herrera v. Herrera, 409 S.W.2d 395 (Tex.1966); Hendricks v. Curry, 401 S.W.2d 796, 802 (Tex.1966); Mumma v. Aguirre, 364 S.W.2d 220 (Tex.1963); Knollhoff v. Norris, 152 Tex. 231, 256 S.W.2d 79, 81-82 (1953); Duckworth v. Thompson, 37 S.W.2d 731 (Tex.Com.App.1931); Legate v. Legate, 87 Tex. 248, 28 S.W. 281 (1894).

Many changes in child custody proceedings were made in the Family Code. Perhaps Section 14.10 is one of the most harsh, far-reaching and difficult for some trial judges to apply. A study of some of the cases which have reached this Court will show that some decisions have been compelled by the statute which were not in the best interests of the children. However, the statute is clear and definite. It should be studied and followed by the courts until and unless it is changed by the Legislature. In this connection, it has been suggested that the Legislature might well consider an amendment which would permit the court of continuing jurisdiction to give paramount consideration to the welfare and best interest of the child by consolidating hearings on writs of habeas corpus and any pending cross actions or motions for change of custody.

**All Citations**

565 S.W.2d 233

Footnotes

[1]    There are exceptions which are not here applicable. Tex.Fam.Code Ann. s 11.05(b)-(d) & s 11.06.

2    Subsection (b)(1) is not applicable in this case and the trial judge expressly found that the 6 months provision of (b)(2) did not apply.

1    Section 14.10 of the Texas Family Code, which is quoted in the Court's opinion.

2    See, in addition to this case, Strobel v. Thurman, 565 S.W.2d 238 (Tex.1978); Robertson v. Hazlett, 21 Tex.Sup.Ct.J. 23 (Oct. 22, 1977); Saucier v. Pena, 559 S.W.2d 654 (Tex.1977); Lamphere v. Chrisman, 554 S.W.2d 935 (Tex.1977); McElreath v. Stewart, 545 S.W.2d 955 (Tex.1977); Standley v. Stewart, 539 S.W.2d 882 (Tex.1976). See also Ex Parte Jabara, 556 S.W.2d 592 (Tex.Civ.App.1977); Fountain v. Nelson, 546 S.W.2d 102 (Tex.Civ.App.1977, no writ); Lugo v. Wade, 534 S.W.2d 726 (Tex.Civ.App.1976, no writ); Clayton v. Newton, 524 S.W.2d 368 (Tex.Civ.App.1975, no writ).

3    The principal exception which would seem to apply to the facts of some of the cases which have reached us, but which has seldom been used in such cases, is in Subsection 14.10(c), which provides: "The court may issue any appropriate temporary order if there is a serious immediate question concerning the welfare of the child."

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by** Purdue Pharma L.P. v. Combs, Ky.App.,
February 28, 2014

827 S.W.2d 833
Supreme Court of Texas.

Charles F. WALKER and Mary Jeanette Walker et
al., Relators,
v.
The Honorable Anne PACKER, Judge,
Respondent.

No. C–9403. | Feb. 19, 1992. | Rehearing Overruled
May 6, 1992. | Dissenting Opinion by Justice
Gammage May 7, 1992.

Parents of child born with brain damage, who had brought action against obstetrician, hospital where child was born, and nurse attending at delivery, brought petition for writ of mandamus arguing that the trial court abused its discretion by refusing to order hospital to produce documents from its insurer's files and by ordering that portions of other responsive documents be stricken. The Supreme Court, Phillips, C.J., held that: (1) plaintiffs had not presented sufficient record to demonstrate that trial court clearly abused its discretion in failing to grant plaintiffs requested discovery from one of defendants, and (2) plaintiffs had adequate remedy by way of appeal as to documents they sought from nonparty for impeachment purposes.

Petition denied.

Gonzalez, J., concurred with opinion.

Doggett, J., dissented with opinion in which Mauzy, J., joined.

Gammage, J., dissented with opinion.

West Headnotes (18)

[1]     **Mandamus**
        ⬤⟶Presumptions and Burden of Proof

Party seeking mandamus relief has burden of providing Supreme Court with sufficient record to establish right to mandamus relief.

496 Cases that cite this headnote

[2]     **Mandamus**
        ⬤⟶Presumptions and Burden of Proof

Party seeking mandamus relief had burden of providing not only a petition and affidavit, but also a statement of facts from evidentiary hearing that had been held. Rules App.Proc., Rule 121(a)(2)(C, F).

21 Cases that cite this headnote

[3]     **Mandamus**
        ⬤⟶Presumptions and Burden of Proof

Plaintiffs bringing motion for leave to file petition for writ of mandamus arguing that trial court clearly abused its discretion by refusing to order defendant to produce documents from insurer's files and by ordering that portions of other responsive documents be stricken failed to meet their burden of providing Court of Appeals with record upon which they could establish their right to mandamus relief; plaintiffs failed to provide Supreme Court with statement of facts from evidentiary hearing. Rules App.Proc., Rule 121(a)(2)(C, F).

833 Cases that cite this headnote

[4]     **Pretrial Procedure**
        ⬤⟶Request, Notice, or Motion and Response or
        Objection

Trial court erred in mechanically applying

*Russell* decision, which disapproved of global discovery of documents merely to impeach potential witness, to deny discovery of documentary evidence by medical malpractice plaintiffs to impeach one of defendants' expert witnesses, a faculty member in obstetrics; plaintiffs presented to trial court evidence of hospital's policy restricting faculty's freedom to testify for plaintiffs, raising the possibility that the faculty member was biased, and plaintiffs' request was narrowly tailored. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 2, par. a; Rules of Civ.Evid., Rule 613(b).

9 Cases that cite this headnote

[5] **Mandamus**
⬥Scope of Inquiry and Powers of Court

Trial court clearly abuses its discretion, for purposes of mandamus, with respect to resolution of factual issues or matters committed to trial court's discretion, only if trial court could reasonably have reached only one decision; reviewing court may not substitute its judgment for that of trial court.

803 Cases that cite this headnote

[6] **Mandamus**
⬥Matters of Discretion

On mandamus review of trial court's determination of legal principles, clear failure by trial court to analyze or apply the law correctly will constitute abuse of discretion, and may result in appellate reversal by extraordinary writ.

1842 Cases that cite this headnote

[7] **Mandamus**

⬥Scope of Inquiry and Powers of Court

On mandamus review of trial court's erroneous denial of requested discovery in medical malpractice case on sole basis of *Russell*, Supreme Court would consider the trial court's decision as a legal conclusion to be reviewed with limited deference.

21 Cases that cite this headnote

[8] **Mandamus**
⬥Proceedings in Civil Actions in General

Trial court's erroneous denial of plaintiffs' requested discovery in medical malpractice case to impeach one of defendants' expert witnesses on sole basis of *Russell* constituted clear abuse of discretion, for purposes of mandamus relief.

387 Cases that cite this headnote

[9] **Mandamus**
⬥Remedy by Appeal or Writ of Error

Requirement that person seeking mandamus relief establish lack of adequate appellate remedy is "fundamental tenet" of mandamus practice.

96 Cases that cite this headnote

[10] **Mandamus**
⬥Remedy by Appeal or Writ of Error

Mandamus will not issue where there is adequate remedy by appeal.

295 Cases that cite this headnote

[11] **Mandamus**
◆Modification or Vacation of Judgment or Order

Party seeking review of discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate.

26 Cases that cite this headnote

[12] **Mandamus**
◆Remedy by Appeal or Writ of Error

Appellate remedy is not inadequate, for purposes of mandamus, merely because it may involve more expense or delay than obtaining an extraordinary writ.

135 Cases that cite this headnote

[13] **Mandamus**
◆Modification or Vacation of Judgment or Order

Party will not have adequate remedy by way of appeal, for purposes of mandamus, when appellate court would not be able to cure the trial court's discovery error, which occurs when trial court erroneously orders disclosure of privileged information which will materially affect the rights of the aggrieved party.

180 Cases that cite this headnote

[14] **Mandamus**
◆Remedy by Appeal or Writ of Error

Appeal will not be an adequate remedy, for purposes of mandamus, where the party's ability to present viable claim or defense at trial is vitiated or severely compromised by trial court's discovery error, but it is not enough to show merely the delay, inconvenience or expense of an appeal, rather, the relator must establish the effective denial of reasonable opportunity to develop the merits of his or her case.

392 Cases that cite this headnote

[15] **Mandamus**
◆Modification or Vacation of Judgment or Order

When trial court imposes discovery sanctions which have effect of precluding decision on merits of party's claims, party's remedy by eventual appeal is inadequate, for purposes of mandamus, unless sanctions are imposed simultaneously with rendition of final, appealable judgment.

97 Cases that cite this headnote

[16] **Mandamus**
◆Modification or Vacation of Judgment or Order

Remedy by appeal may be inadequate, for purposes of mandamus, where trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on the record before it.

49 Cases that cite this headnote

[17] **Mandamus**
Proceedings in Civil Actions in General

If trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on record before it, court must carefully consider all relevant circumstances, such as claims and defenses asserted, type of discovery sought, what it is intended to prove, and presence or lack of other discovery, to determine whether mandamus is appropriate. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

21 Cases that cite this headnote

[18] **Mandamus**
Modification or Vacation of Judgment or Order

Medical malpractice plaintiff seeking documents from defendant hospital to impeach one of defendant's expert witnesses had adequate remedy by appeal, and, thus, mandamus was inappropriate way to compel discovery, where the information was not privileged, burdensome or harassing, nor did it vitiate or severely compromise the plaintiffs' ability to present a viable claim, the materials were considered below, and there was no reason why they would not be available on appeal.

121 Cases that cite this headnote

**Attorneys and Law Firms**

*835 Les Weisbrod and Michael S. Box, Dallas, for relators.

Philipa Remington, Stephen W. Johnson, James A. Williams, Kevin J. Keith, Martha L. Strother, Gary W. Sibley, Dallas and Delmar L. Cain, Austin, for

respondent.

**OPINION**

PHILLIPS, Chief Justice.

This original mandamus action involves two pre-trial discovery requests sought by *836 relators, plaintiffs in a medical malpractice lawsuit. The first discovery dispute involves documents which the plaintiffs seek from one of the defendants, while the second involves documents which they seek from a nonparty for impeachment purposes. As to the first matter, we hold that relators have not presented a sufficient record to demonstrate that the trial court clearly abused its discretion in failing to grant them all requested relief. As to the second, we hold that relators have an adequate remedy by appeal. Thus, mandamus is inappropriate, and we deny the writ.

*The St. Paul and Aetna Records*

Catherine Johanna Walker sustained brain damage at birth in January 1983. In January 1985, her parents, Charles F. and Mary Jeanette Walker, sued Dr. Paul Crider, the obstetrician, St. Paul Hospital, where Catherine was born, and Iris Jean White, a nurse attending at the delivery.

In August 1987, the Walkers served on St. Paul their third request for production of documents pursuant to Tex.R.Civ.P. 167. One request asked for:

> Any and all writings, notes, documents, letters, etc., concerning, mentioning, alluding to, or making reference to (either directly or indirectly), the tape recorded statement given by Nurse White to an Aetna adjuster, including but not limited to any notes or entries in any Aetna adjuster's file, any attorney's file, or any file or writing in possession of any employee, representative or agent of St. Paul Hospital. This request is in reference to the tape recorded

statement which you have been unable to locate, but which was previously requested....

St. Paul responded as follows:

> In an effort to respond to this request, this Defendant again checked with all appropriate personnel and files at St. Paul Hospital and the law firm of Bailey and Williams. No such statement or taped recording was found. For the third time the Aetna Casualty and Surety Company was asked to check its records and files and a partially transcribed statement was located, a copy of which is attached. No taped recording was located.

Nearly two years later, the Walkers filed a motion to compel under Tex.R.Civ.P. 215, asserting that St. Paul failed to respond completely to the request.[1] The Walkers complained that "St. Paul Hospital did not even respond to what was requested in the request for production—that is, writings, notes, and notations in the adjuster's file or attorney's file mentioning, alluding to, or making reference to the tape recorded statement of Nurse White." At about the same time, the Walkers also served on Aetna Casualty and Surety Company, St. Paul's insurer, an "Amended Notice of Intention to Take Deposition Upon Written Questions—Duces Tecum," seeking, among other things, the same documents. Aetna moved to quash the notice.

The trial judge appointed a special master to review the Walkers' motion to compel and Aetna's motion to quash. After an evidentiary hearing on September 5, 1989, the master prepared findings, which formed the basis for two extensive orders signed by the trial court on September 20, 1989. In the first order, the court found that the Walkers were "entitled to all documentation sought in [the request] from the files of Defendant St. Paul or its attorney of record, but not from the files of Aetna Insurance Company, except as they may appear in the files of St. Paul or the attorneys of record of St. Paul." The court also stated that it "has been advised that St. Paul has supplied all documentation that is responsive to [the request], but that additional documentation will be made available *837 to the Court for in camera review."

The court therefore *sustained* the Walkers' motion to compel "to the extent that on Friday, September 8, 1989 the Special Master will review in the Chambers of the 134th District Court the relevant portions of the St. Paul files and their attorney [sic] files, which may be in response to Plaintiff's request...." The court, however, did not order St. Paul to produce documents from Aetna's files for *in camera* inspection.[2]

After the master's September 8 *in camera* inspection, the court ordered discovery of three additional documents from the files of St. Paul and its attorneys, which it found "relate to the matters sought in discovery and should be supplied after irrelevant portions of such documents are stricken."

After unsuccessfully seeking relief in the court of appeals, the Walkers moved for leave to file a petition for writ of mandamus with this court, arguing that the trial court clearly abused its discretion by refusing to order St. Paul to produce the documents from Aetna's files and by ordering that portions of the other responsive documents be stricken. The Walkers contend that the order was a clear abuse of discretion because St. Paul 1) never objected to the Walkers' request for production, 2) had a superior right to the Walkers to compel production of the documents in Aetna's possession, and 3) never asked that any parts of the documents be excised.

The record before us does not include the statement of facts from the evidentiary hearing on the Walkers' motion to compel production. Without it, we cannot determine on what basis the trial judge and the special master reached their conclusions. Since we cannot assess whether or not the trial court's order was correct, we obviously cannot take the additional step of determining that the court's order, if incorrect, constituted a clear abuse of discretion.

[1] [2] [3] As the parties seeking relief, the Walkers had the burden of providing this Court with a sufficient record to establish their right to mandamus relief. Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, *see* Tex.R.App.P. 121(a)(2)(C) and (F), but also a statement of facts from the hearing. *See, e.g., Cameron County v. Hinojosa,* 760 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1988, orig. proceeding); *Greenstein, Logan & Co. v. Burgess Mktg. Inc.,* 744 S.W.2d 170, 177 (Tex.App.—Waco 1987, writ denied); *see also Western Casualty & Surety Co. v. Spears,* 730 S.W.2d 821, 822 (Tex.App.—San Antonio 1987, orig. proceeding).[3] Having failed to meet this burden, the Walkers have not

provided us with a record upon which they can establish their right to mandamus relief against St. Paul.

### *The Obstetrics Faculty Records*

[4] The second discovery dispute arises out of the Walkers' attempt to secure documentary evidence to impeach one of the defendants' expert witnesses, Dr. Larry Gilstrap, a faculty member in obstetrics at the University of Texas Health Science Center at Dallas ("the Center"). Gilstrap testified at his deposition that expert witness fees earned by obstetrics faculty members are deposited into a "fund" in the obstetrics "billing department"; that obstetrics faculty members get paid "indirectly" from this fund; that the fund is handled by Judy Wagers, a Center employee; and that he was unaware of any obstetrics department policy restricting faculty members from testifying for plaintiffs in medical malpractice cases.

*838 Thereafter, the Walkers noticed Wagers' deposition, requesting that she provide all documents regarding (1) the operation of the above-mentioned "fund" from 1985 to 1988; and (2) limitations placed upon obstetrics faculty members relating to their testimony in medical malpractice cases. The Center, on behalf of Wagers, moved to quash the notice, arguing that the request for documents was "vague and overly broad" and that production would be "costly and burdensome."

Two months later, in an unrelated lawsuit, the Walkers' counsel deposed Dr. Alvin L. Brekken, another obstetrics faculty member at the Center. Dr. Brekken testified that the obstetrics department's official policy, distributed in writing to all faculty members, requires a doctor to obtain authorization from other faculty members before testifying for any plaintiff in a medical malpractice case. Based on this testimony, the Walkers sought a court order to depose Wagers and obtain the requested documents.

After reviewing the Gilstrap and Brekken depositions and pleadings of counsel, the trial court ordered the Center to produce the documents for *in camera* review by the special master. Subsequently, in her September 20, 1989 order, the trial judge denied the discovery, stating in part:

> [S]uch requested discovery is improper pursuant to the Rulings of the Supreme Court of Texas in *Russell v. Young* [452 S.W.2d 434

(Tex.1970) ], as the potential witness is not a party to the suit and the records do not relate to the subject matter of the suit, but are sought solely for the purpose of impeachment, according to the Plaintiffs' pleadings.

Although noting that some of the documents "would be relevant to this cause of action," the court nevertheless denied discovery because "all such documents are controlled by the *Russell* decision."

In *Russell,* a party sought wholesale discovery of financial records of a potential medical expert witness who was not a party to the lawsuit.[4] The documents requested did not relate directly to the subject matter of the suit, but were sought solely in an attempt to impeach the potential witness by showing bias or prejudice. The credibility of the witness, however, had not yet been put in doubt. Under these circumstances, we held that the documents were not discoverable, and we directed the trial court to vacate its order allowing the requested discovery. 452 S.W.2d at 435. We reasoned that "[t]here is ... a limit beyond which pre-trial discovery should not be allowed." *Id.* at 437.

The present case is distinguishable. Here, the Walkers presented to the trial court evidence of a specific circumstance—the Center's policy restricting the faculty's freedom to testify for plaintiffs—raising the possibility that Dr. Gilstrap is biased. Thus, the Walkers are not engaged in global discovery of the type disapproved in *Russell;* rather, they narrowly seek information regarding the potential bias suggested by the witness' own deposition testimony and that of his professional colleague.

Our rules of civil procedure, and the federal rules upon which they are based, mandate a flexible approach to discovery. A party may seek any information which "appears reasonably calculated to lead to the *839 discovery of admissible evidence." Tex.R.Civ.P. 166b(2)(a). Evidence of bias of a witness is relevant and admissible. *See* Tex.R.Civ.Evid. 613(b).[5]

The trial court erred in failing to apply the foregoing rules to determine whether the documents were discoverable. Instead, the trial court simply read *Russell* as an absolute bar to discovery, even though the circumstances here are quite distinguishable. In so doing, the trial court

misapplied the *Russell* holding. We expressly disapprove such a mechanical approach to discovery rulings.[6]

Having concluded that the trial court erred in denying the discovery based solely on *Russell*, we now must determine whether the appropriate remedy lies by writ of mandamus. "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).[7] We therefore examine whether the trial court's error in the present case constituted a clear abuse of discretion and, if so, whether there is an adequate remedy by appeal.

### 1. *Clear Abuse of Discretion*

Traditionally, the writ of mandamus issued only to compel the performance of a ministerial act or duty. *See Wortham v. Walker*, 133 Tex. 255, 277, 128 S.W.2d 1138, 1150 (1939); *Arberry v. Beavers*, 6 Tex. 457 (1851); Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts*, 31 S.Tex.L.Rev. 509, 510 (1990); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available*, 32 Sw.L.J. 1283, 1288 (1979).

Since the 1950's, however, this Court has used the writ to correct a "clear abuse of discretion" committed by the trial court. *See, e.g., Joachim v. Chambers*, 815 S.W.2d 234, 237 (Tex.1991); *Jampole v. Touchy*, 673 S.W.2d 569, 574 (Tex.1984); *West v. Solito*, 563 S.W.2d 240, 244 (Tex.1978); *Womack v. Berry*, 156 Tex. 44, 50, 291 S.W.2d 677, 682 (1956). *See generally*, David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders*, 23 St. Mary's L.J. 365, 390 (1991); Cassidy, 31 S.Tex.L.Rev. at 510; Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy*, 1 Rev.Litig. 325, 326–27 (1981); Comment, 32 Sw.L.J. at 1290.

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d at 917. This standard, however, has different applications in different circumstances.

[5] With respect to resolution of factual issues or matters

committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41–42 (Tex.1989) (holding that determination *840 of discoverability under Tex.R.Civ.P. 166b(3)(d) was within discretion of trial court); *Johnson*, 700 S.W.2d at 918 (holding that trial court was within discretion in granting a new trial "in the interest of justice and fairness"). The relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 917. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Johnson*, 700 S.W.2d at 918.

[6] On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *See Joachim v. Chambers*, 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting Code of Judicial Conduct); *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes ISD v. Logue*, 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

[7] [8] In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court. This is consistent with our approach in previous mandamus proceedings arising out of the trial court's interpretation of legal rules. *Cf. Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 555 (Tex.1990); *Barnes v. Whittigton*, 751 S.W.2d 493, 495–96 (Tex.1988); *Terry v. Lawrence*, 700 S.W.2d 912, 913–14 (Tex.1985). Under this analysis, the trial court's erroneous interpretation of the law constitutes a clear abuse of discretion.

### 2. *Adequate Remedy by Appeal*

In order to determine whether the writ should issue, however, we must further decide whether the Walkers have an adequate remedy by appeal.

[9] Mandamus will not issue where there is "a clear and adequate remedy at law, such as a normal appeal." *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Mandamus is intended to be an extraordinary remedy, available only in limited circumstances. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989) (quoting James Sales, *Original Jurisdiction of the Supreme Court and the Courts of Civil Appeals of Texas* in *Appellate Procedure in Texas,* § 1.4[1] [b] at 47 (2d ed. 1979)). The requirement that persons seeking mandamus relief establish the lack of an adequate appellate remedy is a "fundamental tenet" of mandamus practice. *Holloway,* 767 S.W.2d at 684.

[10] Our requirement that mandamus will not issue where there is an adequate remedy by appeal is well-settled.[8] On a few occasions, however, we have not focused *841 on this requirement when applying mandamus review of discovery orders. For example, in *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977), the trial court refused to compel defendant's representative to answer certain deposition questions, and the plaintiff applied to this Court for a writ of mandamus. We concluded that the trial court had abused its discretion, and ordered that the writ conditionally issue. We never discussed the well-settled requirement of inadequate remedy by appeal.

A few months later, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977), the Court again conditionally issued a writ of mandamus to correct a discovery abuse without considering whether the relator had an adequate remedy by appeal. The real party in interest in *Allen* raised this argument, but the Court avoided the issue by citing *Barker. Id.* at 801.

Commentators quickly criticized the *Barker* and *Allen* opinions. *See* James Sales, *Pre–Trial Discovery in Texas,* 31 Sw.L.J. 1017, 1033 (1977); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1300 (1979) (In most cases "forcing a party to await the completion of the trial in order to seek appellate review will not endanger his substantial rights...."); Note, *Mandamus May Issue To Compel A District Judge to Order Discovery,* 9 Tex.Tech L.Rev. 782 (1978) (mandamus should not be a substitute for appeal).

In *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984), the

Court again used the extraordinary writ of mandamus to compel discovery which had been denied by the trial court. Unlike in *Barker* and *Allen,* however, the Court in *Jampole* addressed whether relator had an adequate appellate remedy. The underlying suit in *Jampole* was a products liability action, and the disputed discovery materials included alternate design and assembly documents. The Court held that relator did not have an adequate remedy by appeal because denial of this discovery effectively prevented relator from proving the material allegations of his lawsuit. 673 S.W.2d at 576. Remedy by appeal in a discovery mandamus is not adequate where a party is required "to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal...." *Id.*

Although the Court in *Jampole* recognized the need to address whether relator had an adequate remedy by appeal, it expressly refused to overrule *Barker* and *Allen. Id.* Perhaps because of this, we have on several occasions since *Jampole* used mandamus to correct discovery errors without considering whether the relator had an adequate appellate remedy. *See Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989); *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988); *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986); *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985); *Lindsay v. O'Neill,* 689 S.W.2d 400 (Tex.1985).

On many other occasions, however, we have still required a showing of inadequate *842 remedy by appeal in mandamus proceedings involving other types of pre-trial orders, even those involving discovery. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986). In *Hooks,* for example, we reaffirmed that the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate." 808 S.W.2d at 60.

[11] The requirement that mandamus issue only where there is no adequate remedy by appeal is sound, and we reaffirm it today. No mandamus case has ever expressly rejected this requirement, or offered any explanation as to why mandamus review of discovery orders should be exempt from this "fundamental tenet" of mandamus practice. Without this limitation, appellate courts would "embroil themselves unnecessarily in incidental pre-trial

rulings of the trial courts" and mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991). We thus hold that a party seeking review of a discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate. We disapprove of *Barker, Allen,* and any other authorities to the extent they might be read as abolishing or relaxing this rule.

[12] We further hold that an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. As we observed in *Iley v. Hughes,* the "delay in getting questions decided through the appellate process ... will not justify intervention by appellate courts through the extraordinary writ of mandamus. Interference is justified only when parties stand to lose their substantial rights." 158 Tex. at 368, 311 S.W.2d at 652.

On some occasions, this Court has used, or at least mentioned, the more lenient standard first articulated in *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926), that the remedy by appeal must be "equally convenient, beneficial, and effective as mandamus." *See, e.g., Jampole v. Touchy,* 673 S.W.2d 569, 576 (Tex.1984); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (Tex.1959). This standard, literally applied, would justify mandamus review whenever an appeal would arguably involve more cost or delay than mandamus. This is unworkable, both for individual cases and for the system as a whole. Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as discovery progressed and the evidence was developed at trial. Moreover, the delays and expense of mandamus proceedings may be substantial. This proceeding, for example, involving rulings on collateral discovery matters, has delayed the trial on the merits for over two years. The impact on the appellate courts must also be considered. We stated in *Braden* that "[t]he judicial system cannot afford immediate review of every discovery sanction." 811 S.W.2d 922, 928. It follows that the system cannot afford immediate review of every discovery order in general.[9] We therefore disapprove of *Cleveland, Crane, Jampole* and any other authorities to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus.

Justice Doggett's dissent argues that because discovery errors often constitute harmless errors under Tex.R.App.P. 81(b)(1), parties denied mandamus relief will be deprived of any remedy since the *843 error will not provide a basis for appellate reversal. This is nothing more than a thinly disguised attack on the harmless error rule. Avoiding interlocutory appellate review of errors that, in the final analysis, will prove to be harmless, is one of the principal reasons that mandamus should be restricted.

Justice Doggett's dissent also suggests that we will be unable to develop a coherent body of discovery law without unrestricted mandamus review. We do not think, however, that losing parties will be reluctant to raise perceived discovery errors on appeal, nor will an appellate court be foreclosed from writing on discovery issues, even when the error may be harmless. *See, e.g., Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 652–53 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

Nor are we impressed with the dissenters' claim that strict adherence to traditional mandamus standards will signal an end to effective interlocutory review for some parties or classes of litigants. There are many situations where a party will not have an adequate appellate remedy from a clearly erroneous ruling, and appellate courts will continue to issue the extraordinary writ. In the discovery context alone, at least three come to mind.

[13] First, a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party, such as documents covered by the attorney-client privilege, *West v. Solito,* 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information. *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256 (Tex.1974). As we noted in *Crane:* "After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers." 160 Tex. at 190, 328 S.W.2d at 439. It may also occur where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 35 Tex.Sup.Ct.J. 454 (1992) (demand for tax returns); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983) (demand for information about all

vehicles for all years).

[14] [15] Second, an appeal will not be an adequate remedy where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error. It is not enough to show merely the delay, inconvenience or expense of an appeal. Rather, the relator must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources. We recently held that when a trial court imposes discovery sanctions which have the effect of *precluding a decision on the merits of a party's claims*—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991). Similarly, a denial of discovery going to the heart of a party's case may render the appellate remedy inadequate.

[16] [17] Finally, the remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error *844 on the record before it. *See Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 558 (Tex.1990) ("[M]andamus is the only remedy because the protective order shields the witnesses from deposition and thereby prevents the evidence from being part of the record."); *see generally Jampole,* 673 S.W.2d at 576 ("Because the evidence exempted from discovery would not appear in the record, the appellate courts would find it impossible to determine whether denying the discovery was harmful."). If the procedures of Tex.R.Civ.P. 166b(4) are followed, this situation should only rarely arise. If and when it does, however, the court must carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.[10]

[18] In the present case, the Walkers seek documents from the Center to impeach one defendant's expert witness. This information is not privileged, burdensome or harassing, nor does it vitiate or severely compromise the Walkers' ability to present a viable claim. In fact, as we have already noted, the trial court may ultimately conclude that it is not admissible or even discoverable.

Finally, although the materials are not before us, they were considered below, and we know of no reason why they would not be available on appeal. Therefore, under our traditional standards of mandamus review, as measured by the factors we mention above, the Walkers have an adequate remedy by appeal and mandamus is inappropriate.

For the above reasons, we conclude that the Walkers have not established their right to relief by mandamus on either discovery matter. Therefore, we deny the Walkers' petition for writ of mandamus.

GONZALEZ, J., concurs and files an opinion.

DOGGETT, J., dissents and files an opinion, joined by MAUZY, J.

GAMMAGE, J., dissents and files an opinion.

GONZALEZ, Justice, concurring.

I agree with the court's disposition of this cause but disagree with the court's opinion regarding the "Obstetrics Faculty Records." Specifically, I disagree with the court's attempt to distinguish *Russell v. Young,* 452 S.W.2d 434 (Tex.1970). Nevertheless, I concur in the result.

*Russell* holds that wholesale discovery of the private records of a *non-party witness* is not permitted if the sole purpose for discovery is to impeach the credibility of the non-party.[1] 452 S.W.2d at 435. The policy considerations of *Russell* still apply today. By disapproving of *Russell* as "a mechanical approach to discovery rulings," at 839, the court forces trial courts to get further involved in discovery matters. This increases the backlog, delay, and cost of litigation by creating the need for more hearings.

In the instant case, the plaintiffs sought to discover documents from the University of Texas Health Science Center to confirm the existence of a written policy restricting faculty members from testifying for plaintiffs in medical malpractice cases. This policy was sought for use in impeaching defendant's expert witness, Dr. Gilstrap. In refusing discovery, the trial court concluded *845 that the relevance of this material was limited to

impeachment. As such, the requested documents fell squarely within the prohibition of *Russell.*

Despite the court's mischaracterization of *Russell*, the issues and type of evidence sought here and in *Russell* are identical. Just as in *Russell*, the records sought in the instant case did not relate directly to the subject matter of the suit. The only difference between the present case and *Russell* is the identity of the party seeking the information. In *Russell*, a defendant sought evidence to impeach the plaintiffs' expert; here, the plaintiff sought evidence to impeach a defendant's expert. Surely, we cannot have a rule that changes in application depending on whether the relator is a plaintiff or a defendant in the trial court.

In my opinion, the court strains to distinguish *Russell.* The court suggests that the trial judge made a mistake in her ruling by failing to read *Russell* in conjunction with the rules of civil procedure and evidence. However, when we adopted the new Texas Rules of Civil Evidence, there was no discussion whatsoever that, by their adoption, we intended to reject the settled rule that information sought solely for impeachment of a non-party is not discoverable. *Russell*, 452 S.W.2d at 435; *see also W.W. Rodgers & Sons Produce Co. v. Johnson*, 673 S.W.2d 291, 294–95 (Tex.App.—Dallas 1984, orig. proceeding). Furthermore, the scope of discovery has not changed in the twenty years since *Russell* has been on the books. When *Russell* was decided, the scope of discovery was codified in Texas Rule of Civil Procedure 186a. It provided in pertinent part that:

> [p]arties may obtain discovery regarding any matter which is relevant to the subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party.

This same text is now codified in Rule 166b(2)(a). Clearly, impeachment evidence regarding *collateral matters* would not relate to the subject matter of the pending action.

Implicitly, the court concludes that the credibility of a non-party witness alone is a relevant avenue of inquiry and, thus, is a matter properly open to discovery under some new, broader definition of relevancy.

While I agree that the definition of relevance in Rule 401 of the Texas Rules of Civil Evidence includes matters bearing on credibility, this alone does not explain or distinguish *Russell.* A witness' credibility has always been a relevant matter. As the United States Supreme Court has said: "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Yet in *Russell*, we said that a trial court lacked "authority" to order discovery from a *non-party* solely for purposes of impeachment. 452 S.W.2d at 435. We chose to withdraw all discretion in this particular area of discovery. *Russell* concedes that impeachment evidence may be relevant and admissible at trial, but holds that it cannot be discovered from a non-party for its own sake prior to trial. 452 S.W.2d at 436.

The fact that a matter may have some relevance yet not be subject to discovery is hardly a novel concept. The basic premise of the rules of discovery is to weigh the legitimate needs of litigation against the other rights and values that would be irreparably harmed by unfettered discovery. *Russell* strikes the proper balance by protecting non-party witnesses from indiscriminate invasions into their private lives where the information sought would not appreciably shed light on the issues of the case.

Furthermore, the decision in *Russell was not* grounded on whether the credibility of the witness had been placed in doubt. Instead, the court highlighted the fact that *846 the witness had not offered testimony at trial nor was his deposition introduced into evidence at trial. The court said:

> Relator has not yet taken the witness stand nor has his deposition been introduced into evidence because there has not yet been a trial; relator's records cannot possibly have impeachment value because there is nothing yet to impeach and there may never be anything to impeach, depending upon the contents of the testimony, if any, which is introduced during the trial of the lawsuit.

*Russell*, 452 S.W.2d at 437. Thus, it is evident that the

court has today reinterpreted *Russell* with little or nothing to gain in a way that further obscures the proper scope of discovery.

I am concerned that as a result of today's ruling, some *non-parties* will be subjected to harassment and intrusion into their private lives, and that trial courts will be inundated with hearings on collateral issues far afield from the merits of the cause of action or defense. The court has attempted to fix something that was not broken. This reinterpretation of *Russell* will further tax our overburdened judicial system without appreciably benefiting the litigants or the system.

Finally, for the reasons expressed in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991) (Gonzalez, J., dissenting), I agree with the clarification of the standards for the issuance of mandamus.

DOGGETT, Justice, dissenting.

*Them that's got shall get*

*Them that's not shall lose*
*—God Bless The Child*[1]

With a double standard, the majority strikes a devastating blow at the most direct method of curbing abuses of judicial power. Many judicial excesses far beyond the scope of anything alleged in this particular case will henceforth receive only an official nod and wink from the Texas Supreme Court.

Mandamus is the legal tool by which appellate courts can promptly correct arbitrary and capricious rulings by trial judges. Today's opinion announces that this remedy will be available to support concealment of the truth but not its disclosure. Mandamus is officially declared a one-way street in the Texas courts—our judiciary can help to hide but not to detect.

Despite a determination that a "clear abuse of discretion" has occurred in this particular case, at 840, all relief is denied. Finding a wrong and denying a remedy echoes the logic of the majority's recent conclusion that a tax is unconstitutional but must be paid anyway. *See Carrollton–Farmers Branch Indep. Sch. Dist. v.*

*Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 524 (1992) (*Edgewood III* ) (Doggett, J., dissenting). Rather than correcting the abuse, the court simply gives the Walkers the same message it gave Texas taxpayers—wait. Only after a full jury trial based upon incomplete discovery will the judiciary even consider any possibility of relief.

For those who have previously sought more specific guidelines for the use of mandamus concerning discovery orders, the majority responds with not one but two standards for reviewing trial court action: orders compelling discovery may be immediately corrected; review of denied discovery is postponed indefinitely in a manner to ensure that no meaningful relief will ever be forthcoming.

## I.

What a different path this court now pursues than that so recently proclaimed in its unanimous decision that

> Discovery is ... the linchpin of the search for truth, as it makes "a trial less *847 a game of blind man's bluff and more a fair contest with the issues and facts disclosed to the fullest practicable extent."

*State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991) (quoting *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Similarly ignored are our recent, unanimous writings in *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 553, 555 (Tex.1990, orig. proceeding) ("[Discovery should provide] the fullest knowledge of the facts and issues prior to trial.... [T]he ultimate purpose of discovery ... is to seek the truth...."); and *Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 559 (Tex.1990, orig. proceeding) ("The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed."). Without mandamus review to add meaning to these laudatory expressions, they are just hollow words. The new signal is clear—circumvent discovery and conceal information.

Today's opinion reflects the radical change in philosophy which has taken firm hold in this court—discovery is no longer a search for truth, it is merely a game of hide and seek. No longer may appellate courts intercede through mandamus even for the trial court's complete abuse of discretion in denying access to vital data; under the

newly-announced double standard, intervention can, however, be accorded for those who persevere in evasion.

When a local business is defrauded, when a community is exposed to dangerous toxic wastes, when a manufacturer ignores reports that a safety design change would reduce user injuries, when a monopoly extorts unfair gain from the public, when discrimination results in job loss, and in numerous other circumstances, the burden of proving wrongdoing is exceedingly difficult to satisfy without obtaining evidence of that wrong from the files of the perpetrator. In such situations denial of discovery effectively means denial of all relief. That reality does not go unrecognized by today's majority.

Entities that begin litigation in control of most of the relevant evidence can often defeat their adversaries simply by denying them the power of information:

> [T]hose with established positions of power are more likely to ... win by preventing their adversaries from producing evidence; they are less likely to be in the position of having to extract evidence from their opponents to make out their case.

23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5422, at 674 (1980). With its separate and unequal treatment of litigants, the majority gives yet another edge to the already advantaged. Providing immediate review for orders that start the flow of information but refusing to consider those that stop it, the majority once again expresses its preference for helping the powerful over the seemingly powerless. Those opposing meaningful discovery

> tend to be institutions rather than individuals, and tend to be among the more wealthy and powerful segments of society. A review system that gives priority (that is, immediate review) to the complaints of privilege holders, but which consigns the complaints of parties seeking discovery until after final judgment, gives an advantage to those wealthy institutional litigants. They have the power to achieve more favorable results

during the pretrial process; their opponents must wait.

Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come*, 44 Sw.L.J. 1045, 1082 (1990) (hereinafter *Review of Discovery Orders* ) (footnote omitted).[2] In this way the *848 majority ensures that the scales of justice—which at the onset of litigation are often in reality uneven—never achieve balance.

Until this court included discovery orders within the scope of mandamus review, very few reported opinions addressed this important subject. Trial judges were effectively accorded unlimited discretion with a "resulting atmosphere [that] was very hostile to discovery." *Id.* at 1071. As a practical matter, discovery battles, often both complex and time-consuming, were shunned. When the party controlling vital data exercises the power of withholding it, fighting every important request, the judicial command "go work it out" often amounts to a denial of meaningful discovery. The mud-wrestling that frequently ensues in such contests may discourage a trial judge from determining who is acting fairly and who started the fight. If mandamus is not available to correct ill-considered or hasty denials, the hope for ultimate justice in complex litigation is prematurely crushed. The majority's decision today marks a return to those dark ages when discovery was regularly denied as the path of least resistance and greatest convenience for the judiciary.

## II.

By its very nature, discovery involves a search for what is largely unknown from someone who may have an incentive to make that search as long and tortuous as possible. Efforts to prevent discovery have been limited only by the boundless imagination of the top legal talent in America. Requests are either too broad or too narrow; records produced are either minimal or in such voluminous, disorganized form as to make locating relevant information most difficult; vital documents vanish in "routine document destruction" programs or are misplaced. Accordingly, our discovery rules have required continual revision to cope with the newest ways invented by those intent on subverting the process. Each revision of the Texas Rules of Civil Procedure during the last decade has included attempted clarification and improvement of discovery procedures. This has produced

a body of law that is "complex and rapidly evolving." David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 375 (1991) (hereinafter *Mandamus of Disclosure Orders* ).

Given the creativity of those who would thwart discovery, rules of procedure cannot be drawn to provide clear guidance in every situation; judicial interpretation is essential. The more complicated the rule, the more necessary the construction and the greater the likelihood for misinterpretation. *See id.* at 386 ("Erroneous interpretations of these changes ... are likely with the absence of prior significant precedent.... [and] could have a substantial effect on the subsequent course of a lawsuit."). This court's responsibility does not and cannot end when the text of promulgated amendments appears in the *Texas Bar Journal.* Rather, the court has a duty *both* to make the rules *and* to interpret them.

Our American system of jurisprudence is founded on the precept that it is of great benefit to have a written body of case law construing controlling legal principles and applying them to particular facts. This approach is undeniably desirable in the discovery context:

> In a system where trial court decisions are unreported and have no precedential value, the creation of a body of reported appellate case law regarding discovery has substantial value. Case law on discovery promotes uniform interpretation of the discovery rules and, in time, decreases the opportunity for individual **\*849** judge's biases to shape discovery outcomes. Reported decisions develop clear rules, where rules are possible, and narrow the range of judicial discretion in other areas simply by providing numerous cases finding that the trial court did or did not abuse its discretion. Such case law can be particularly helpful in a jurisdiction that has recently amended its discovery rules. Over time, the existence of discovery case law may even clarify the rules sufficiently so as to decrease the number of disputes in the trial court.

*Review of Discovery Orders* at 1080 (footnotes omitted). Appellate opinions properly applying mandamus produce, then, both more consistency and more accuracy in trial court decisions. *See id.* at 1077.[3]

The role of this court is particularly important in answering novel or significant questions of discovery law. *See Mandamus of Disclosure Orders* at 376 ("[P]re-trial appellate review of [important discovery] questions could lend critical guidance to the development of Texas discovery practice."). Rather than avoiding its responsibility, this court should utilize mandamus review to reduce the abuse of judicial power when "a unique question of discovery" law is presented. David West, Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litigation 325, 327 (1981) (hereinafter *The Use of Mandamus* ).

Most trial court mistakes denying discovery result from the need to make repeated, quick decisions based upon limited information. Recognizing this circumstance, trial judges sometimes actually encourage litigants to raise disputed rulings affecting truly vital matters for appellate examination through mandamus by automatically staying their orders. Refusal of prompt appellate review not only denies a party its rights but may also deprive a trial court of desired guidance.

Today's opinion appropriately recognizes that "this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction." At 839 n. 7. But under the standard announced, questions of importance concerning judicially-approved concealment of facts will never be considered. The significance to the state's jurisprudence of a ruling should certainly not be controlled by whether the order granted or denied discovery.

### III.

With mandamus now severely limited, many important issues will not be reviewed. *See generally Review of Discovery Orders* at 1056; *The Use of Mandamus* at 337 & n. 94. Abuses of judicial power will go forever uncorrected when the party disallowed discovery, realizing the difficulty of proving a case with less than full information and the uphill task of maintaining a

successful appeal, is either forced to settle or forgoes a costly and extended appeal following defeat on the entire case. Nor will improper rulings ever be reviewed where one denied discovery, although severely handicapped, nonetheless prevails at trial.

Where appeals do occur, remedies will be rare even for egregious pretrial rulings. To succeed in this endeavor, one must show that

> the error complained of amounted to such a denial of the rights of appellant as *850 was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b). This standard is universally regarded as a "more difficult hurdle" than abuse of discretion. Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts*, 31 S.Tex.L.Rev. 509, 512 (1990). As another commentator has aptly concluded,

> only an unusual discovery order would be dispositive enough to show the harmful error that most jurisdictions require for appellate reversal. Many appellants, therefore, would not even raise the discovery points on appeal.

*Review of Discovery Orders* at 1056; *see also Mandamus of Disclosure Orders* at 376 n. 40 (observing that, because of the harmless error rule, many discovery rulings are not pursued on appeal). In denying mandamus today, the majority closes and locks the appellate courthouse door to any meaningful consideration of numerous significant matters.

## IV.

Only with the tragic recent change in course by this court's majority has such denial of access become acceptable. Previously both this court and the courts of appeals had employed their writ power as necessary to correct the abusive refusal of discovery. Among those cases providing the foundation for appropriate mandamus review is *Barker v. Dunham*, 551 S.W.2d 41 (Tex.1977, orig. proceeding), in which the trial court had overruled a motion to complete an expert witness's deposition and to compel production of his work papers. We interceded, stating that: "It is settled that the writ of mandamus may issue in a discovery proceeding to correct a clear abuse of discretion by a trial judge." *Id.* at 42. Similarly, in *Allen v. Humphreys*, 559 S.W.2d 798 (Tex.1977, orig. proceeding), the trial court refused to order discovery of tests, surveys and complaints by similarly affected persons. This court found an abuse of discretion and granted the writ, despite the argument that the plaintiff had "an adequate remedy via the normal appellate process." *Id.* at 801. It is difficult to perceive, in light of this argument and the court's subsequent grant of mandamus relief, how the majority can now claim that "we [had] not focused" on the requirement of an inadequate remedy by appeal in *Allen* and on, admittedly, a "few [other] occasions." At 840–841.

Following these two opinions, this court has not hesitated to consider and correct the wrongful denial of discovery. By issuing mandamus to rectify an erroneous trial court ruling refusing discovery in *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984, orig. proceeding), this court recognized that appeal is not an adequate remedy:

> [R]equiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus."

*Id.* at 576 (quoting *Crane v. Tunks*, 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (citation omitted)); *see also Cleveland v. Ward*, 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926).

A trial court's unwillingness to order the production of accident scene photographs was overturned by mandamus in *Terry v. Lawrence*, 700 S.W.2d 912 (Tex.1985, orig. proceeding). In *Lindsey v. O'Neill*, 689 S.W.2d 400, 402 (Tex.1985, orig. proceeding) (per curiam), the court overturned by mandamus an order limiting the scope of a deposition and quashing the accompanying document request. A blanket order protecting hospital records was similarly vacated by mandamus in *Barnes v. Whittington*, 751 S.W.2d 493 (Tex.1988, orig. proceeding). In *Lunsford v. Morris*, 746 S.W.2d 471 (Tex.1988, orig. proceeding), this court again granted mandamus to

remedy a trial court's erroneous disallowance *851 of relevant discovery. *See also Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989, orig. proceeding) (correcting by mandamus wrongful denial of discovery); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986, orig. proceeding) (per curiam) (mandamus directing trial court to rescind order denying discovery of documents from insurer in subrogation action); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985, orig. proceeding) (erroneous bar of deposition by court of appeals cured by mandamus).[4]

It is only after fifteen years of repeated judicial reliance upon *Barker* and *Allen* in the issuance of numerous opinions that we learn these precedents of our court are not good law. This is all the more strange in that we had explicitly refused to overrule them. When that very request was urged in *Jampole,* 673 S.W.2d at 576, our answer was unmistakable: "We decline to do so." But the majority's new answer is simple: "Line them up against the wall." What does it matter that a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals are to the contrary? They can be disposed of in a mass execution of precedent.[5] Today's firing squad announces that it is only answering the command of Jim Sales and two law students who separately criticized the court during the period 1977–79. At 840–841. It thereby rationalizes constructing so distorted a standard on the corpses of so many prior authorities.

One of the most significant casualties is *Jampole v. Touchy,* which has formed the centerpiece for discovery in litigation over defective products and toxic substances for almost a decade. The majority, in a massive understatement, "disapproves" *Jampole* "to the extent [it implies] that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." At 842. Although leaving untouched for now this court's prior writing on the proper scope of discovery, the majority has in fact overruled that landmark precedent in its entirety. Despite a gross abuse of discretion in denying critical discovery in *Jampole,* the majority's only correction by mandamus would be to require inclusion of the disputed materials in *852 the record, to await a deferred and meaningless appellate review.

## V.

Instead of affording the relief that prior rulings demand,

the majority announces, after considerable mental gymnastics, that "at least three [discovery situations] come to mind" where mandamus is justified, at 843; then it strangely proceeds to describe six. The first three instances where remedy by appeal is inadequate stem from a trial court's wrongful allowance of discovery. First, mandamus will issue if "disclosure of privileged information ... will materially affect the rights of the aggrieved party." At 843. This requisite is easily fulfilled with discovery objections that include an assertion of privilege, the violation of which necessarily impinges on the objecting party's rights.

Second, mandamus will issue when a trial court orders the disclosure of "trade secrets without adequate protections to maintain the confidentiality of the information." At 843 (citing, without discussion, *Automatic Drilling Machs., Inc. v. Miller,* 515 S.W.2d 256 (Tex.1974, orig. proceeding)). Posing numerous problems, this hastily-drawn exception has no relevance to the instant case and was concocted by the majority without any briefing or argument by counsel. One privilege is thereby unjustifiably elevated above all others. Moreover, the writing implies an absolute protection of trade secrets from discovery when in fact this privilege is most definitely qualified, as recognized by *Automatic Drilling,* 515 S.W.2d at 259,[6] the rule itself, Tex.R.Civ.Evid. 507 (trade secrets not protected when nondisclosure conceals fraud or works injustice), and even Mr. Sales, whose writing purportedly warranted today's brash action.[7] Nor does this exception consider the availability in some cases of the interlocutory appeal mechanism provided in Tex.R.Civ.P. 76a(8) to address the adequacy of a protective order. *See Eli Lilly & Co. v. Marshall,* Order Granting Leave to File Petition for Writ of Mandamus (Doggett, J., dissenting), 829 S.W.2d 156 (Tex.1991).

The third situation requiring mandamus is an "order [that] compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." At 843. This "catch-all" exception indeed makes the extraordinary writ of mandamus an ordinary one. In almost any complex litigation, the claim of burden is essentially a form objection to discovery. It is difficult to perceive a dispute in which the party seeking to obstruct the process could not and, after today's decision, will not claim harassment or imposition of an undue burden. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992) (per curiam) (granting mandamus to preclude disclosure of corporate

tax returns on the basis of undue burden and unnecessary expense, not privilege).[8]

A fourth exception, based on *853 *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding), is described when the trial court imposes "discovery sanctions ... precluding a decision on the merits of a party's claims ... unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment." At 843 (emphasis deleted). The majority falsely suggests that today's standard creates a symmetry with *Transamerican.* Unlike *Transamerican,* which treated the striking of a petition in the same manner as the entry of a default judgment, this ruling creates a double standard. Unlike *Transamerican,* which involved a readily-perceptible wrong such as an order of dismissal, a determination of whether hidden documents "go to the heart of a party's case," at 843, involves significant uncertainties.

More importantly, *Transamerican* was issued at a time when the announced policy of this court was to deter abuses of discretion without regard to whether discovery was granted or denied. A wide spectrum of sanction orders arising from discovery rulings are immediately appealable. *See Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding). Superimposing *Transamerican* and *Braden* on today's double standard sends a clear message to the rare trial court that would impose significant penalties on those who obstruct discovery with deceit and delay—be careful. There is no real danger of immediate and genuine appellate examination of an order denying discovery, but there is a constant threat of appellate review of an order granting discovery or imposing meaningful sanctions on obstructionists. Once again the majority provides an incentive for concealment.

The remaining two situations address the wrongful denial of discovery, and constitute a narrow path in the woods compared to the expressway for resisting discovery constructed in the previous four exceptions. Mandamus is possible when

> the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error on the record

before it.

At 843–844. The quick fix of including materials in the appellate record is both ingenious and ingenuous. It has the immediate "benefit" of excluding a great number of errors in the discovery area from mandamus review. As the majority in fact recognizes, "this situation should only rarely arise." At 844.[9] And if it ever does, the majority guarantees that no relief will be forthcoming, by directing that the reviewing court

> carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.

At 844. Within these constraints, there will always be a readily available excuse to deny both discovery and mandamus.

In most cases the materials can be boxed up, file-stamped, and sent to the appellate court. How this will accomplish anything more than cluttering the judicial chambers is quite another matter. No clue is given as to how to resolve the obvious difficulties inherent in appellate determination, without any effective argument and analysis by counsel, of whether each item would have affected the result. Moreover, this approach improperly requires courts of appeals to act as juries while denying to the true fact-finder evidence that may be highly *854 relevant to the proceeding. This distrust of juries—of ordinary people resolving factual disputes—is increasingly reflected in the majority's decisions.[10]

The only hope for review of a trial court's order denying discovery is upon proof that a claim has been "vitiated or severely compromised by the trial court's discovery error." At 843. It must be shown "that the trial would be a waste of judicial resources," at 843, and that "a denial of discovery [goes] to the heart of a party's case." At 843. It is far from clear whether these encompass one or three different standards. What is clear is that few cases, if any, will satisfy whatever standard is applied.

The majority offers no example of a case in which a party has ever met such a heavy burden. Apparently an applicant for mandamus in this court must confess that, without the discovery sought, the trial court should and must direct a contrary verdict. Any semblance of a chance at prevailing prevents a determination that the trial would be a "waste of judicial resources" or that the discovery denied goes "to the heart of a party's case." While this

situation may theoretically arise in the future, it will be most unlikely. Nor is there any explanation of how a party can be expected to show such a probability without having any of the materials in question. We have previously recognized the hardship inherent in showing need for documents when their contents are unknown. *State v. Lowry,* 802 S.W.2d 669, 673 (Tex.1991) ("It is difficult for the [relators] to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

Application of today's font of mandamus law to the Walkers' situation is most revealing. The majority summarily concludes that the trial court's misapplication of the law to deprive them of relevant evidence "does [not] vitiate or severely compromise the Walkers' ability to present a viable claim." At 844. Most ironically, today's announcement imposes one type of double standard on top of another alleged double standard. The Walkers claim they have uncovered a double standard at a taxpayer-financed institution that encourages faculty to defend those accused of medical malpractice while discouraging professional advice on behalf of the alleged victim. It is the merits of this revelation that the majority so eagerly seals away from both the Walkers and the public.

Fully aware of the impact of expert credibility on the outcome of much medical malpractice litigation, the majority denies the Walkers the very information that could perhaps demonstrate the bias of a key witness. An official blessing is thus provided for trial court action that may have a material, adverse effect on their ability to present a viable case. Having now learned that the denial of impeachment evidence is never susceptible to mandamus, it remains to be seen what other critical information will next be similarly viewed as unimportant to this majority.

While the nature of the double standard approved by today's writing requires that this dissent focus on wrongful denials, I recognize that the wrong can be every bit as real from improper grants of discovery. As a practical matter there is probably less danger that a trial judge will capriciously ignore properly established objections and privileges to accord too much information instead of too little. Nevertheless, I favor the use of mandamus to control abuse without regard to how it occurs or whom is helped. What I deplore is the discrimination which the majority officially substitutes for even-handedness. Scholars viewing *855 the so-called "*Walker* mandamus standard" should recognize that it is

not a standard but an excuse for ignoring wrongdoing.

After today's decision, discovery disputes will no longer be resolved on a level playing field. I believe that mandamus should be available to correct any trial court abuse concerning a subject that is important to the jurisprudence of the state and which substantially affects rights of an aggrieved party. If this requisite is satisfied, relief should be accorded without regard to whether the trial court has granted or denied discovery.

## VI.

In supporting today's opinion, Justice Gonzalez insists that we must stem what he claims is an alarming increase in the number of mandamus filings. At 844–846 (Gonzalez, J., concurring). The view that "the sky is falling" is best reflected in the gruesome statistics and conclusions of his dissenting opinion in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991). *See also Jampole,* 673 S.W.2d at 578 (Barrow, J., dissenting); *cf.* C.L. Ray & M.R. Yogi McKelvey, *The Mandamus Explosion,* 28 S.Tex.L.Rev. 413, 413–14 (1987).

Blaming an ever-increasing caseload for the Texas courts on the advent of the discovery mandamus is wholly insupportable. These petitions most often present emergency situations requiring expedited review and, consequently, are frequently viewed as a thorn in the side of appellate courts. *See Review of Discovery Orders* at 1059 n. 99. But I cannot agree that justice should be denied or delayed solely to accommodate appellate judges.

Recent studies have debunked the myth of the mandamus explosion. The *Joachim* dissent, to which Justice Gonzalez once again points with pride today, is based upon an analysis that fails to segregate filings arising from discovery disputes. A more detailed study of Supreme Court experience during a period of more than ten years correctly concluded that:

> [I]nterlocutory review of discovery orders ... has [had] a positive effect.... The increase [in appellate caseloads] has been an extremely small and manageable one....

. . . . .

The numbers, then, suggest that while the availability

of interlocutory review of discovery orders added cases to the appellate docket, interlocutory review has not added a large or burdensome number of cases.

*Review of Discovery Orders* at 1047, 1059.

The fact is that most petitions are denied, with fewer than 3% granted by us during fiscal year 1991. Most of these were handled expeditiously, with over half resolved within one month of filing. Moreover, Justice Gonzalez completely ignored the fact that mandamus requests in this court actually decreased over the last three years. There were 202 of these in fiscal 1991, down from 257 and 258, respectively, in fiscal 1989 and 1990. Although the court's overall workload is expanding, the contribution of mandamus filings is certainly not uncontrollable.[11] "In deciding whether courts should permit interlocutory *856 review in specific cases, judges and commentators tend to emphasize the needs of court administration over the needs of the litigants." *Id.* at 1049. While cutting off the right to mandamus review when discovery is denied may reduce the appellate workload, the result will be a significant decline in the quality of justice. The inconvenience caused by the unexpected arrival of a petition that often demands immediate action is the price paid "to assure that ... trial proceedings are fair and equitable to *all* concerned parties.... '[W]e must not sacrifice justice upon the altar of expediency.'" *Mandamus Review of Disclosure Orders* at 422 (quoting David W. Holman & Byron C. Keeling, *Disclosure of Witnesses in Texas: The Evolution and Application of Rules 166b(6) and 215(5) of the Texas Rules of Civil Procedure,* 42 Baylor L.Rev. 405, 458 (1990)) (emphasis added).

## VII.

The majority announces here not a standard, but a pseudo-standard. In reality, the rule is little more than "how can we help those whom we want to help?" The only true precedent for this is *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991), where *Republican relators* in *redistricting* were accorded relief in the Supreme Court never sought in any other forum. This "triple R exception to mandamus," *id.* at 760–61 (Mauzy, J., dissenting), only presages the continued pursuit of this goal.

If doubts remain as to the one-sidedness of the standard announced today, its application to currently pending cases should resolve them. *See, e.g., Remington Arms Co. v. Canales,* No. D–1867, 35 Tex.S.Ct.J. 245 (Dec. 13, 1991) (trial court order which found documents relating to firearm safety relevant and required their production stayed despite no timely response or objection being made); *Eli Lilly & Co. v. Marshall,* No. D–1827, 35 Tex.S.Ct.J. 168, 354 (Dec. 3, 1991 and Jan. 23, 1992) (stays of trial court order directing production of information relating to the drug Prozac); *see id.* at 189 (Order Granting Leave to File Petition for Writ of Mandamus) (Doggett, J., dissenting); *Valley Baptist Medical Center v. Bennett,* No. D–1193, 34 Tex.S.Ct.J. 668 (June 18, 1991) (stay issued to protect hospital from disclosure of materials relating to policy of informing patients of risk of treatment), and 35 Tex.S.Ct.J. 452 (Feb. 12, 1992) (motion for leave to file granted). One interested in verifying the true meaning of the majority's carefully chosen words will do well to observe how the court actually disposes of each of these matters.

## VIII. CONCLUSION

In an apparent attempt to cope with a false "mandamus explosion," today's opinion has offered us an explosion of another type—a reverberating detonation of this court's prior rulings. True the majority has considerable experience in disregarding precedent as merely a lifeless thing of the past. *See Edgewood III,* 826 S.W.2d at 516, 517 (Doggett, J., dissenting); *Terrazas,* 829 S.W.2d at 739 (Mauzy, J., dissenting); *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting). But a dozen or more Texas Supreme Court authorities and even more rulings from the courts of appeals cut down at one time is not a modest accomplishment. Precedent, no matter how voluminous or how well-established, will clearly not restrain this majority from accomplishing its preconceived social policy objectives.

Through both deed and now word, the majority invites a true explosion in mandamus filings. What does an attorney whose client faces the possibility of a judgment for significant damages have to lose from accepting the beneficence of a majority of this court ever willing to serve as protector of the privileged? Will a deposition site other than that ordered by the trial court *857 be more costly and inconvenient to the claimant? Get a stay from the Texas Supreme Court, even if your petition is still pending in the court of appeals. *See Continental Can Co.*

*v. Wittig,* No. D–2015, 35 Tex.S.Ct.J. 355, 1992 WL 17415 (Jan. 29, 1992) (stay of trial court order directing engineering employee of products liability defendant to be deposed in Houston rather than Chicago even though mandamus petition was pending in court of appeals). Did the trial court resolve a conflict in deposition schedules in a manner unacceptable to an insurance company? Don't worry, the Texas Supreme Court will stay proceedings even without bothering to get a response from the affected judge. *See Cigna Corp. v. Spears,* No. D–2069, 35 Tex.S.Ct.J. 463 (Feb. 19, 1992). Any attorney whose client desires to make more difficult access to information that will jeopardize its credibility, suggest its liability or defeat its defenses would be foolish to accept a trial court discovery order. A majority of the Texas Supreme Court is ready and willing to interfere for the asking.

The ripple effect created by today's refusal to accord mandamus review to pretrial discovery orders will swell to tidal-wave proportion, and sweep before it any hope of fair and consistent application of our Texas discovery rules. In many cases it will leave buried in the sand any possibility of trials directed by the full and truthful revelation of the underlying facts. Juries will be forced to resolve critical disputes based not on truths but rather upon whatever half-truths can be discovered. Left in the wreckage on the beach will be the tattered remains of the many prior decisions of this court and others that viewed litigation as a search for truth in which fair and prompt appellate review of an order denying discovery was vital.

MAUZY, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

I dissent. Today's decision departs from previous instances where this court has provided mandamus relief to correct a wrongful denial of discovery, and labors too hard to conclude that appeal is an adequate remedy for a party who is denied adequate discovery.

I would hold that mandamus is available to correct a trial court error which negatively and materially affects the right of aggrieved parties to adequately present their cases, whether the particular party is seeking discovery or resisting it. *See Iley v. Hughes,* 158 Tex. 362, 368, 311 S.W.2d 648, 652 (1958); *see also* Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 SW.L.J. 1045 (1990). In the case before us, the trial court's denial of discovery has a material and adverse effect on the Walkers' ability to present their case. The information they seek could impugn the credibility of key expert witnesses at trial. Because their medical malpractice claim, like all such claims, will likely stand or fall on the credibility of the expert witnesses, I would hold that the Walkers are entitled to the information they seek, and that relief by appeal is inadequate.

Discovery is the "linchpin of the search for truth," and "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary." *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Today the court removes and disposes of that "linchpin" and abandons enforcement of fair and adequate discovery. Because I believe that mandamus relief should be readily available when a court allows *either* too much *or* too little discovery, I dissent.

**All Citations**

827 S.W.2d 833

## Footnotes

1    St. Paul contends that the Walkers' request for mandamus relief is barred by laches since the Walkers delayed almost two years before seeking to compel production. Because we find that the Walkers have failed to establish the requirements for mandamus relief, we do not reach this issue.

2    The court also sustained Aetna's motion to quash, holding that the discovery requested was improper under the investigation exemption, the attorney-client privilege, and the work-product privilege. The Walkers do not complain to us about this ruling.

3    Even if no evidence had been presented, the Walkers would have had the burden of filing an affidavit so stating. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988) ("The undisputed fact that no testimony was adduced at any of

the hearings, as set forth in the affidavit of relator's counsel, satisfies the relator's burden under Rule 121.").

The records sought in *Russell* included, among others:
(2) All appointment books maintained by [the expert physician] during 1969;
(3) All statements, listings, ledgers, or other books showing the accounts receivable of [the expert physician] during 1969;
(4) All deposit slips or tickets showing deposits into bank accounts of [the expert physician] during 1969;
(5) All statements, listings, ledgers, journals, or other books showing receipt of payments, either in cash, by check or by any other means [by the expert physician] during 1969;
(6) All statements of account or bills for services rendered [by the expert physician] during 1969;
(7) All accounting ledgers, journals or other books of account of [the expert physician] maintained during 1969; and
(8) All financial statements showing income and expenses of [the expert physician] during 1969.
452 S.W.2d at 435.

Evidence of bias is not admissible if the witness "unequivocally admits such bias or interest" at trial. Tex.R.Civ.Evid. 613(b). To date, however, Dr. Gilstrap has not admitted any bias, but rather has flatly denied it. In this situation, such evidence should be discoverable.

We do not decide whether the documents were properly discoverable, only that the trial court erred in denying discovery based solely on *Russell*. If the Walkers sought the documents solely to attack the credibility of Dr. Gilstrap by showing that his deposition testimony was untrue, for instance, the information would probably not be reasonably calculated to lead to the discovery of admissible evidence. *See* Tex.R.Civ.Evid. 608(b). ("Specific instances of the conduct of a witness [other than criminal convictions], for the purpose of attacking ... his credibility, may not be ... proved by extrinsic evidence.").

Additionally, this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction. *Cf.* Tex.Gov't Code § 22.001(a)(6); Tex.R.App.P. 140(b). This issue, however, is properly resolved in deciding whether to grant leave to file the petition, not in its disposition.

*See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991) (imposition of discovery sanctions); *Schultz v. Fifth Judicial District Court of Appeals,* 810 S.W.2d 738, 739 n. 4 (Tex.1991) (refusal to enforce turnover order by contempt); *Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (refusal to bar judicial officer from testifying as expert witness); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991) (refusal to grant nonsuit); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990) (refusal to dismiss for lack of subject-matter jurisdiction); *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (grant of new trial); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986) (imposition of discovery sanction); *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (grant of new trial); *Abor v. Black,* 695 S.W.2d 564, 566 (Tex.1985) (denial of plea in abatement); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984) (refusal to reinstate temporary injunction); *Pat Walker & Co. v. Johnson,* 623 S.W.2d 306, 309 (Tex.1981) (refusal to extend time for filing statement of facts); *State Bar of Texas v. Heard,* 603 S.W.2d 829, 833 (Tex.1980) (refusal to suspend attorney); *Pope v. Ferguson,* 445 S.W.2d 950, 953 (Tex.1969) (refusal to dismiss criminal case pending against relator), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (discovery order); *Iley v. Hughes,* 158 Tex. 362, 367–68, 311 S.W.2d 648, 652 (1958) (bifurcation of trial); *Harrell v. Thompson,* 140 Tex. 1, 1, 165 S.W.2d 81, 81 (1942) (restriction of oil and gas production by Railroad Commission); *Ben C. Jones & Co. v. Wheeler,* 121 Tex. 128, 130, 45 S.W.2d 957, 958 (1932) (refusal to enter judgment nunc pro tunc); *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (1926) (refusal to enter judgment); *Aycock v. Clark,* 94 Tex. 375, 376–77, 60 S.W. 665, 666 (1901) (refusal to enter injunction); *Screwmen's Benevolent Ass'n v. Benson,* 76 Tex. 552, 555, 13 S.W. 379, 380 (1890) (expulsion of member from charitable corporation).

We recently held that a mandamus action was never required to preserve error on appeal. *Pope v. Stephenson,* 787 S.W.2d 953 (Tex.1990). We explained: "The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal." *Id.* at 954.

Courts use a similar approach in determining whether a witness has properly invoked the Fifth Amendment privilege against self-incrimination. It is often impossible for a witness to prove that an answer might incriminate him without

actually answering and thereby forfeiting the privilege. Therefore, rather than requiring actual proof of the privilege, courts sustain the privilege if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer [might be incriminating]." *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

1 If the records have relevance apart from their potential for impeachment, however, *Russell* does not bar discovery. *See* *Ex Parte Shepperd,* 513 S.W.2d 813, 816 (Tex.1974).

1 Billie Holiday, *God Bless the Child* (Okeh Records 1941) (words and music by Arthur Herzog, Jr. & Billie Holiday).

2 These entities rarely need information to prevail:
> Even when an institutional litigant appears as a plaintiff suing an individual defendant as, for example, when a corporation sues an individual on a debt, the institutional litigant tends to already have the information needed to prove its case.
*Review of Discovery Orders* at 1070 n. 162. They are also less likely to require information from an opponent to establish affirmative defenses. *Id.* at 1070.

3 With no appellate opinions setting forth appropriate limitations upon trial court discretion, "litigants may receive widely divergent rulings from different judges, even in the same geographical location." *Id.* at 1077. Proper use of mandamus discourages forum shopping to obtain a trial judge more likely to provide a more favorable ruling and allows for greater consistency and accountability:
> [Such] review ... even[s] out inconsistencies in trial court rulings, and ... allows trial judges to operate with a more accurate understanding of the meaning of the discovery rules.... If the appellate court is consistent, it can fix disparities and inequities produced by the trial courts and promote consistency among the trial level decisionmakers.
*Id.* at 1047, 1077 (footnotes omitted).

4 Intermediate appellate courts have also recognized the importance of mandamus to avoid trial court abuse in improperly limiting or denying discovery. *See, e.g., Kentucky Fried Chicken Nat'l Mgmt. Co. v. Tennant,* 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (writ granted when discovery of plaintiff's psychiatric records denied); *Foster v. Heard,* 757 S.W.2d 464 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (mandamus issued against trial court's denial of discovery of post-accident investigation report); *Super Syndicate, Ltd. v. Salazar,* 762 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding) (granting mandamus against trial court's denial of discovery of claims investigator's files); *Goodspeed v. Street,* 747 S.W.2d 526 (Tex.App.—Fort Worth 1988, orig. proceeding) (trial court's denial of discovery of hospital records based on privilege without presentation of evidence overturned); *Estate of Gilbert v. Black,* 722 S.W.2d 548, 551 (Tex.App.—Austin 1987, orig. proceeding) (denial of discovery of insurer's internal communications overturned on mandamus, despite argument that "mandamus is proper only [for] improperly ordered discovery of privileged material, not when the trial court has denied discovery."); *Essex Crane Rental Corp. v. Kitzman,* 723 S.W.2d 241 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (writ granted to correct trial court's order quashing deposition); *Velasco v. Haberman,* 700 S.W.2d 729, 730 (Tex.App.—San Antonio 1985, orig. proceeding) (mandamus appropriate "not only where the trial court order improperly grants discovery, but the writ may also issue where the trial court improperly limits or denies discovery."); *Aztec Life Ins. Co. v. Dellana,* 667 S.W.2d 911 (Tex.App.—Austin 1984, orig. proceeding) (mandamus issued against trial court for denying discovery of claims files).

5 The majority identifies by name five cases in conflict with today's writing, declaring that: "We disapprove of *Barker* and *Allen,* and any other authorities," at 842, and "[we] disapprove of *Cleveland, Crane, Jampole,* and any other authorities," at 842, to the extent they conflict with the new *Walker* standard. Subsumed within the "other" designation are a great number of additional cases from this court and the courts of appeals that would grant to the Walkers relief when the trial court has clearly abused its discretion in denying discovery. The court's willingness to sweepingly erase whole unidentified categories of recent precedent is exemplified by their signing of a blank check: "any other authorities," meaning all other authorities, are now endangered.

6 The few cases citing *Automatic Drilling* do not expand its holding to that suggested by the court today. *See Jampole,* 673 S.W.2d at 574–75 ("We hold that discovery cannot be denied because of an asserted proprietary interest in the requested documents when a protective order would sufficiently preserve that interest."); *Firestone Photographs, Inc. v. Lamaster,* 567 S.W.2d 273, 278 (Tex.Civ.App.—Texarkana 1978, no writ) ("[T]he claim of trade secrets ... does not

necessarily defeat the right of discovery.").

7    James B. Sales, *Pretrial Discovery in Texas Under the Amended Rules: Analysis and Commentary*, 27 S.Tex.L.Rev. 305, 345–46 (1986), stating that:
> Trade secrets ... are not, per se, exempt from discovery. The trial court is obligated to weigh the need for discovery against the interests on secrecy.... The need to protect the confidentiality of documents does not constitute an absolute bar to discovery....

8    Although also citing *General Motors Corp. v. Lawrence*, 651 S.W.2d 732 (Tex.1983, orig. proceeding), as allowing mandamus relief from an allegedly burdensome trial court discovery order, the majority fails to note the very expansive discovery permitted in that case. The efforts of General Motors to limit discovery to results from tests performed on the particular type of truck and the particular type of impact involved in the subject incident were rejected, and it was directed to supply all impact test results for all types of trucks manufactured over a 23–year period.

9    If the trial court "refuses to make [the discovery] part of the record," At 843, presumably the only relief accorded under today's standard would be issuance of a writ directing inclusion of these materials.

10   *See Caller Times Publishing Co. v. Triad Communications*, 826 S.W.2d 576, 597–608 (Tex.1992) (Doggett, J., dissenting) (addressing court's refusal to allow evidence of predatory intent); *see also Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 596 & n. 1 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn*, 804 S.W.2d 463, 488 (Tex.1990) (Doggett, J., concurring and dissenting).

11

## Supreme Court Filings

| Year | Mandamus Discovery Orders | All Mandamus Filings | Total Mandamus and Applications for Writ | Discovery as Percentage of Total |
|------|------|------|------|------|
| 1979 | 24 | 129 | 933 | 2.6% |
| 1981 | 17 | 98 | 943 | 1.8% |
| 1989 | 51 | 257 | 1078 | 4.7% |
| 1991 | 64 | 202 | 1257 | 5.1% |

*Interlocutory Review of Discovery Orders* at 1058–59; the 1989 and 1991 figures are derived from my review of court filings.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

| Vernon's Texas Statutes and Codes Annotated |
| --- |
| Family Code (Refs & Annos) |
| Title 5. The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship (Refs & Annos) |
| Subtitle B. Suits Affecting the Parent-Child Relationship |
| Chapter 155. Continuing, Exclusive Jurisdiction; Transfer (Refs & Annos) |
| Subchapter C. Transfer of Continuing, Exclusive Jurisdiction (Refs & Annos) |

V.T.C.A., Family Code § 155.201

§ 155.201. Mandatory Transfer

Effective: June 18, 2005

Currentness

(a) On the filing of a motion showing that a suit for dissolution of the marriage of the child's parents has been filed in another court and requesting a transfer to that court, the court having continuing, exclusive jurisdiction of a suit affecting the parent-child relationship shall, within the time required by Section 155.204, transfer the proceedings to the court in which the dissolution of the marriage is pending. The motion must comply with the requirements of Section 155.204(a).

(b) If a suit to modify or a motion to enforce an order is filed in the court having continuing, exclusive jurisdiction of a suit, on the timely motion of a party the court shall, within the time required by Section 155. 204, transfer the proceeding to another county in this state if the child has resided in the other county for six months or longer.

(c) If a suit to modify or a motion to enforce an order is pending at the time a subsequent suit to modify or motion to enforce is filed, the court may transfer the proceeding as provided by Subsection (b) only if the court could have transferred the proceeding at the time the first motion or suit was filed.

**Credits**

Added by Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995. Amended by Acts 1999, 76th Leg., ch. 1135, § 1, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 916, § 14, eff. June 18, 2005.

Notes of Decisions (78)

V. T. C. A., Family Code § 155.201, TX FAMILY § 155.201

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.